**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CLARICE WHITMORE and HELGA MARIA SCHULZKI, on behalf of themselves and all others similarly situated, | No. |
| Plaintiffs, | CLASS ACTION COMPLAINT FOR: |
| v. | 1. FEDERAL RICO VIOLATIONS<br>2. DECLARATORY JUDGMENT |
| GUGGENHEIM PARTNERS, LLC, SECURITY BENEFIT LIFE INSURANCE COMPANY, GUGGENHEIM LIFE AND ANNUITY COMPANY, and EQUITRUST LIFE INSURANCE COMPANY, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

I.    INTRODUCTION ....................................................................................................1

II.   PARTIES AND RELATED ENTITIES ...............................................................11

     A.    Plaintiffs ..................................................................................................11

     B.    Defendants ..............................................................................................12

     C.    Related Entities ......................................................................................12

III.  JURISDICTION ...................................................................................................14

IV.  GENERAL ALLEGATIONS ...............................................................................15

     A.    The Insurance Company Model:  Short-Term Cash, Long-Term
         Obligations .............................................................................................15

     B.    The Guggenheim Insurers Are Subject to Statutory Accounting
         Requirements Designed to Protect Policyholders and Annuity Holders .............16

     C.    Relevant Statutory Accounting Principles .............................................20

         1.    General reporting under Statutory Accounting Principles. .......................20

         2.    The rules governing dealings with affiliated entities. ...............................21

         3.    The rules governing "admitted asset" treatment. ......................................27

     D.    The Conflict between the Insurance Company and the Private Equity
         Models .....................................................................................................28

     E.    By Acquiring the Guggenheim Insurers, Defendants Lay the Foundation
         to Exploit the Insurance Company Model to Reap Short-Term Profits ................31

     F.    Defendants' Fraudulent Scheme .............................................................34

         1.    The linchpin of the Scheme:  concealing liabilities through
             fraudulent "reinsurance" transactions. .......................................................35

         2.    The corrupted "reinsurer" entities:  Guggenheim Life, Paragon,
             and Heritage ...............................................................................................40

         3.    Defendants use "reinsurance" transactions and other accounting
             machinations to fraudulently misrepresent the financial condition
             of the Guggenheim Insurers. ......................................................................45

a.      Security Benefit Life has misrepresented its surplus. .....................45

        (1)      Security Benefit Life misstated its financial strength by falsely claiming reserve credits for liabilities ceded to Heritage, a concealed affiliated company. ..........47

        (2)      Security Benefit Life misstated its surplus by falsely claiming reserve credits for liabilities ceded to affiliated company Guggenheim Life. ..............49

        (3)      Security Benefit Life misstated surplus and statutory reserves by mischaracterizing and concealing Security Benefit Life's collateralized FHLB loans and the pledge of policyholder assets to the FHLB......................50

        (4)      Security Benefit Life has misstated surplus by concealing massive amounts of toxic assets. ....................57

        (5)      Security Benefit Life Summary .........................................58

b.      Guggenheim Life has misrepresented its surplus. .........................58

c.      EquiTrust Life has misrepresented its surplus. ..............................61

4.      Summary:  Defendants have engaged in a massive fraudulent swirl of deceptive non-economic reinsurance transactions designed to falsely present a positive surplus for the Guggenheim Insurers. ..............66

G.      Defendants Profit from the Fraud ........................................................................66

1.      Guggenheim extracted dividend payments from the Guggenheim Insurers when those insurers did not have the requisite surplus and profits to support paying dividends...........................................................66

2.      Guggenheim extracted outsized management fees from the Guggenheim Insurers. ................................................................................67

3.      Guggenheim extracted substantial "investment fees" from the Guggenheim Insurers without delivering corresponding value through *bona fide* investment services......................................................68

4.      Guggenheim extracted cash from the Guggenheim Insurers through the use of affiliate loans and promissory notes. ..........................69

5.      Guggenheim used Guggenheim Insurer funds in its highly-leveraged and speculative Dodgers acquisition, and then concealed it in the Guggenheim Insurers' financial statements...............................................70

6.      Guggenheim inappropriately loaned funds to other Guggenheim cronies. ...................................................................................72

7.      Concerns About Private Equity Have Been Realized. ..............................75

H.      The Fraudulent Scheme Has Accelerated in 2013 ..................................76

V.      RICO ALLEGATIONS ..................................................................................77

A.      Standing, Injury, and Proximate Cause ..................................................77

B.      The Alleged Associated-in-Fact RICO Enterprise ................................79

C.      Purpose ....................................................................................................80

D.      Relationships among Separate and Distinct Associates ........................81

E.      Continuous Existence ............................................................................84

F.      Interstate Commerce ..............................................................................85

G.      Pattern of Racketeering Activity ..........................................................85

H.      Predicate Acts ........................................................................................86

VI.     PLAINTIFFS' PURCHASE OF GUGGENHEIM INSURER'S ANNUITIES ...............91

A.      Plaintiff Whitmore ................................................................................91

B.      Plaintiff Schulzki ..................................................................................92

VII.    CLASS ALLEGATIONS ................................................................................94

VIII.   COUNTS ....................................................................................................97

COUNT ONE  (VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c)) ..........................97

COUNT TWO  (VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)) ..........................98

COUNT THREE  (DECLARATORY RELIEF) ................................................99

PRAYER FOR RELIEF ...........................................................................................99

JURY DEMAND ...................................................................................................100

010342-12  658147 V1

Plaintiffs Clarice Whitmore and Helga Maria Schulzki (collectively, "Plaintiffs"), by and through their attorneys, bring this Complaint against Defendants Guggenheim Partners, LLC ("Guggenheim"), Security Benefit Life Insurance Company ("Security Benefit Life"), Guggenheim Life and Annuity Company ("Guggenheim Life") and EquiTrust Life Insurance Company ("EquiTrust Life") (collectively, "Defendants"), on behalf of themselves and all other similarly situated persons who purchased annuity products issued by Security Benefit Life, Guggenheim Life and EquiTrust Life (collectively, "Guggenheim Insurers") on or after January 1, 2010. Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon the investigation made by and through their attorneys and expert consultants.

## I.    INTRODUCTION

1.    The goal of most private equity firms like Guggenheim is to maximize quick profits. Private equity firms focus on short-term profits, often accomplished through high-risk or aggressive investments.

2.    Life insurance companies receive cash in the form of policy payments while undertaking long-term obligations to policyholders and annuity holders under the life insurance and annuity contracts issued to them. Insurance companies must, therefore, take a conservative approach to investing the premium and annuity payments they receive, one in which safe investments generate sufficient returns to cover their obligations to policyholders and annuity holders. Insurance companies must not only make sure they have adequate reserves and capitalization to meet their current and long-term obligations, they must also ensure that their assets are sufficiently liquid in order to meet those obligations any time they become due.

3.    To safeguard policyholders and annuity holders and ensure that insurance companies honor their obligations to them, insurance companies are required to follow a unique

set of accounting rules called Statutory Accounting Principles ("SAP") and must also establish statutory reserves and certify that a company has assets sufficient to meet both current and future obligations.

4.     Rating agencies, the insurance industry, and regulators generally use two metrics by which to measure whether an insurance company is adequately capitalized to meet future policyholder and annuity holder obligations.  One test is whether the insurance company maintains an adequate surplus of assets against liabilities, including reserves for future policyholder and annuity holder obligations; the second is whether the insurance company's Risk-Based Capital" ratio is adequate to meet the company's obligations given its size and risk profile.  Both metrics reflect the conservative nature of insurance and the long-term liabilities insurance represents, and operates as a tripwire system to identify inadequately capitalized companies that lack a proper margin of safety for policyholders and annuity holders.

5.     For a combined 246 years, Security Benefit Life, EquiTrust Life and Guggenheim Life operated according to these principles.  They survived numerous economic downturns, wars, and periods of hardship by following the "tried and true" fundamentals of operating life and annuity insurance companies.  They stored up policyholder premiums and annuity payments as reserves and surplus for the long haul so that when claims, annuity payments or requests for withdrawals or surrenders came due, adequate assets were readily available to make those payments.  When they purchased reinsurance, it was mostly with outside, unaffiliated reinsurance companies that had their own capital and surplus to be used to actually spread the risk – which is the legitimate reason for reinsurance in the first place.

6.     This all changed when Guggenheim – a private equity firm – swooped in to exploit the insurance company model, acquiring insurance companies, raiding their cash and

leaving the long-term obligations of the policyholders and annuity holders unprotected. In the mere two years after taking control of Security Benefit Life, EquiTrust Life, and Guggenheim Life, Guggenheim ignored the fundamentals of operating an insurance company for the long-term security of the policyholders and annuity holders by extracting hundreds-of-millions of dollars from these companies, not only depleting their surplus but eroding their reserves, leaving them in a ***negative*** surplus condition – meaning assets are less than required reserves.

7. This case is about the fraud that Guggenheim and others working in association with it committed to sell Guggenheim Insurers' annuity products to unwitting annuity purchasers, many of whom are elderly, while concealing the adverse effects of their depletion of the funds needed to satisfy the Guggenheim Insurers' long-term obligations to these annuity purchasers.

8. Guggenheim's plan was pernicious: acquire insurance companies weakened by the recession and use them to sell seemingly safe and secure annuity products (particularly annuities with large, upfront premiums) while funneling cash out to Guggenheim and its affiliates, friends and associates rather than holding or reserving it to satisfy their long-term obligations to the annuity holders.

9. Between 2009 and 2012 Guggenheim purchased the three insurance companies – Guggenheim Life, Security Benefit Life and EquiTrust Life – and then, by emphasizing their purported financial strength and positive surplus condition, collected hundreds of millions of dollars in premium payments ("considerations") from the members of the proposed class:

| GLAC: | 2010 | 2012 | ONLY FIRST 9 MONTHS 2013 | ANNUALIZED 2013 |
|---|---|---|---|---|
| Annuity Considerations | $0 | $268,786,575 | $555,843,742 | 741,124,989 |



| SBL: | 2010 | 2012 | ONLY FIRST 9 MONTHS 2013 | ANNUALIZED 2013 |
|---|---|---|---|---|
| Annuity Considerations | $321,254,569 | $4,112,610,163 | $4,526,741,936 | 6,035,655,915 |
| All Other Premiums | $29,964,763 | $988,015,284 | $509,491,004 | 679,321,339 |
| | $351,219,332 | $5,100,625,447 | $5,036,232,940 | 6,714,977,253 |







| | 2010 | 2012 | ONLY FIRST 9 MONTHS 2013 | ANNUALIZED 2013 |
|---|---|---|---|---|
| **EQT:** | | | | |
| Annuity Considerations | $362,645,619 | $1,562,595,311 | $1,862,746,001 | $2,483,661,335 |

10.    The inevitable consequence of such dramatically increased sales of annuity products is, of course, dramatically increased long-term liabilities.  However, to access and deplete the Guggenheim Insurers' surplus while maintaining the illusion of adequate capitalization, Guggenheim operated its group of wholly-owned insurers as excessively interdependent and incestuous affiliates, reinsuring virtually all of their risks with one another rather than spreading the risks to legitimate reinsurance companies through arm's-length reinsurance treaties.  At the same time, instead of retaining premium revenue in reserve for future claims and annuity payments, the Guggenheim Insurers used the annuity holder funds to pay stockholder dividends to their Guggenheim parent and to loan billions of dollars more to a slew of Guggenheim affiliated companies.

11.    In addition to saddling the Guggenheim Insurers with the highly illiquid affiliated promissory notes and billions of dollars of highly illiquid mortgage and other risky asset-backed securities, Guggenheim Chief Executive Officer Mark R. Walter ("Walter"), Guggenheim President Todd L. Boehly ("Boehly") and Guggenheim business associate Robert "Bobby" Patton Jr. ("Patton") used the Guggenheim Insurers as a cash machine to buy the most expensive

- 5 -

sports franchise in world history, the Los Angeles Dodgers ("the Dodgers"), with over a billion dollars in policyholders' funds.

12.     To gain access to the large sums of money generated by annuity sales and to keep selling these products and generating more cash, Defendants concealed the true financial impact of the increased liabilities that went along with those sales and the true financial condition of the Guggenheim Insurers.  Defendants simultaneously concealed the Guggenheim Insurers' liabilities and inflated the companies' assets to falsely report adequate surplus to distribute cash to Guggenheim and its affiliates and business associates.

13.     To accomplish their illicit goals Defendants took a page out of the Enron playbook, creating a fraudulent scheme through complicated accounting machinations that gave the false appearance of financial strength and stability to Security Benefit Life, Guggenheim Life and EquiTrust Life by:  (1) moving liabilities off their books to affiliated and secretly affiliated entities (primarily through non-economic "reinsurance" transactions with affiliated entities), (2) inflating their assets by counting already encumbered assets as though they were available to make annuity holder payments, (3) executing billions of dollars of what appear to be essentially uncollateralized loans to affiliated entities or associates and portraying the related-party unsecured paper as assets, and (4) hiding their non-performing assets.

14.     At the center of this scheme was a shell game that Defendants hoped no one could follow, where money and liabilities were continuously shifted between companies with whom the Guggenheim Insurers acknowledged an affiliation (Security Benefit Life, Guggenheim Life, EquiTrust Life and Paragon Life Insurance Company of Indiana ("Paragon")) and with a separate, secretly affiliated company that Defendants acquired and corrupted to facilitate the fraudulent scheme, Heritage Life Insurance Company (AZ) ("Heritage").

15.    Defendants used Paragon (formed by Guggenheim in 2011) and Heritage (bought in 2012 by Patton) as vehicles to remove dump massive liabilities from the books of Security Benefit Life, Guggenheim Life, and EquiTrust Life, through illegitimate, non-arm's length "reinsurance" transactions among affiliates.

16.    Paragon and Heritage were both essentially shell entities, selling no life or annuity products of their own.  Instead, they both were improperly used by Defendants to bury massive liabilities transferred from Security Benefit Life, Guggenheim Life, and EquiTrust Life in order to materially alter the Guggenheim Insurers' represented asset/liability and Risk-Based Capital ratios and give them the false appearance of sufficient positive surplus and financial strength.

17.    The fraudulent movement of current liabilities around and among the disclosed and concealed Guggenheim affiliated entities as of December 31, 2012, is described in detail below and summarized by the following diagram:



18.    At the same time Defendants were hiding the Guggenheim Insurers' liabilities, Defendants were also inflating their assets by additional fraudulent accounting machinations.

19.     For example, collectively the three Guggenheim Insurers improperly counted as "admitted assets" over $2.59 billion of collateral that was already pledged to repay loans to the Federal Home Loan Banks.

20.     The Guggenheim Insurers also reported at the full value (*i.e.*, at their original cost) huge amounts of toxic assets (mostly mortgage backed securities) rather than at their realizable value, thus grossly overstating the worth of these assets.

21.     Even worse, however, the Guggenheim Insurers spent over $5.1 billion to acquire affiliated debt instruments from holding companies in the Guggenheim family of companies, often appearing to receive no collateral beyond a written promise by the affiliated holding companies to pay back those billions.  The Guggenheim Insurers nevertheless booked these uncollateralized IOUs as true assets at par value on their financial statements, again fraudulently misrepresenting their solvency to enable them to channel money to their Guggenheim parent companies.

22.     Indeed, between the years 2010 and 2012 the affiliated transactions of the Guggenheim Insurers and Paragon alone amounted to over $10.319 billion – dwarfing the reported surplus of these companies each year and graphically demonstrating their deceptive misrepresentation of a stable financial condition:

|  | Affiliated Reinsurance & Affiliated Paper | Reported Surplus |
|---|---|---|
| SBL: | $3,849,231,483 | $766,966,609 |
| EQT: | $2,370,120,980 | $706,968,965 |
| GLAC: | $3,948,444,014 | $487,529,302 |
| Paragon: | $151,579,689 | $65,553,524 |
|  | $10,319,376,166 | $2,027,018,400 |
|  |  |  |
|  | 509% | of surplus |

010342-12  658147 V1

23.     In sum, after their acquisition by Guggenheim each of the Guggenheim Insurers was in short order rendered statutorily impaired, each having an essentially negative surplus (which means annuity holder funds were consequently impaired).

24.     Defendants' fraudulent scheme meanwhile allowed Guggenheim to generate and take cash out of the insurance companies, leaving behind companies in hazardous financial condition and putting their annuity holders at risk.  Indeed, while the true surplus of each of these companies plunged further and further, Defendants continued to funnel the cash extracted from its scheme to Guggenheim, its affiliates, and its associates.

25.     Flush with their annuity holders' cash, for example, Security Benefit Life and EquiTrust Life paid over $445 million in dividends to their respective Guggenheim parents, over $217 million in management fees to Guggenheim affiliates, and over $55 million in investment fees to Guggenheim affiliates.  Additionally, beyond the $5.1 billion the Guggenheim Insurers paid to various affiliates within the Guggenheim family of companies in what appears to be largely unsecured promissory notes, they loaned almost $1 billion to Guggenheim business associates.  Perhaps the most perverse aspect of Defendants' fraudulent scheme, however, is the acquisition of the Dodgers by Guggenheim, Walter, Boehly and Patton for $2.15 billion – $1.2 billion of which was financed by policyholder and annuity holder money from the Guggenheim Insurers.

26.     Given the Guggenheim Insurers' true financial condition, none of the cash distributed to Guggenheim, its affiliates or its associates should have left the insurance companies.  The cash raid on the Guggenheim Insurers has left the annuity holders with annuities worth far less than the premium dollars they paid and has exposed them to wholly undisclosed and ever-increasing risks as Defendants continue to sell overpriced annuities to unwitting

purchasers, particularly to elderly who make up some 50% of all annuity purchasers and are least able to tolerate the risk of losing their life and retirement savings.

27.     At all relevant times, but for Defendants' illicit accounting machinations each of the Guggenheim Insurers had a negative surplus.  Simply put, that means that assets reserved for the performance of the Guggenheim Insurers' long-term obligations to their annuity holders have been severely impaired.  A negative surplus condition means that the true value of admitted assets backing the Guggenheim Insurers' ability to perform their obligations to Plaintiffs and their other similarly situated annuity purchasers is significantly lower than their immediate and future obligations to those purchasers.

28.     Plaintiffs and the other members of the proposed Class suffered concrete damages on the date they purchased their annuities from Security Benefit Life, EquiTrust Life or Guggenheim Life.  As a direct result of the unlawful practices alleged herein, Plaintiffs and the Class members purchased one or more annuities that were worth far less than the premiums paid; each of them incurred an immediate, measurable financial loss on the purchase date equal to the difference between the premiums paid and the diminished value attributable to the Guggenheim Insurers' undisclosed adverse financial condition and default risk of the Guggenheim Insurers. In addition, to the extent that Plaintiffs and other Class members surrender their annuities before expiration of the pertinent surrender charge period, they have sustained additional concrete damages in the form of a surrender charge.  For example, Plaintiff Whitmore incurred a surrender charge of $4,778.34.

29.     Defendants have thus, through a scheme that began as early as January 1, 2010, and continues through the present day ("the Class Period"), fraudulently duped Plaintiffs and the Class into buying annuity products based on false assurances of safety and financial strength.

Plaintiffs and the Class would not have purchased their annuities had they known the true financial condition of Security Benefit Life, EquiTrust Life and Guggenheim Life, purchasing annuity products that are far riskier and thus worth far less at the date of acquisition than comparable products issued by financially sound issuers.

30.     Defendants' fraudulent scheme constitutes a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d).  Plaintiffs and the Class have been damaged by Defendants' pattern of racketeering activity because they were misled into purchasing annuities based on material misrepresentations of the financial strength of the issuing companies, annuity products that no reasonable person would purchase if not deceived. This suit is necessary to remedy the injury caused by Defendants' racketeering activity.

## II.     PARTIES AND RELATED ENTITIES

### A.     Plaintiffs

31.     Plaintiff Clarice Whitmore is, and at all times mentioned herein was, a resident and citizen of the State of Arkansas.  As discussed in greater detail below in Section V, in June 2012 Plaintiff Whitmore purchased an Security Benefit Life Total Value annuity based on Security Benefit Life's express and implied representations of Security Benefit Life's positive surplus and financial stability, and would not have done so had she known Security Benefit Life's true financial condition.

32.     Plaintiff Helga Schulzki is, and at all times mentioned herein was, a resident and citizen of the State of California.  As discussed in greater detail below in Section V, in April 2013 Plaintiff Schulzki purchased an EquiTrust Life single premium fixed and equity index deferred annuity based on EquiTrust Life's express and implied representations of EquiTrust Life's positive surplus and financial stability, and would not have done so had she known EquiTrust Life's true financial condition.

- 11 -

33.     Plaintiffs each have standing to represent annuity purchasers from the other Guggenheim Insurers during the Class Period because of the intertwined nature of the Guggenheim holding company system and the fact that the Defendants essentially functioned as a single RICO enterprise.

**B.      Defendants**

34.     Defendant Guggenheim Partners, LLC ("Guggenheim") is a New York limited liability corporation, with its headquarters in Chicago, Illinois and New York, New York.

35.     Defendant Security Benefit Life Insurance Company ("Security Benefit Life") is a Kansas company domiciled in Kansas.  Security Benefit Life sold its annuity products in Illinois and elsewhere during the Class Period.

36.     Defendant Guggenheim Life and Annuity Company ("Guggenheim Life") is a Delaware company domiciled in Delaware.  Guggenheim Life sold its annuity products in Illinois and elsewhere during the Class Period.

37.     Defendant EquiTrust Life Insurance Company ("EquiTrust Life") is an Iowa company domiciled in Iowa.  EquiTrust Life sold its annuity products in Illinois and elsewhere during the Class Period.

**C.      Related Entities**

38.     Mark Walter ("Walter") was at all relevant time Guggenheim's CEO.  Walter is currently Chairman and controlling owner of the Dodgers.  Walter is also a trustee or director of several organizations including the parent holding companies for Security Benefit Life and EquiTrust Life.

39.     Todd Boehly ("Boehly") was at all relevant times Guggenheim's President.

40.     Robert "Bobby" Patton Jr. ("Patton") was at all relevant times a Guggenheim client and associate of Walter and Boehly.

41.     Paragon Life Insurance Company of Indiana ("Paragon") is an Indiana company domiciled in Indiana.  Paragon sold no annuity products during the Class Period; since being formed by Guggenheim in January 2012, Paragon has instead assumed approximately $1.12 billion in current liabilities through reinsurance agreements with Guggenheim Life.

42.     The corporate relationship of Guggenheim and its foregoing subsidiaries (omitting wholly owned intermediary companies) is as follows:



43.     Heritage Life Insurance Company (AZ) ("Heritage") is an Arizona company domiciled in Arizona, with its "Main Administrative Office" reportedly at 401 Pennsylvania Parkway, Suite 300, Indianapolis, Indiana.

44.     Heritage is not a subsidiary of Guggenheim.  Heritage, like Paragon, sold no annuity products during the Class Period; it has instead assumed approximately $2.9 billion in current liabilities through reinsurance agreements with Security Benefit Life and EquiTrust Life.

45.     As shown below, despite Heritage's separate ownership, Guggenheim is affiliated not only with Security Benefit Life, Guggenheim Life, EquiTrust Life, and Paragon, but also with Heritage; by the same token, despite Heritage's separate ownership, Security Benefit Life,

- 13 -

Guggenheim Life and EquiTrust Life are likewise affiliated with Guggenheim, Heritage and Paragon, and with one another.

## III.    JURISDICTION

46.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

47.    This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. § 1965(a), (b) and (d).  Guggenheim and the Guggenheim Insurers reside in, are found in, have agents in and transact their affairs in Illinois.  Guggenheim on its website declares its headquarters to be in Chicago, Illinois.[1]  Guggenheim operates in a computer-dominant environment, with all major information systems administration and data storage being performed at a Guggenheim data center located in Chicago, Illinois.  As reported in their Schedule T filed with the National Association of Insurance Commissioners ("NAIC"), the Guggenheim Insurers have in 2011 and 2012 generated in close to $400 million in annuity sales in Illinois:

| Company | 2012 | 2011 |
| --- | --- | --- |
| Security Benefit Life | $195,368,548 | $75,172,020 |
| Guggenheim Life | $19,648,989 | $929,299 |
| EquiTrust Life | $82,170,313 | $25,439,885 |

Moreover, all Defendants are associates in and have participated in a fraudulent enterprise designed to market, promote, distribute, and sell the Guggenheim Insurers' annuity products in Illinois during the Class Period, such that the "ends of justice" support the exercise of personal jurisdiction over them by this Court.

---

[1] http://guggenheimpartners.com/contact.

48.     Defendants' contacts with the United States as a whole satisfy the "minimum contacts" test of *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), such that the exercise of jurisdiction over them is consistent with constitutional due process protections.

49.     Venue is proper in this District pursuant to 18 U.S.C. § 1965(a) and (b), as Guggenheim and the Guggenheim Insurers reside in, are found in, have agents in and transact their affairs in Illinois.

50.     Venue in this District is alternatively appropriate under 28 U.S.C. § 1391, because Guggenheim and the Guggenheim Insurers, as corporations, are deemed to reside in any judicial district in which they are subject to personal jurisdiction, and because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## IV.     GENERAL ALLEGATIONS

### A.     The Insurance Company Model:  Short-Term Cash, Long-Term Obligations

51.     Insurance companies, especially life and annuity companies, by their nature receive very substantial cash funds in the form of initial premiums collected from customers at the inception of the underlying life insurance or annuity policies.  Insurance companies provide products that are unique financial obligations of long-term duration.  Policyholders and annuity holders thus pay premiums for what is essentially a long-term promise of performance by the insurer.

52.     In particular, an annuity is a contract in which, in exchange for the payment of a premium by the annuity owner, an insurance company agrees to make a payment or a series of payments to the annuitant or beneficiary in the future.  The value of the annuity to a purchaser is thus the present value of the projected future stream of payments, discounted to reflect, among other things, the risk of non-payment by the insurance company.

53. Annuity products are aggressively marketed to seniors, as a way to convert their assets into a stream of future payments guaranteed for a period certain or as long as they live.

54. For the insurer, the sale of annuity products creates immediate revenues through premium receipts, but also current obligations (including payment of agent commissions) and long-term liabilities based on the insurer's future performance obligations.

55. After payment of commissions, traditional insurers invest the premium revenues in conservative investments designed to ensure the insurers' ability to meet the current, intermediate and long-term obligations to their annuity holders.

56. Insurance laws, practices, procedures, and regulatory oversight are designed to protect the policyholder and annuity holder by ensuring that the insurance company holds sufficient assets to meet its current, intermediate and long-term obligations to them.

**B.     The Guggenheim Insurers Are Subject to Statutory Accounting Requirements Designed to Protect Policyholders and Annuity Holders**

57. The National Association of Insurance Commissioners ("NAIC") is the U.S. standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia, and five U.S. territories.  Through the NAIC, state insurance regulators establish standards and best practices, conduct peer review, and coordinate their regulatory oversight.  NAIC staff supports these efforts and represents the collective views of state regulators domestically and internationally.  NAIC members, together with the central resources of the NAIC, form the national system of state-based annuity and insurance regulation in the United States.

010342-12  658147 V1

58.     Among the goals included in NAIC's mission statement is to "[p]rotect the public interest" and to "[p]romote the reliability, solvency and financial solidity of insurance institutions."[2]

59.     As insurance companies, the Guggenheim Insurers are subject to regulation not only by the laws of their state of domicile, but to the state laws and regulations governing the sale of insurance in every state in which they are licensed to do business.

60.     Thus, as insurance companies, the Guggenheim Insurers are required each year to prepare and file with their insurance regulators a sworn Annual Statement based on the convention blank form adopted by the NAIC.

61.     The Annual Statement is a detailed statement of an insurance company's finances that must be prepared according to SAP set forth in the NAIC Accounting Practices and Procedures Manual ("AP&P Manual") and NAIC Annual Statement Instructions to the extent they are not in conflict with applicable state statutes and/or regulations.  Quarterly Statements using SAP are also prepared using the same accounting methodology but contain less detail than the Annual Statement.

62.     The fundamentals of statutory accounting for insurance companies are unique and differ from other financial accounting methods because the focus is on solvency for the protection of policyholders.  This is because insurance contracts, especially annuities, involve a promise to pay which extends years (often decades) into the future.

63.     A basic tenet of statutory accounting for insurance companies is conservatism in valuation and accounting to protect policyholders and annuity holders:  "Conservative valuation procedures provide protection to policyholders against adverse fluctuations in financial condition

---

[2] NAIC website, at http://www.naic.org/index_about.htm.

or operating results. Statutory accounting should be reasonably conservative over the span of economic cycles and in recognition of the primary responsibility to regulate for financial solvency." AP&P Manual, ¶ 30. This emphasis in statutory accounting to determine an insurer's ability to satisfy its obligations to policyholders and annuity holders due years in the future is much different than other financial accounting methods.

64.     An insurance company's solvency is determined by the surplus the insurance company reports in its Quarterly and Annual Statements. Surplus is derived by comparing the company's admitted assets to all of its liabilities, including its current and projected future obligations to policyholders and annuity holders.

65.     Importantly, an insurance company is prohibited from reporting as "Admitted" assets that are unavailable due to encumbrances or other third-party interests to calculate surplus; such assets are considered "Nonadmitted" and accorded limited or no value in statutory reporting. *See* AP&P Manual, SSAP No. 4.

66.     In addition, even though an insurer may be part of a holding company system, the solvency of each insurance company is determined solely by that company's finances independent of the finances of any other affiliated company within the holding company system.

67.     The following example of a simplified balance sheet demonstrates how surplus is calculated:

| Admitted Assets | | | Liabilities | |
|---|---|---|---|---|
| Bonds | $13 Billion | | All Reserves | $14 Billion |
| Stock | $ 1 Billion | | Expenses Due | $2 Billion |
| Cash | $ 1 Billion | | Debt | $ 0 |
| All Other | $2 Billion | | | |
| **Total Admitted Assets** | **$17 Billion** | | **Total Liabilities** | **$16 Billion** |
| | | | | |
| | | **Surplus = $1 Billion** | | |

68.     If an insurance company's statutory surplus falls below a certain minimum dollar or Risk-Based Capital amount, or to zero or even negative, then the company is in "hazardous financial condition" and state laws and regulations require disclosure and immediate intervention by regulators to protect policyholders and annuity holders.

69.     If an insurance company's statutory surplus falls below minimum levels of capital and surplus, the insurance company is not permitted to pay dividends.

70.     Accurate Annual Statement reporting is critically important, because the Annual Statement is made available to the public so that consumers, agents, and other professionals can develop an assessment of the company's financial strength and ability to pay future claims as they come due.

71.     An insurance company's Annual Statement and statutory surplus is also the key variable in the financial strength rating assigned by A.M. Best, a rating agency that historically focuses on the insurance industry, as well as other rating agencies.

72.     For example, A.M. Best issues financial strength ratings that provide an opinion of an insurer's financial strength and ability to meet its ongoing obligations to policyholders and annuity holders.  The financial strength rating is based on the surplus and other data the insurance company reports in its Annual Statement "since it is the foundation for policyholder security."  A.M. Best Methodology, Criteria – Insurance, May 2, 2012, at page 1.

73.     As A.M. Best explains on its website, a financial strength rating is important because insurance agents and professionals depend on it "to assess the creditworthiness of an insurer's operations, to evaluate prospective reinsurance accounts, to compare company performance and financial condition," and a "rating can influence an agent's selection of plans to market."  Moreover, "[a] rating also is an important factor in the consumer's decision-making

process to purchase insurance," and it "can provide consumers with the information necessary for an educated buying decision."[3]

## C.  Relevant Statutory Accounting Principles

### 1.  General reporting under Statutory Accounting Principles.

74.  The NAIC Accounting Practices and Procedures Manual provides the Rules of Statutory Accounting for Insurance Companies.  All fifty states require the adoption of this manual and the Annual Statement Instructions.

75.  The NAIC proscribes a set of accounting regulations called Statutory Accounting Principles that govern the preparation of an insuring firm's financial statements.  The SAPs represent the top level of requirements in the statutory hierarchy of accounting requirements and are codified in the AP&P Manual.  With minor state-by-state variations, the SAPs form the basis for state regulation of insurance company solvency throughout the United States.

**76.**  The SAP Preamble:  Scope of Project states:

> The conceptual framework used in developing and maintaining statutory accounting principles for insurance companies is summarized in the Statutory Accounting Principles Statement of Concepts.  The application of ***conservatism, consistency and*** recognition assure that guidance developed and codified as part of this project is consistent with the underlying objectives of statutory accounting.

(Emphasis added.)

77.  The SAP Preamble:  Objectives of Statutory Financial Reporting states:

> The primary responsibility of each state insurance department is to regulate insurance companies in accordance with state laws with an emphasis on solvency ***for the protection of the policyholders***. The ultimate objective of solvency regulation is to ensure that the policyholder, contract holder and other legal obligations are met when they come due and ***that the companies maintain capital and***

---

[3] http://www.ambest.com/ratings/guide.asp.

*surplus at all times and in* such *forms as required by statute to provide an adequate margin of safety*.  The cornerstone of solvency is financial reporting.

\*\*\*

Statutory reporting applies to all insurers authorized to do business in the United States and its territories, and *requires sufficient information to meet the statutory objectives.*  However, statutory reporting as contained in this guide is not intended to preempt state legislative and regulatory authority.  The SAP financial statements include the balance sheet and related summary of operations, changes in capital and surplus, and cash flow statements.  Because these basic financial statements cannot be expected to provide all the information necessary to evaluate an entity's short-term and long-term stability, *management must supplement the financial statements with sufficient disclosures* (e.g., notes to the financial statements, management's discussion and analysis, and supplementary schedules and exhibits) to assist financial statement users in evaluating the information provided.

(Emphasis added.)

78.     The SAP Preamble:  Conclusion states in pertinent part:

Application of SAP, either contained in the SSARs or defined as GAAP and adopted by NAIC, to unique circumstances or individual transactions should be consistent with the concepts of *conservatism, consistency, and recognition*.

(Emphasis added.)

**2.     The rules governing dealings with affiliated entities.**

79.     Historically, regulators had all too often seen insurance policyholder and annuity

holder funds siphoned off by for-profit holding companies for use by their non-insurer affiliates.

So they developed and implemented rules relating to transactions among affiliated entities.

80.     SSAP No. 25 governs accounting for transactions with affiliates and other related

parties.  SSAP No. 25 in pertinent part provides:

[1] Related party transactions are subject to abuse because reporting entities may be induced to enter transactions that may not reflect economic realities or may not be fair and reasonable to the

- 21 -

reporting entity or its policyholders.  As such, related party transactions require specialized accounting rules and increased regulatory scrutiny.  This statement establishes statutory accounting principles and disclosure requirements for related party transactions.

***

[7] Loans or advances (including debt, public or private) made by a reporting entity to its parent or principal owner shall be admitted if approval for the transaction has been obtained from the domiciliary commissioner **and** the loan or advance is determined to be collectible based on the parent or principal owner's ***independent payment ability***.  An affiliate's ability to pay shall be determined after consideration of the liquid assets or revenues available from ***external sources*** (i.e., determination shall not include dividend paying ability of the subsidiary making the loan or advance) which are available to repay the balance and/or maintain its account on a current basis.  Evaluation of the collectability of loans or advances shall be made periodically.  If, in accordance with *SSAP No. 5R – Liabilities, contingencies and Impairments of Assets – Revised* (SSAP No. 5R), it is probable the balance is uncollectible, any uncollectible receivable shall be written off and charged to income in the period the determination is made.

***

[8] ***Loans or advances by a reporting entity to all other related parties shall be evaluated by management and nonadmitted if they do not constitute arm's – length transactions as defined in paragraph 11.***  Loans or advances made by a reporting entity to related parties (other than its parent or principal owner) that are economic transactions as defined in paragraph 11 shall be admitted.

***

[11] An arm's-length transaction is defined as a transaction in which willing parties, each being reasonably aware of all relevant facts and neither under compulsion to buy, sell, or loan, would be willing to participate.  A transaction between related parties involving the exchange of assets or liabilities shall be designated as either an economic transaction or non-economic transaction.  An economic transaction is defined as an arm's-length transaction which results in the transfer of the risks and rewards of ownership and represents a consummated act thereof, i.e., "permanence."  The appearance of permanence is also an important criterion in

- 22 -

assessing the economic substance of a transaction. In order for a transaction to have economic substance and thus warrant revenue (loss) recognition, it must appear unlikely to be reversed. If subsequent events or transactions reverse the effect of an earlier transaction prior to the issuance of the financial statements, the reversal shall be considered in determining whether economic substance existed in the case of the original transaction. *** An economic transaction must represent a bona fide business purpose demonstrable in measurable terms. *A transaction which results in the mere inflation of surplus without any other demonstrable and measurable betterment is not an economic transaction. The statutory accounting shall follow the substance, not the form of the transaction.*

***

[12] In determining whether there has been a transfer of the risks and rewards of ownership in the transfer of assets or liabilities between related parties, the following – and any other relevant facts and circumstances related to the transaction – shall be considered:

> [a] Whether the seller has a continuing involvement in the transaction or in the financial interest transferred, such as through the exercise of managerial authority to a degree usually associated with ownership;

***

[14] A non-economic transaction is defined as any transaction that does not meet the criteria of an economic transaction. Similar to the situation described in paragraph 13, transfers of assets from a parent reporting entity to a subsidiary, controlled or affiliated entity shall be treated as a non-economic transactions at the parent reporting level because the parent has continuing indirect involvement in the assets.

***

[15] When accounting for a specific transaction, reporting entities shall use the following valuation method:

> [a] Economic transactions between related parties shall be recorded at fair value at the date of the transaction. To the extent that the related parties are affiliates under common control, the controlling reporting entity shall defer the effects of such transactions that result in gains or increases in surplus (*see* paragraph 13);

- 23 -

[b] Non-economic transactions between reporting entities, which meet the definitions of related parties above, shall be recorded at the lower of existing book values or fair values at the date of the transaction;

[c] Non-economic transactions between a reporting entity and an entity that has no significant ongoing operations other than to hold assets that are primarily for the direct or indirect benefit or use of the reporting entity or its affiliates, shall be recorded at the fair value at the date of the transaction; however, to the extent that the transaction results in a gain, that gain shall be deferred until such time as permanence can be verified;

[d] Transactions which are designed to avoid statutory accounting practices shall be reported as if the reporting entity continued to own the assets or to be obligated for a liability directly instead of through a subsidiary.

SAP 25 ¶¶ 1, 7, 8, 11, 12, 14 & 15 (emphasis added).

81.    Efforts to detect and prevent affiliated transaction abuses have also lead regulators in all 50 states to adopt the NAIC Model Holding Company Act.  The primary objective of the NAIC Model Holding Company Act is ensuring that insurance companies' transactions with their affiliates are "fair and reasonable" and done at "arms-length."

82.    The NAIC itself places particular emphasis on recognizing the dangers of affiliated transactions.  Its Examiner's Handbook states:

**2.    Review of affiliated transactions.**

There are two broad categories of affiliated transactions:

a.    Transactions having implications as to potentially misleading presentation of the annual statement. Such transactions frequently have involved questionable dealings, including management fraud. This type of affiliated transactions occurs infrequently but constitutes a very difficult area.

b.    Transactions occurring in the ordinary course of business are considered affiliated transactions only because of an existing relationship between the transacting parties.

- 24 -

This section provides guidance for identifying and examining affiliated transactions.

Generally, examiners are more concerned with detecting and disclosing those affiliated transactions in the first category than with those affiliated transactions that are transacted in the ordinary course of business.  Even though the greatest exposure is focused on only a relatively few affiliated transactions, procedures are performed to encompass the broad definitions of affiliates and affiliated transactions.

a.     Affiliates Defined

Affiliates exist when there is a relationship that offers the potential for self-dealing, transactions at less than arm's length, favorable treatment, *or the ability to direct the outcome of events differently from what might result in the absence of that relationship*.

***

NAIC Financial Condition Examiner's Handbook, at Section IV(A)(4), page 1-48 (emphasis added).

83.     Full disclosure requires that management disclose all material transactions with affiliates affiliated not merely based on percentage of shares held, but all parties with the ability to "significantly influence" one another.  The NAIC Examiner's Handbook provides:

An affiliate also includes any other person with which the reporting entity may deal *if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests*.  *A third person is also affiliated if it can significantly influence the management or operating policies of the transacting parties* or if it has an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests.

NAIC Financial Condition Examiner's Handbook, at Section IV(A)(4)(a), page 1-48 (emphasis added).

84.     The NAIC specifically defines "affiliated transactions" as follows:

- 25 -

An affiliated transaction is any direct or indirect transaction between the reporting entity and an affiliate. Affiliated transactions include transactions between:

(1)     A parent company and its subsidiaries;

(2)     Subsidiaries of a common parent; and

(3)     The reporting entity and:

- Other affiliated business

- Management (including directors)

- Principal owners

- Pension and profit-sharing trusts managed by or under the trusteeship of management

- Other parties having the ability to exert significant influence

NAIC Financial Condition Examiner's Handbook, at Section IV(A)(4), pages 1-48 & 1-49.

85.     Finally, the NAIC Examiner's Handbook specifically recognizes the potential abuses that can result from holding company or affiliated relationships:

(1)     Misuse of insurance company assets through:

i.     Shifting assets (particularly securities) from one affiliate to another for window-dressing purposes during examinations or at the financial statement date;

ii.     Making unsecured loans or advances to affiliates;

(2)     Siphoning of insurance company funds through:

i.     Dividends;

ii.     Management of service fees;

iii.     Payment of exorbitant reinsurance premiums to affiliates

iv.     Inappropriate payment of the expense of affiliates; or,

- 26 -

<blockquote>
<blockquote>
v.     Misdirection of premiums or commissions to affiliate insurance companies or agencies.
</blockquote>

(3)     Other forms of misrepresentations:

<blockquote>
i.     Creating nonexistent receivables due from affiliates for window-dressing purposes during examination, or at the financial statement date;

ii.     Assuming the liabilities by/for an affiliate.
</blockquote>
</blockquote>

NAIC Financial Condition Examiner's Handbook, at Section IV(A)(4), pages 1-50 & 1-51.

**3.     The rules governing "admitted asset" treatment.**

86.     To reduce the risk of non-payment, insurance companies are required by their regulators to maintain specified reserves of assets available to pay the claims of their annuity holders, known as "admitted assets."

87.     NAIC SSAP No. 4 governs what may and may not be classified as an "admitted asset":

> **SSAP No. 4 – Assets and Nonadmitted Assets**
>
> For purposes of statutory accounting, an asset shall be defined as: probable future economic benefits obtained or controlled by a particular entity as a result of past transactions or events. An asset has three essential characteristics: (a) it embodies a probable future benefit that involves a capacity, singly or in combination with other assets, to contribute directly or indirectly to future net cash inflows, (b) a particular entity can obtain the benefit and control others' access to it [Footnote 2], and (c) the transaction or other event giving rise to the entity's right to or control of the benefit has already occurred. These assets shall then be evaluated to determine whether they are admitted.

(Footnote 1 omitted). Footnote 2 states:

> ***If assets of an insurance entity are pledged or otherwise restricted by the action of a related party, the assets are not under the exclusive control of the insurance entity and are not available to satisfy policyholder obligations due to these encumbrances or other third party interests. Thus, pursuant to paragraph 2(c),***

> **such assets shall not be recognized as an admitted asset on the balance sheet.**

(Emphasis added.)

88.     As reiterated in the Summary for "Nonadmitted Assets:"

As stated in the Summary of concepts, "The ability to meet policyholder obligations is predicated on the existence of readily marketable assets available when both current and future obligations are due. Assets having economic value other than those which can be used to fulfill policyholder obligations, or those assets which are unavailable due to encumbrances or third party interests should not be recognized on the balance sheet," and are, therefore, considered nonadmitted.

89.     In short, to qualify as an admitted asset, the asset must (a) be available to satisfy policyholder/annuity holder obligations, and (b) be sufficiently liquid to permit the claims to be paid.

## D.     The Conflict between the Insurance Company and the Private Equity Models

90.     In contrast to the conservatism and the long-term outlook of the insurance company business model and regulations and laws governing insurances companies, the private equity model is one focused on rapid short-term returns and risk reward.

91.     Private equity firms operate with a short-term view of maximizing capital appreciation and income. They generally operate on a total return basis, often through high-risk or aggressive investments, some of which are successful, and some of which are not.

92.     Recently, however, private equity firms have begun to acquire insurance companies.

93.     The opportunity for exploitation of the timing difference between the short-term receipt of cash premiums and the long-term performance obligations has rightly become a source of concern in the insurance industry.

- 28 -

94.     As former Iowa Insurance Commissioner and former head of the NAIC Terri Vaughn has stated: "There's a lot of concern within the industry about the influx of private equity into the insurance sector. Some people are worried that their business model is to invest in a variety of high-risk opportunities, knowing that some won't turn out. And in our industry, that means policyholders wouldn't get the benefits they've been promised and the rest of the industry would have to share in the losses."

95.     Walter White, CEO of Allianz Life Insurance Company of North America has stated, "[t]he insurance business is a long-term business. For any player to be successful, you have to take that long-term view. The traditional view of private equity is short-term." As Deloitte insurance analyst Matt Hutton has explained, regulators "are worried that the private equity firms are going to make riskier investment decisions to drive their overall returns to the detriment of policyholders."

96.     In July 2013, the NAIC's Center for Insurance Policy and Research published an article addressing insurance industry concerns with the acquisition of insurers by private equity groups, a true and accurate copy of which is attached as Exhibit A. In the article, the authors note:

> [I]nvestors have varying investment horizons and investment strategies depending on their goals and objectives. For instance, life insurers typically engage in a "buy and hold" investment strategy focused on the yield or average rate of return earned if a security is purchased today and held to maturity. Because they traditionally sell long-tailed products in which claims on the policy are not expected to be filed for a long period of time, life insurers have a longer-term investment horizon. They focus on asset-liability management, as much as possible, closely matching their assets' duration to that of their longer-term liabilities so that the cash flow streams of the investments are synchronized with when liabilities become due.
>
> Private equity-backed life insurance companies, on the other hand, are likely to invest on a total return basis – the percentage gain (or

loss) on a security based on the purchase price plus any interest, dividends or other income that may have been received or accrued – in a similar fashion to their parent or affiliated sponsor. Total return investors actively trade in and out of securities with a short-term view of maximizing capital appreciation and income. Their focus is more so on risk-adjusted relative value – where the attractiveness of an investment is measured in terms of risk, liquidity and return relative to another investment – more so than asset liability management. This might possibly lead to an asset/liability mismatch and might result in a timing issue whereby the insurer runs the risk of being forced to sell an investment at an inopportune time to meet an upcoming liability payment. In addition, a private equity-backed insurer's focus on market value and shorter-term investing is inconsistent with the basis of amortized cost in statutory accounting and the time horizon assumptions for bond investments in the [insurance regulators' Risk-Based Capital] framework, respectively.

97.     In the Center for Insurance Policy and Research article, the authors also specifically note the risk of siphoning the insurance company's funds through fees paid to the private equity firm or its affiliates:

Private equity firms can have a number of different financial businesses under its umbrella, such as asset managers, broker-dealers or reinsurers, among others. There is, therefore, the potential for intercompany transactions with affiliates that could result in taking cash out of the insurance company. If the affiliated asset manager is hired to manage the assets of the insurance company, the insurer would have to pay a management fee for this service. The management fee should be reasonable and comparable to what others in the market are paying.

It should also be noted that if the affiliated asset manager invests in funds or transactions managed by the private equity sponsor, there might be additional fees charged. Furthermore, buy or sell transactions with an affiliated broker-dealer might also generate more fees. All of these layers of potential fees would result in cash being extracted out of the insurer and reduce the amount of cash available to meet future liabilities.

98.     The authors of the Center for Insurance Policy and Research article also note the increased risks of transactions with affiliates that lack economic meaning or are not arm's-length:

> Affiliated transactions should be monitored closely, with regular
> reporting of intercompany transactions and/or targeted exams of
> investment portfolios, or prohibited altogether if determined
> prudent to do so. Other intercompany transactions that can result
> in taking cash out of the insurance company is the purchasing and
> selling of securities with another account managed, maintained or
> trusteed by the asset manager. The concern is that a transaction
> will be executed at a price other than the current market price,
> resulting in a potential conflict of interest.

99. The industry concerns for abuse are so strong that the NAIC's Financial Analysis Working Group ("FAWG") of the Financial Condition (E) Committee, which is charged with identifying adverse insurance trends and handling insurance solvency issues, has proposed a new NAIC working group be formed to investigate the issue.

100. Julie McPeak, chairwoman of the NAIC's Life Insurance and Insurance Committee has stated: "FAWG and other regulators are already discussing that we have to have life insurance owners that are fit for that purpose. FAWG has already noticed that there could be inconsistent promises between a private equity firm and beneficiaries of a life insurance or annuity company …. There could be some firms that think there is this nice big pool of assets that they could invest more aggressively than we would be comfortable with."

**E.    By Acquiring the Guggenheim Insurers, Defendants Lay the Foundation to Exploit the Insurance Company Model to Reap Short-Term Profits**

101. Unfortunately, the foregoing private equity exploitation concerns were realized with Guggenheim's purchase and cash raid on three insurers: Security Benefit Life, EquiTrust Life and Guggenheim Life.

102. Guggenheim is a global financial services firm with more than $190 billion in assets under its management.

103.    On its website, Guggenheim claims to embrace a set of values by which it conducts its business, including "Integrity," by which it means "[i]n every action we take, we do the right thing, for the right reasons."[4]

104.    Through a complicated accounting fraud designed to evade insurance company statutory accounting requirements, however, Guggenheim has orchestrated a scheme to drain the Guggenheim Insurers of cash, endangering those insurers' financial ability to meet their obligations to annuity holders like Plaintiffs Whitmore and Schulzki and the other members of the Class.

105.    None of this was done with "Integrity" or "for the right reasons." Indeed, through this scheme, Guggenheim reaped large profits for itself, its parent companies, affiliates, and associates and conspirators at the risk of the very annuity holders the insurance companies are obligated to protect.

106.    Guggenheim's campaign to acquire vulnerable insurance companies began with its August 2009 acquisition of Guggenheim Life, which operated in 2009 as Wellmark Community Insurance Inc. ("Wellmark"). Wellmark was relatively dormant for the several years preceding the Guggenheim purchase in 2009, with total assets at year-end 2008 of only $18 million and surplus of only $16 million.

107.    Guggenheim next acquired Security Benefit Life in July, 2010. In the years leading up to the Guggenheim purchase, Security Benefit Life had written substantial annuity business that had put stress on Security Benefit Life's surplus, which was down to $420 million at year-end 2009, giving Security Benefit Life a very thin solvency ratio (the ratio total assets to

---

[4] http://guggenheimpartners.com/firm/guiding-principles.

total liabilities) of only 104.5%.  Guggenheim promptly demutualized Security Benefit Life, so that its dividends would be paid to Guggenheim rather than its policyholders.

108.    Guggenheim next acquired EquiTrust Life in December, 2011.  Prior to its acquisition by Guggenheim, EquiTrust Life's weak financial condition had required repeated capital contributions from its parent from 2001 through 2008.

109.    While these three companies were financially vulnerable, they played by the rules, following the statutory accounting rules and operated conservatively in their investments and with an eye towards their long-term obligations. All of that changed when Guggenheim acquired, corrupted and effectively looted Security Benefit Life, EquiTrust Life and Guggenheim Life.

110.    Immediately after Guggenheim acquired Guggenheim Life, Security Benefit Life and EquiTrust Life, Guggenheim and the companies embarked on a campaign to generate maximum short-term cash by selling ever-increasing massive amounts of annuities premised on false representations of financial strength.

111.    Sales of annuities for Security Benefit Life increased from $321,254,569 in 2010 to $4,112,610,163 in 2012 of annuity considerations, a 1,180% increase.  In just two short years Security Benefit Life rose to becoming the industry leader in fixed annuities and the second largest in the United States in indexed annuity sales. In just the first nine months of 2013, Security Benefit Life has already eclipsed its 2012 number, selling $4,526,741,936 in annuity considerations.

112.    Similarly, sales for EquiTrust Life rose from $362,645,619 in 2010 to $1,562,595,311 in 2012, a 331% increase.  EquiTrust Life rose from the 16th largest seller nationally to the 6th in just one year, between 2011 to 2012.  2013 will be an even larger year, as

EquiTrust Life has already sold $1,862,745,001 in annuity considerations through the end of September 2013.

113.    Guggenheim Life sold no annuities at all in 2010.  In 2012, however, Guggenheim Life sold $268,786,575 and through the first nine months of 2013 had already sold $555,843,742 in annuity considerations through the end of September 2013.

114.    In the few short years under Guggenheim, then, sales of annuities for each of the Guggenheim Insurers went from negligible to industry leading levels, generating huge revenues based on assurances of their financial strength and stability.

115.    While annuity products generate lots of up-front cash, however, they also carry with them large long-term liabilities, putting a strain on surplus under statutory accounting requirements.

116.    Defendants knew that without inflating the Guggenheim Insurers' reported surplus they would have no access to the Guggenheim Insurers' cash, because statutory accounting requirements, laws and regulations prohibit cash distributions without adequate corresponding surplus.

117.    To pilfer the cash build-up without detection, Defendants engaged in a complicated fraud designed to misstate the Guggenheim Insurers' financial condition so they could continue selling high commission annuity products to consumers like Plaintiff Whitmore, Plaintiff Schulzki and the other members of the Class.

**F.    Defendants' Fraudulent Scheme**

118.    To give the Guggenheim Insurers the appearance of positive surplus and financial strength so it could siphon massive amounts of money from them, Defendants engaged in a series of fraudulent accounting maneuvers that together effectively misrepresent the positive surplus status and financial health of each of the Guggenheim Insurers, by (a) transferring

- 34 -

liabilities off their balance sheets through fraudulent non-economic affiliated "reinsurance" transactions, (b) mischaracterizing certain liabilities as "admitted assets," and (c) misrepresenting the value of the billions of dollars mortgage-backed securities ("MBS") and other "toxic" assets that Guggenheim has dumped or left behind in the Guggenheim Insurers. Each of these misdeeds violates well-established accounting rules governing insurers and has contributed to falsely portraying the financial stability of the Guggenheim Insurers.

**1.      The linchpin of the Scheme:  concealing liabilities through fraudulent "reinsurance" transactions.**

119.      Insurance companies regularly enter legitimate reinsurance transactions.

120.      When an insurance company "cedes" risks of a block of life insurance policies or annuities through a *bona fide* reinsurance transaction, the assuming company is obliged by the governing reinsurance contract or "treaty" to set up reserve liabilities for that block. The ceding company can then remove those liabilities from its own financial statements because the assuming company is simultaneously responsible for and able to pay those liabilities.

121.      Assume, for example, that Company A originally sold 100 insurance policies to customers (policyholders), each with a death benefit of $100,000. Although extremely unlikely, the worst-case scenario for the insurer is that all 100 policyholders suddenly die the very next day. Doing the math, a $100,000 death benefit multiplied by 100 policies equals a $10 million liability. However, the policyholders will not likely all die after one day, and death rates are actually quite predictable. Applying mathematical tables, formulas and the "Law of Large Numbers," actuaries can predict with remarkable accuracy for a given group the probability that an insured of a given age within the group will die. Accordingly, immediately upon the sale of a $100,000 death benefit policy, the insurance company is not required to set up reserve liabilities for the entire $100,000; however, between the date of issue and the ultimate date of death, the

insurance company is expected to earn interest which will accumulate over time with the premiums to equal the final $100,000 benefit.  So a very young, healthy, non-smoker will have a much lower initial reserve liability than an elderly smoker.  This assessment, keyed to the present value of the obligations, is done through annual cash flow testing and reserve calculations.

122.     In insurance parlance, in this example the total needed to fulfill all contractual obligations (in this example $10 million) is referred to as the "Gross In-Force"; this is simply the sum of all ultimate death benefit payments.  But since it is extremely likely that the deaths will occur staggered out across ensuing years, the insurance company only needs to have, today, the present-value of that ultimate $10 million.  For this example, assume that the actuarially required immediate reserve liability is $1 million for the entire block.

123.     When Company A cedes this block of policies to Company B, Company A **_drops_** the present value amount of $1 million from its liabilities and Company B **_sets up_** the $1 million liability on its books.  Company B is now basically standing in the shoes of Company A, and must pay to Company A $100,000 for each death claim as it is made.  The terminology used to describe Company A's reduction of the $1 million liability is a "Reserve Credit."  In other words, because Company B is now "on the hook" to pay the claims as they come in, Company A is allowed to take a reserve credit (reduction) of $1 million.  In this way, Company A reduces its liabilities by $1 million and Company B adds $1 million to its liabilities. Company A pays the $1 million of reserves as a reinsurance premium and receives a portion back as a ceding commission representing a portion of the future profits on the business.

124.     That is how it works in the world of **_legitimate, arms'-length_** reinsurance.  But as shown below, if the assuming company lacks sufficient demonstrable financial strength to honor the liabilities assumed from Company A, statutory insurance accounting does not permit the

$1 million reserve credit to Company A, because there is considerable concern that Company B will not be able to make good on its obligations to Company A. In such a case, Company A may not reduce its liabilities for the cession to Company B. Reversing the transaction restores a $1 million increase in Company A's liabilities, in turn causing a reduction of $1 million to Company A's otherwise falsely inflated surplus.

125.    Historically, insurance companies have chosen to reinsure their risks with highly capitalized and independent ("non-affiliated") companies. Legitimate reinsurers are chosen not only for their strong financial support, but also for their investment acumen, significant expertise and advice. A knowledgeable, well-capitalized and honest reinsurer can be a tremendous aid in helping a company spread its risks (helping minimize the "too many eggs in one basket" exposure) and share knowledge of good underwriting practices and economic expectations. The independent reinsurer has its own set of experienced executives, actuaries and other experts who can help the ceding company achieve their shared goals. With well-capitalized and independent reinsurers, the valid purpose for reinsuring risks is achieved.

126.    In recent years, however, "for-profit" insurance companies have dramatically increased their reliance on reinsurers that are not only *insufficiently capitalized* but also the opposite of independent: they have ceded risks *to their own affiliates*. Often there is no real difference in the two companies: they are sister companies that may likewise sell life and/or annuity policies, or may be mere shells with no independent operations whatsoever. There is no valid economic reason for such a transaction. It is similar to a husband handing off a debt owed to the bank to his wife, purportedly to improve the family's financial condition. It does nothing. There can be meaningful purposes for *some* affiliated reinsurance, such as moving certain lines of business to an affiliate that specializes in that line. But to cede substantial blocks of life or

annuity business from one life insurer to another affiliated life insurer accomplishes nothing of economic substance, and evidences an improper motive.

127.    One illicit motive of such an illusory reinsurance transaction with an affiliate is to enable the insurer to report (falsely) that the transaction "frees up" surplus for the ceding company, allowing that sham surplus to support selling even more life and annuity policies to raise more premium dollars which are, in turn, paid to the parent through upstream dividends. The overall surplus of a group of affiliated companies can be freed up if the reinsurer operates under rules allowing for lower reserves than the ceding company.

128.    This practice enables a for-profit holding company to siphon off the ceding insurer's revenues through dividends and grossly inflated management, service, and investment fees to non-insurance affiliates with the false appearance of no adverse financial consequences to that ceding insurer.

129.    Because regulators limit the extent of dividends from an insurance company without regulatory approval to the greater of current profits or to a fixed percent of surplus, there is an incentive for unscrupulous insurance companies to report or "book" falsely inflated profits.

130.    To illustrate the foregoing, below is an actual Annual Statement schedule (Schedule S – Part 3) taken from Security Benefit Life's 2012 Annual Statement in which Security Benefit Life reports ceded reinsurance.  Note that in column 8, in the upper portion of the Schedule in which Security Benefit Life reports *affiliated* reinsurance, it received a Reserve Credit of $502,384,360 from its own affiliate, Guggenheim Life.  Significant is that the reinsurance is on a funds withheld basis meaning that no funds are transferred at the inception of reinsurance.  That single affiliated reinsurance transaction makes up more than 65% of Security Benefit Life's reported surplus.  However, in the lower section of that Schedule below, Security

Benefit Life reports its ***non-affiliated*** reinsurers.  On the last day of the year in 2012 (*see* column 3), Security Benefit Life ceded another $1.69 billion to Heritage also without transferring funds on a funds withheld basis:

**SCHEDULE S - PART 3 - SECTION 1**
Reinsurance Ceded Life Insurance, Annuities, Deposit Funds and Other Liabilities without Life or Disability Contingencies, and Related Benefits Listed by Reinsuring Compa

| 1 NAIC Company Code | 2 Federal ID Number | 3 Effective Date | 4 Name of Company | 5 Domiciliary Jurisdiction | 6 Type of Re-insurance Ceded | 7 Amount in Force at End of Year | Reserve Credit Taken 8 Current Year | 9 Prior Year | 10 Premiums |
|---|---|---|---|---|---|---|---|---|---|
| General Account - Authorized - Affiliates - U.S. Affiliates | | | | | | | | | |
| 83607 | 43-1380564 | 08/01/2012 | GUGGENHEIM LIFE & ANN CO. | DE | ACDFHI... | 0 | 502,384,360 | 0 | 23,211,649 |
| 0199999 - General Account - Authorized - Affiliates - U.S. Affiliates | | | | | | 0 | 502,384,360 | 0 | 23,211,649 |
| 0399999 - General Account - Authorized - Affiliates - Total Authorized affiliates | | | | | | 0 | 502,384,360 | 0 | 23,211,649 |
| General Account - Authorized - Non-Affiliates - U.S. Non-Affiliates | | | | | | | | | |
| 64394 | 86-0165716 | 12/31/2012 | HERITAGE LIFE INS CO. | AZ | ACDFHI... | 0 | 1,690,955,350 | 0 | 1,645,324,285 |
| 65110 | 57-0380426 | 12/31/1994 | KANAWHA INS CO. | SC | CDIL... | 7,424,658 | 5,652,007 | 5,982,161 | |
| 65129 | 44-0308260 | 04/01/1997 | KANSAS CITY LIFE INS CO. | MO | CDIL... | 1,170,680,555 | 214,537,403 | 222,862,163 | 11,015,316 |
| 65331 | 63-0124600 | 12/31/1995 | LIBERTY NATL LIFE INS CO. | NE | CDIL... | 1,708,355,784 | 317,610,754 | 304,173,902 | 16,032,889 |
| 90670 | 43-1178580 | 07/01/1994 | SCOTTISH RE LIFE CORP. | DE | VRTIL... | 36,607,810 | 327,211 | 89,615 | 210,822 |

131.    Because, as shown below, Heritage is in reality affiliated with Security Benefit Life, Security Benefit Life should have included the $1.69 billion transaction in the upper, "affiliated" portion of the Schedule.  Properly accounted for, Security Benefit Life's affiliated reserve credits with affiliated companies now total $2.19 billion, which is 285% of Security Benefit Life's reported surplus.  As the assets were not transferred to the reinsurer, the reinsurance is a sham lacking economic value whose sole purpose is the use of the economic vagaries of statutory accounting in the various state jurisdictions.  And, as also shown below, because Security Benefit Life knows that neither Guggenheim Life nor Heritage has the financial resources to make good on the ceded reinsurance obligations (*i.e.*, they lack "independent payment ability" required by SSAP No. 25), Security Benefit Life cannot claim the reserve credit; thus, Security Benefit Life's representation of reserves is false and any reduction in their Risk-Based Capital ratios is at best questionable.

132.    Security Benefit Life is not alone in ceding reinsurance almost entirely to its own affiliated entities.  All three of the Guggenheim Insurers are excessively (indeed collectively more than 90%) reinsured with their own affiliated insurance companies:

- 39 -



Guggenheim Insurers - *Affiliated* Reinsurance as a % of *Total* Reinsurance

### REINSURANCE CEDED

|  | Affiliated | Unaffiliated | Total Ceded | Affiliated % |
|---|---|---|---|---|
| SBL | $2,193,339,710 | $598,278,888 | $2,791,618,598 | 78.57% |
| GLAC | $1,821,118,910 | $0 | $1,821,118,910 | 100.00% |
| EQT | $2,369,336,491 | $39,774,141 | $2,409,110,632 | 98.35% |
|  | $6,383,795,111 | $638,053,029 | $7,021,848,140 | 90.91% |

133.     As shown below, through a fraudulent scheme and enterprise, Guggenheim, the Guggenheim Insurers, Paragon, and Heritage have employed these and related deceptive accounting techniques with each of the three of the insurance companies Guggenheim has acquired over the last three years, falsely portraying a positive surplus in order to continue to generate revenues to pay Guggenheim, their affiliates and associates and to be used for Guggenheim's for-profit speculation at the expense of those annuity purchasers.

### 2.     The corrupted "reinsurer" entities:  Guggenheim Life, Paragon, and Heritage

134.     To pull-off the fraud, the Guggenheim and Guggenheim Insurers needed "reinsurers" to serve as dumping grounds for their liabilities.

135.     Defendants began by entering into reinsurance transactions with their own affiliates.

136.     Immediately after Guggenheim purchased Wellmark in 2009 and changed its name to Guggenheim Life, Guggenheim promptly arranged for Guggenheim Life to assume $1.02 billion in ceded insurance liabilities from two insurance companies owned by Guggenheim's indirect parent, Sammons Financial Group:  Midland National Life Insurance

Company and North American Company for Life and Health Insurance ("NAC"). Guggenheim Life subsequently assumed another $418 million from NAC in 2010, bringing the total to about $1.5 billion, and by 2011, the amount of Guggenheim Life's ceded insurance from these two affiliates alone increased to $1.65 billion.

137. In 2011, Guggenheim set up another affiliated dumping ground for liabilities when it formed Paragon. Paragon does not sell life insurance or annuity products. As shown below, Paragon was formed and corrupted to facilitate Defendants' fraudulent scheme and enterprise by providing a dumping ground for "reinsurance" liabilities from Guggenheim Life. Indeed, in 2011 and 2012 alone, Paragon assumed $1.12 billion in "reinsurance" liabilities from the Guggenheim Insurers.

138. As depicted above, Defendants created a shell game where liabilities were transferred among affiliated entities, including Security Benefit Life, Guggenheim Life, EquiTrust Life, and Paragon in a system that by design was difficult to follow.

139. However, to maximize concealment of these fraudulent "reinsurance" transactions, Defendants needed a third-party reinsurer willing to go along with their scheme. By avoiding reinsurance transactions solely with disclosed affiliates, Defendants could also escape the heightened scrutiny that is supposed to accompany affiliated reinsurance transactions, allowing Defendants to move liabilities off the books of the Guggenheim Insurers without detection.

140. Enter Patton, a Texas attorney with business ties to Guggenheim.

141. Patton is part of the group that formed Guggenheim Baseball Management, LLC with Walter and Boehly, the private partnership Guggenheim formed in 2011 to acquire the Dodgers.

142.     Upon information and belief, Patton himself has no insurance or actuarial experience.  Nor had Patton ever owned an insurance company.  But in 2012 he willingly acquired and corrupted one to further the fraudulent scheme.

143.     Specifically, on December 21, 2012, Patton, though one of his holding companies, acquired Heritage, an insurance company that, according to Heritage's financial statements, was largely a shell with assets of only $150,000 in bonds.

144.     Only 10 *days later*, on December 31, 2012, Heritage entered into funds withheld reinsurance transactions in which Security Benefit Life ceded approximately *$1.69 billion* in liabilities to Heritage, and EquiTrust Life ceded *$1.2 billion* in liabilities to Heritage.  Thus, the Guggenheim Insurers within just 10 days of Patton's acquisition of Heritage suddenly ceded more than *$2.9 billion* in current liabilities to that shell company.

145.     On December 31, 2012, Heritage also accrued a capital contribution of $850 million from its parent holding company, also owned by Patton, which it applied to surplus.

146.     The immediate result was to materially alter the Risk-Based Capital ratios of both Security Benefit Life and EquiTrust Life to give them the appearance of year-end financial strength and then, almost immediately, to move approximately $2.9 billion of liabilities off their books and into Heritage.

147.     In reality, the source of the $850 million Heritage received and recorded as a contribution to capital was the Guggenheim Insurers themselves, including Security Benefit Life and EquiTrust Life.  The Guggenheim Insurers recorded this outflow of money totaling $914 million as numerous "collateral loans" to various "unaffiliated entities" that, in truth, are LLCs also controlled by Patton and formed just days before receiving the loans.  This influx of Guggenheim Insurer policyholder and annuity holder funds enabled the Patton companies to

- 42 -

supposedly "contribute capital" of $850 million from these loans in a series of transactions: the money was contributed to Heritage's parent, which then contributed it to Heritage, which then recorded this borrowed money as "contributed capital" in its Annual Statement.  In short, ***the Guggenheim Insurers, including Security Benefit Life and EquiTrust Life, secretly loaned at least $850 million to their own affiliated reinsurer, Heritage***.

148.    To disguise the fact that the "reinsurance" transactions were not arms-length and were simply a vehicle to move liabilities off the books of the Guggenheim Insurers, Heritage and Defendants were both falsely portrayed as unaffiliated entities.

149.    Indeed, Heritage in its 2012 Schedule Y states that it is, through a series of wholly owned LLC's, ultimately wholly owned by Patton, and makes no reference to any affiliation with or control by the Guggenheim or Guggenheim Insurers:



150.     The Guggenheim Insurers in their Annual Statements likewise deny any affiliation with Heritage, representing that all reinsurance transactions with Heritage are transactions with an unaffiliated entity.

151.     To regulators and the outside world, then, the transfer of liabilities from the Guggenheim Insurers to Heritage appeared to be an arms-length reinsurance transaction between unrelated parties.  They would have no reason to think otherwise as Security Benefit Life, EquiTrust Life and Heritage all reported the reinsurance transaction as being between "unaffiliated" entities in sworn Annual Statements filed with regulators.

152.     What went undisclosed, however, is that nearly all of Heritage's director and officer positions are connected to Guggenheim, often as employees of Guggenheim affiliated companies.  Indeed, as of December 31, 2012, nearly *every* officer and director position at Heritage is populated with personnel having undisclosed connections to Guggenheim:

| Name | Heritage Position | Guggenheim Connection |
|---|---|---|
| John Francis Klein | President and CEO | Guggenheim Securities, LLC employee |
| Daniel Jonathan Towriss | Chief Risk Officer, Chief Actuary and Secretary, Director | Guggenheim Life, President & CEO |
| James Daniel Purvis | COO and Treasurer | EquiTrust Life, Treasurer |
| Francis Kennedy Neill III | Chief Investment Officer | Guggenheim Life, Chief Investment Officer |
| Jill Sugar Factor | Assistant Secretary | Guggenheim Partners LLC, Managing Director |
| Dennis Arthur Cullen | Director or Trustee | Retired Managing Director at The Liberty Hampshire Company (Guggenheim owned) |
| Brian Thomas Sir | Director or Trustee | Guggenheim Life, Director |
| David Lee Korman | Director or Trustee | Guggenheim Capital, LLC, Chief Legal Officer |

153.     Moreover, the address Heritage lists as its "administrative office" (401 Pennsylvania Parkway, Suite 300, Indianapolis, Indiana 46280) – the same as Guggenheim

Life's home address – and the address Heritage lists as its "statutory home office" is that of the Kutak Rock law firm in Arizona.

154. Under any view of statutory accounting, Heritage is an affiliated entity: Guggenheim controls Heritage, either directly or indirectly, no less than it controls the Guggenheim Insurers.

155. Defendants fraudulently concealed that Heritage is an affiliated entity in order to avoid the scrutiny of affiliated transactions under statutory accounting principles and to enable them to continue selling life insurance and annuity policies without revealing the adverse effects of their massive extraction of cash from the Guggenheim Insurers.

**3. Defendants use "reinsurance" transactions and other accounting machinations to fraudulently misrepresent the financial condition of the Guggenheim Insurers.**

156. Contrary to, and in knowing violation of the above-referenced fundamental principles of statutory accounting, Defendants during the Class Period misrepresented to Plaintiffs and the putative Class the true financial condition of *each* of the Guggenheim Insurers, including in particular each insurer's purportedly *positive* surplus.

**a. Security Benefit Life has misrepresented its surplus.**

157. Security Benefit Life was organized in 1892, and for more than a century has issued insurance policies. A substantial part of Security Benefit Life's current business involves the sale of annuity products in Illinois and nationwide.

158. By early 2010, however, Security Benefit Life was suffering from strained or inadequate capital and an investment portfolio saddled with illiquid and risky assets, including toxic MBS.

159. Guggenheim acquired Security Benefit Life in July, 2010. Guggenheim installed Guggenheim President Boehly as Chairman of the Board for Security Benefit Life, and

- 45 -

Guggenheim CEO Mark Walter as a Security Benefit Life director. As alleged herein,

Guggenheim promptly implemented fraudulent accounting schemes to commence a program of

siphoning cash out of Security Benefit Life.

160.     Security Benefit Life markets its annuity products based upon express

representations of its financial stability, emphasizing that Security Benefit Life is well-

capitalized with positive surplus and otherwise sufficient admitted assets to perform its long-term

contractual commitments to its annuitants.

161.     On its website Security Benefit Life recognizes that solvency is "Important:"

**Solvency Ratio is Important when Buying Annuities**

Financial strength is important when entrusting a portion of your
life savings. Finding a company with a high "solvency ratio" is a
key measure consideration when you buy an annuity.

162.     In its sales brochure for the "Total Value Annuity" sold to Plaintiff Whitmore,[5]

Security Benefit Life emphasizes that "[w]ith the Total Value Annuity, you can protect a portion

of your retirement savings and receive interest on those savings." Security Benefit Life also

notes that its "[g]uarantees are subject to Security SBL's financial strength."

163.     More specifically, Security Benefit Life in its sales brochure touts its purported

positive surplus of $774 million as of December 31, 2012. *See* Security Benefit Life's "A

Company You Can Trust" sales brochure, a true and accurate copy of which is attached as

Exhibit B, at 4. Security Benefit Life also encouraged those interested in Security Benefit Life's

statutory financial statements to review them on its website. *Id.* at 8.

---

[5] https://www.securitybenefit.com/individuals/products/fixed-indexed-annuities/security-benefit-total-value-annuity.aspx.

010342-12  658147 V1

164.    On its website,[6] Security Benefit Life states that "[f]or more than 100 years, we have been serving the needs of our clients based upon a core set of values and a belief in what we do[,]" and emphasizes its "heritage of … security for our customers."  According to Security Benefit Life, "[a]ll of this is built upon a solid financial foundation that means we believe we can deliver on our promises and your future."

165.    On its website,[7] Security Benefit Life reports hundreds-of-millions of dollars of positive surplus as of December 31, 2011, December 31, 2012, and June 30, 2013.  At the same page, Security Benefit Life represents that "Assets, liabilities and surplus are presented on a Statutory Accounting Basis as promulgated by the NAIC and/or the laws of the Company's domiciliary state."

166.    To preserve the false appearance of a positive surplus, however, Security Benefit Life filed Annual Statements with its regulators reporting grossly overstated surplus.  For example, in its statutory Annual Statement, Security Benefit Life represented a positive surplus of $769.996 million of December 31, 2012.

167.    As shown below, these misrepresentations of positive surplus were achieved only through a series of deceptive statutory accounting manipulations.  Had the rules of statutory accounting been followed, Security Benefit Life's true financial condition in the Annual Statements would have reflected much less in 2012.

>           **(1)     Security Benefit Life misstated its financial strength by falsely
>                     claiming reserve credits for liabilities ceded to Heritage, a
>                     concealed affiliated company.**

168.    For the reasons explained above, to evaluate the financial condition of a company it is important for regulators to know whether the recipient of ceded insurance obligations is or is

---

[6] https://www.securitybenefit.com/about-us/our-story.aspx.

[7] https://www.securitybenefit.com/media/101421/sbl_statutory_information.pdf.

010342-12  658147 V1

not affiliated with the ceding company. In its Schedule S, therefore, Security Benefit Life is required to disclose annually whether the insurance company to which it has ceded insurance is a U.S. affiliate of Security Benefit Life.

169.    In addition, Security Benefit Life in the "Ceded Insurance Report" of its Annual Statement is required to disclose whether any of the reinsurers identified in Schedule S as non-affiliated are "controlled, either directly or indirectly," by Security Benefit Life or "by any representative, office, trustee, or director" of Security Benefit Life.

170.    Schedule S to Security Benefit Life's Annual Statement for 2012 includes a reserve credit for reinsurance ceded on December 31, 2012, of $1.69 billion in insurance ceded to Heritage.

171.    In its Annual Statement for the year 2012, the first question posed by the NAIC in the reinsurance section is whether any of the reinsurers is affiliated with the reporting insurer. Security Benefit Life specifically answered this question "NO" when asked whether any of the reinsures identified in Schedule S as non-affiliated are "controlled, either directly or indirectly," by Security Benefit Life or by any representative, office, trustee, or director of Security Benefit Life:



**23. REINSURANCE**

**A.  CEDED REINSURANCE REPORT**
Section 1 - General Interrogatories

    1. Are any of the reinsurers, listed in schedule S as non-affiliated, owned in excess of 10% or controlled, either directly or indirectly, by the Company or by any representative, officer, trustee, or director of the Company?
YES( )  NO(X)  If yes, give full details.

172.    Because Heritage is, in fact, an affiliated entity by virtue of Guggenheim officers' ability to exercise control over Heritage's decision process, the Guggenheim Insurers were required to report Heritage as an affiliate in multiple places within their Annual Statements and

- 48 -

other official company records. The NAIC Annual Statement Instructions, the NAIC Model Holding Company Act as adopted by all states, and the NAIC Accounting Practices and Procedures Manual, including specifically SSAP 25, make clear that such affiliations must be disclosed.

173.    However, in all such appropriate and mandated disclosures, Defendants and Heritage falsely reported that Heritage is *not* affiliated with the Guggenheim Insurers.

174.    Not only is the fact that Heritage's affiliation with the Guggenheim Insurers fraudulently concealed, the $1.69 billion in ceded insurance from Security Benefit Life remains a liability of Security Benefit Life, because Heritage is insufficiently capitalized, lacks independent payment ability, and is being used as nothing more than a dumping ground for Security Benefit Life's current liabilities.

175.    Indeed, as alleged in detail below, at the same time that Security Benefit Life ceded $1.69 billion to Heritage, Heritage assumed *another* $1.2 billion from EquiTrust Life, while again being falsely classified as non-affiliated. This renders Heritage even less able to make independent payment of the obligations it assumed from Security Benefit Life.

176.    Heritage is not and never was sufficiently capitalized to make independent payment of the liabilities purportedly ceded to it by Security Benefit Life.

> **(2)    Security Benefit Life misstated its surplus by falsely claiming reserve credits for liabilities ceded to affiliated company Guggenheim Life.**

177.    On August 1, 2012, Security Benefit Life purported to cede $502 million in reinsurance to Guggenheim Life, for which Security Benefit Life claimed a reserve credit in its 2012 Annual Statement in the amount of $502 million:

- 49 -

## SCHEDULE S - PART 3 - SECTION 1

Reinsurance Ceded Life Insurance, Annuities, Deposit Funds and Other Liabilities without Life or Disability Contingencies, and Related Benefits Listed by Reinsuring Comp

| 1 NAIC Company Code | 2 Federal ID Number | 3 Effective Date | 4 Name of Company | | 5 Domiciliary Jurisdiction | 6 Type of Re-insurance Ceded | 7 Amount in Force at End of Year | Reserve Credit Taken | | 10 Premiums |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 8 Current Year | 9 Prior Year | |
| General Account - Authorized - Affiliates - U.S. Affiliates | | | | | | | | | |
| 93607 | 43-1362564 | 08/01/2012 | GUGGENHEIM LIFE & ANN CO. | DE | | ACOPW1 | | 502,364,360 | 0 | 23,211,849 |
| 0799999 - General Account - Authorized - Affiliates - U.S. Affiliates | | | | | | | 0 | 502,364,360 | 0 | 23,211,849 |
| 0899999 - General Account - Authorized - Affiliates - Total Authorized Affiliates | | | | | | | 0 | 502,364,360 | 0 | 23,211,849 |
| General Account - Authorized - Non-Affiliates - U.S. Non-Affiliates | | | | | | | | | |
| 64394 | 06-0745716 | 12/31/2011 | HERITAGE LIFE INS CO. | AZ | | ACOPW1 | 7,890,955,350 | | 0 | 1,645,324,295 |
| 65110 | 57-0380426 | 12/31/1994 | KANAWHA INS CO. | SC | | CO/1 | 7,424,656 | 5,682,007 | 5,982,161 | 0 |
| 65526 | 44-0308260 | 04/01/1997 | KANSAS CITY LIFE INS CO. | MO | | CO/1 | 170,680,556 | 214,537,403 | 227,862,183 | 31,016,916 |
| 65331 | 63-0134600 | 12/31/1994 | LIBERTY NATL LIFE INS CO. | AL | | CO/1 | 708,355,784 | 317,011,754 | 304,173,502 | 16,032,059 |
| 90670 | 43-1178580 | 07/01/1994 | SCOTTISH RE LIFE CORP | DE | | YRT/1 | 36,607,810 | 127,211 | 89,615 | 210,822 |
| 0499999 - General Account - Authorized - Non-Affiliates - U.S. Non-Affiliates | | | | | | | 2,923,068,807 | 2,238,882,725 | 533,107,841 | 1,672,583,282 |
| 0899999 - General Account - Authorized - Non-Affiliates - Total Authorized Non-Affiliates | | | | | | | 2,923,068,807 | 2,238,882,725 | 533,107,841 | 1,672,583,282 |
| 0799999 - General Account - Authorized - Total General Account Authorized | | | | | | | 2,923,068,807 | 2,741,247,085 | 533,107,841 | 1,695,795,131 |

178.    As explained above, because ceding insurance or annuity obligations to an affiliated company is supposed to be a revenue neutral event, it is misleading for the ceding company (Security Benefit Life) to claim a reserve credit for the reinsured liabilities if the assuming entity lacks independent payment ability capable of satisfying the ceded obligations. As shown below, that is precisely the case:  Guggenheim Life's own purported positive financial surplus is falsely represented, and Guggenheim Life lacks the independent payment ability with respect to the $502 million ceded to it by Security Benefit Life.

> **(3)    Security Benefit Life misstated surplus and statutory reserves by mischaracterizing and concealing Security Benefit Life's collateralized FHLB loans and the pledge of policyholder assets to the FHLB.**

179.    The Federal Home Loan Bank ("FHLBank") is a government-sponsored enterprise formed in 1932.  The fundamental business of the FHLBank is to provide a readily available, low-cost source of funds in a wide range of maturities to meet the demands of its members.  The FHLBank can raise funds by issuing AA-rated debt and is exempt from federal, state, and local income taxes; therefore, it can make *loans* to its members (known as "advances") at favorable rates and terms.

- 50 -

180.    The FHLBank consists of twelve federally chartered and member owned wholesale banks.  Each regional FHLBank makes advances to its member institutions on the security of collateral pledged by the borrowing member.

181.    Each regional FHLBank is independently managed within the framework of the Federal Housing Finance Agency ("FHFA").

182.    A financial institution must first become a member of a regional FHLBank to be eligible to borrow.

183.    To join the regional FHLBank, the member must purchase stock in the regional FHLBank ("FHLB Member Stock").  The amount of FHLB Member Stock required to be purchased varies by regional FHLBank.  Typically the amount is equal to a certain number of basis points multiplied by either the Member's total assets (5bps to 15bps) or total mortgage related assets (20bps to 100bps).

184.    To borrow funds from the FHLBank, the member must purchase additional FHLBank stock ("FHLB Activity Stock").  The amount of FHLB Activity Stock required to be purchased varies by regional FHLBank and typically ranges from 4% to 5% of the member's aggregate advance amount outstanding.

185.    FHLB Member Stock is nonmarketable and redeemable at par by each regional bank.  Members may redeem excess FHLB Activity Stock or terminate membership by redeeming all of their FHLB Member Stock after a notice period, which is typically five years.  But a member may not sell FHLB Activity Stock or FHLB Member Stock (collectively, "FHLB Stock") *unless the related debt is extinguished*.

186.    To obtain an advance, the FHLBank member must in addition pledge assets ("FHLB Pledged Assets") equal in value to the member's aggregate advance amount plus an

- 51 -

applicable *over*-collateralization amount (known colloquially as the "haircut"). Eligible collateral varies by regional FHLBank. Typical eligible collateral includes: US government and agency securities, mortgage backed securities, and whole mortgages. Pledged assets are still owned by, and investment income flows to, the institution member. The institution may substitute collateral at any time.

187. Advances obtained by FHLBank members are unequivocally ***collateralized loans***, as confirmed by the authorizing statute:

> Each Federal Home Loan Bank is authorized to make secured advances to its members upon collateral sufficient, in the judgment of the Bank, to fully secure advances obtained from the Bank under this section or [statutory Bank reserve requirements].

12 U.S.C.A. § 1430(a)(1).

> Such advances shall be made upon the note or obligation of the member secured as provided in this section, bearing such rate of interest as the Federal [H]ome [L]oan [B]ank may approve or determine, and the Federal Home Loan Bank shall have a lien upon and shall hold the stock of such member as further collateral security for all indebtedness of the member to the Federal Home Loan Bank.

12 U.S.C.A. § 1430(c).

> The institution applying for an advance shall enter into a primary and unconditional obligation to pay off all advances, together with interest and any unpaid costs and expenses in connection therewith according to the terms under which they were made, in such form as shall meet the requirements of the bank. The bank shall reserve the right to require at any time, when deemed necessary for its protection, deposits of additional collateral security or substitutions of security by the borrowing institution, and each borrowing institution shall assign additional or substituted security when and as so required….

12 U.S.C.A. § 1430(d).

188. Based on the notion that they hold huge amounts of MBS and thus play a role in the national housing market, insurance companies are permitted to obtain FHLB advances.

- 52 -

189.    Insurance companies are required to disclose their indebtedness on Line 22 of their Annual Statement.  Initially, most insurance companies reported their FHLBank advances as indebtedness on Line 22 as required.  However, some insurers have engaged in the fiction that, rather than **borrowing** money from the FHLBank, they were instead essentially **selling** a guaranteed insurance contract – euphemistically referred to as a "funding agreement" – to the FHLBank.

190.    Statutory accounting principles, and not the whim of the issuer, control the proper reporting of FHLBank loans obtained by an insurance company.  If the arrangement is in substance a borrowing agreement, then it must be accounted for consistent with other borrowed money in accordance with SSAP No. 15.  *See* INT-08-08, Balance Sheet Presentation of Funding Agreements Issued to a Federal Home Loan Bank (INT 08-08).  This is the express conclusion of the NAIC Emerging Issues Working Group, Appendix A.10 – INT 08-08, at 32-33 (reconciling SSAP 15 with INT 08-08).

191.    In any event, as noted above, regardless of how the FHLBank advance is characterized by the insurance company in its financial statements, all FHLBank advances must be over-secured by collateral assets pledged by the borrower-insurer.

192.    Recently, the FHFA has expressed its concern that the FHLBanks are not sufficiently collateralized for their advances made to insurance companies such as Security Benefit Life.  In response, the FHLBanks have assured the FHFA that its loans to insurance companies are fully secured by pledged assets in excess of the amount of the loans, and emphasized that the FHLB actually "controls" the pledged collateral assets in such a fashion as to ensure that the FHLBanks will hold priority to the FHLB Pledged Assets over the competing claims of the borrowing insurance company's policyholders and annuity holders.  *See* letter of

FHLBanks dated December 3, 2012, a true and accurate copy of which is attached as Exhibit C, at 5-6. The FHLBanks letter further confirms that the pledged assets are fully controlled by the FHLBank *regardless* of whether the insurance company characterizes the loan as indebtedness or as the issuance of a funding agreement. *Id.* at 8.

193. In a memorandum dated June 19, 2013, a true and accurate copy of which is attached as Exhibit D, the FHLBank reiterated to the NAIC their firm position that the FHLBank's interest in collateral pledged to the FHLBank by insurance companies is superior to any claim by the policyholders in the event of a receivership, regardless of whether the loan was couched as an "advance" or as a "funding agreement."

194. Assets which are unavailable to the issuer to satisfy annuity holder claims due to encumbrances or other third-party interests should not be recognized on the balance sheet and are, therefore, considered "nonadmitted." SSAP 4, Summary cmt. 3.

195. Security Benefit Life does not, however, disclose these FHLB Advances to Plaintiffs and the Class as a loan on its Annual Statements. Security Benefit Life instead misrepresents that the funds it borrows from the FHLB are not loans to Security Benefit Life, but rather the sale of "funding agreements" by Security Benefit Life to the FHLB-Indianapolis. Security Benefit Life therefore does not report the FHLB Advances as borrowed funds in Line 22 of Security Benefit Life Annual Statement as required by SAP, including SSAP 15, even though they are *in substance* nothing more than loans obtained by Security Benefit Life for operations and loans and other payments made to Guggenheim affiliates.

196. Indeed, this substantial debt load comprised of the FHLB Advances requires Security Benefit Life to pay interest out rather than taking earned interest in, undermining Security Benefit Life's ability to perform its long-term obligations to its annuity holders.

Security Benefit Life's financial disclosures (which unlike other insurers does not report the rates of interest on its FHLBank debt), evidence that Security Benefit Life is paying out interest to the FHLBank at rates that it cannot hope to match on its current investment portfolio which is, as explained below, laden with overvalued and illiquid MBS.

197.     By not reporting its debt to the FHLB on Line 22, "Borrowed Money," Security Benefit Life concealed from Plaintiffs and the Class its need to borrow funds for liquidity, a critical financial indicator or "red flag."

198.     More importantly, however, than how the FHLB advances are characterized, is the fact that to sustain the FHLB Advances Security Benefit Life has pledged to the FHLBank assets in an amount that ***exceeds its entire reported surplus*** in every year after Guggenheim's acquisition of Security Benefit Life.  Therefore, not only did these advances eliminate that surplus, the pledged assets also necessarily cut into Security Benefit Life's required statutory reserves.

199.     Specifically, in 2011 Security Benefit Life reported a surplus of $606 million, even though it had $1.294 billion in FHLB Pledged Assets.  Likewise, at the end of 2012, Security Benefit Life reported a surplus of $767 million, even though it had $792 million in FHLB Pledged Assets.

200.     SAP rules and principles (especially SSAP No. 4) preclude Security Benefit Life from including the FHLB Pledged Assets as admitted assets, because they are pledged to the FHLBank and thus are not available to satisfy Security Benefit Life's obligations to its annuity holders.

201.     Security Benefit Life's fraudulent inclusion of the FHLB Pledged Assets in its admitted asset calculations falsely inflates Security Benefit Life's reported surplus, materially misleading Plaintiffs and the Class as to Security Benefit Life's true financial condition.

202.     And the misreporting extends beyond fraudulently including the FHLB Pledged Assets as admitted assets.  Security Benefit Life's Annual Statements consistently indicate that Security Benefit Life holds restricted FHLB Member Stock purchased in order to use the credit facilities of or to issue funding agreements to the FHLBank.

203.     SAP rules and principles, including specifically SSAP No. 4 – Assets and Nonadmitted Assets, preclude Security Benefit Life from reporting the FHLB Stock as admitted assets, because it is restricted and not available to satisfy Security Benefit Life's obligations to its annuitants.

204.     Security Benefit Life nevertheless includes the FHLB Stock as an admitted asset in its surplus calculation, again materially misrepresenting its true financial condition to Plaintiffs and the Class, by overstating its admitted assets.

205.     When the FHLB Advances, the FHLB Pledged Assets, and the FHLB Stock are truthfully accounted for under SAP rules and principles, Security Benefit Life's statutory liabilities *far* exceed its admitted assets, revealing it in fact to have even further ***negative*** surplus.

206.     Security Benefit Life has for each year since acquired by Guggenheim misrepresented its true financial condition by failing to nonadmit the FHLB Pledged Assets and the restricted FHLB Stock.

**(4)    Security Benefit Life has misstated surplus by concealing massive amounts of toxic assets.**

207.    As surplus of an insurer dips below the minimum in required reserves, prompting regulatory intervention, the carrying values of poorly performing assets (such as MBS) can no longer be based on holding them to maturity.

208.    Given the surplus impairment concealed by the foregoing scheme, certain asset categories reported on Security Benefit Life's financial statements must be adjusted to their realizable values to give an accurate statement of its financial condition. Security Benefit Life's true negative "surplus" (deficit) creates an environment in which Security Benefit Life (and the other Guggenheim Insurers) will likely face lower realizable values than their original cost values, similar to "fire sale" values.

209.    The illiquidity and loss of value in MBS since 2008 has been widely reported in the financial press and recognized in the financial industry.

210.    As to Security Benefit Life, its massive holdings of such toxic securities includes specifically:  (a) the worst class of Security Benefit Life's MBS and other toxic securities, which, in 2012, were $377.396 million as listed at Line 1.523 as "All other" (*i.e.*, non-agency) securities; and (b) "credit tenant loans and hybrid securities" (in 2012, $4.060 billion listed within Line 2. 1 "Unaffiliated domestic securities").  In light of Security Benefit Life's total reported surplus of $767 million for 2012, the "All other" assets represent nearly 50% of Security Benefit Life's reported surplus.  Notably, by contrast, only 0.046% is held in U.S. treasury securities – a ridiculously tiny amount for an insurer with annuity obligations.

211.    Furthermore, Security Benefit Life's reported "Cash, cash equivalents and short-term investments" of $2.359 billion amounts to some 24% over Security Benefit Life's admitted assets in 2012.  Although a large amount of "cash, cash equivalents and short-term investments"

would normally be a good thing, here a substantial part of that figure is invested in illiquid affiliate notes. As alleged below, some $394 million of that amount here consists of unsecured promissory notes issued by Guggenheim affiliates.

212.     The foregoing required adjustments further reduce the admitted assets available to calculate statutory surplus for Security Benefit Life, exacerbating its hazardous financial condition.

(5)     Security Benefit Life Summary

213.     When Security Benefit Life's shell games are disregarded – as they must be under the governing statutory accounting rules and principles, including SSAP No.'s 4, 15 & 25 – Security Benefit Life is revealed to have ***negative*** "surplus" throughout the Class Period, which means that assets backing Security Benefit Life's ability to perform its obligations to its annuity purchasers have been materially impaired and are materially less than represented.

214.     Purchasers of annuity products from Security Benefit Life like Plaintiff Whitmore received a product that was worth far, far less than they paid for them. No reasonable person would purchase annuity products from Security Benefit Life during the Class Period if not deceived.

**b.     Guggenheim Life has misrepresented its surplus.**

215.     Guggenheim Life was first organized in 1985 as Kansas City Variable Life Company. Following a change in ownership, that company was renamed Wellmark Community Insurance Inc., which Guggenheim through its subsidiaries acquired in the fall of 2009 and renamed Guggenheim Life. Walter and other employees of Guggenheim and Guggenheim's parent, Guggenheim Capital, LLC, were made members of Guggenheim Life's board of directors.

- 58 -

216.     As alleged herein, Guggenheim promptly commenced a program to conceal Guggenheim Life's true financial condition so it could siphon cash out of Guggenheim Life and keep selling annuities to generate the cash.

217.     A substantial part of Guggenheim Life's current business involves the sale of annuity products in Illinois and nationwide.

218.     Guggenheim Life, like Security Benefit Life, markets its annuity products based upon express representations of its financial stability, emphasizing that Guggenheim Life has a positive surplus and otherwise sufficient admitted assets to perform its long-term contractual commitments to its annuity holders.

219.     For example, in its sales brochure for its "Provider Single Premium Immediate Annuity Product," available to prospective annuity purchasers online, Guggenheim Life emphasizes "Safety of Principal – funds are guaranteed by the financial strength of Guggenheim Life and are not subject to fluctuating financial markets."

220.     On its website,[8] Guggenheim Life states:  "Security: From our products to our personal service, we work to ensure your retirement is secure."

221.     These representations are false, because Guggenheim Life in fact engages in the same sort of fraudulent accounting machinations as Security Benefit Life.

222.     For example, Guggenheim Life in its Annual Statement reported its surplus in 2012 as positive $487 million.  However, like Security Benefit Life, Guggenheim Life has pledged to the FHLBank assets far in excess of its reported surplus.  In 2012, for example, Guggenheim Life had $983 million in FHLB Stock and FHLB Pledged Assets, which alone reduces its true "surplus" to ***negative*** $496 million.

---

[8] http://guggenheimlife.com/.

010342-12  658147 V1

223.     Moreover, Guggenheim Life reduced its reported current liabilities by purporting to cede $703 million in reinsurance to affiliated entity EquiTrust Life:

ANNUAL STATEMENT FOR THE YEAR 2012 OF THE Guggenheim Life

### SCHEDULE S - PART 3 - SECTION

Reinsurance Ceded Life Insurance, Annuities, Deposit Funds and Other Liabilities without Life or Disability Contingencies, and Related Be

| 1 NAIC Company Code | 2 Federal ID Number | 3 Effective Date | 4 Name of Company | 5 Domiciliary Jurisdiction | 6 Type of Re-insurance Ceded | 7 Amount in Force at End of Year | 8 Reserve Cr Current Year |
|---|---|---|---|---|---|---|---|
| General Account - Authorized - Affiliates - U.S. Affiliates | | | | | | | |
| 14029 | 27-4548295 | 01/01/2011 | PARAGON LIFE INS CO OF IN | IN | COFWII | | 734,258,959 |
| 14029 | 27-4548295 | 01/31/2011 | PARAGON LIFE INS CO OF IN | IN | COFWII | | 383,566,529 |
| 62510 | 42-1468417 | 03/31/2012 | EQUITRUST LIFE INS CO | IA | COFWII | | 703,293,422 |
| 0199999 - General Account - Authorized - Affiliates - U.S. Affiliates | | | | | | 0 | 1,821,118,910 |

224.     Just as Guggenheim Life has no independent payment ability to perform its $502 million obligation to Security Benefit Life, as shown below EquiTrust Life has no independent payment ability to satisfy the $703 million ceded to it at the end of the first quarter of 2012.

225.     Guggenheim Life also purports to reduce its liability in 2012 by ceding another $1.117 billion to affiliated entity Paragon:

ANNUAL STATEMENT FOR THE YEAR 2012 OF THE Guggenheim Life

### SCHEDULE S - PART 3 - SECTIO

Reinsurance Ceded Life Insurance, Annuities, Deposit Funds and Other Liabilities without Life or Disability Contingencies, and Related Be

| 1 NAIC Company Code | 2 Federal ID Number | 3 Effective Date | 4 Name of Company | 5 Domiciliary Jurisdiction | 6 Type of Re-insurance Ceded | 7 Amount in Force at End of Year | 8 Reserve Cr Current Year |
|---|---|---|---|---|---|---|---|
| General Account - Authorized - Affiliates - U.S. Affiliates | | | | | | | |
| 14029 | 27-4548295 | 01/01/2011 | PARAGON LIFE INS CO OF IN | IN | COFWII | | 734,258,959 |
| 14029 | 27-4548295 | 01/31/2011 | PARAGON LIFE INS CO OF IN | IN | COFWII | | 383,566,529 |
| 62510 | 42-1468417 | 03/31/2012 | EQUITRUST LIFE INS CO | IA | COFWII | | 703,293,422 |
| 0199999 - General Account - Authorized - Affiliates - U.S. Affiliates | | | | | | 0 | 1,821,118,910 |

226.     Paragon is, however, likewise unable to satisfy this obligation.  Indeed, since its formation in January 2011 by Guggenheim, Paragon has never sold its own insurance or annuity products; instead, Paragon's *raison d'etre* is to assume liabilities from its affiliated insurers.

227.     For example, Paragon itself reported surplus of only $55 million in 2011 and $65.5 million in 2012, which once again were both nearly 10 times exceeded by its pledge of assets to FHLB in the amount of $544 million in 2011 and $522 million in 2012.

228.     Thus, Paragon in truth has itself had a negative "surplus" every year since formed in 2011.  Guggenheim Life's claim of a $1.117 billion reserve credit from Paragon is therefore bogus.

229.     Meanwhile, Guggenheim Life, like Security Benefit Life also grossly overstates the value of its investment holdings, including over $1 billion in unspecified "other" investments, which in fact consists of nonperforming and illiquid MBS and other risky assets.

230.     When Guggenheim Life's shell games are disregarded – as they must be under the governing statutory accounting rules and principles, including SSAP No.'s 4, 15 & 25 – Guggenheim Life is revealed to have ***negative*** "surplus" throughout the Class Period, which means that assets backing Guggenheim Life's ability to perform its obligations to its annuity purchasers have necessarily been materially impaired and are materially less than represented.

231.     Purchasers of annuity products from Guggenheim Life received a product that was worth far, far less than they paid for them.  No reasonable person would purchase annuity products from Guggenheim Life during the Class Period if not deceived.

**c.     EquiTrust Life has misrepresented its surplus.**

232.     Guggenheim acquired EquiTrust Life in December 2011 from the Farm Bureau Life Group of companies. Walter and other employees of Guggenheim and Guggenheim's parent, Guggenheim Capital, LLC, were made members of EquiTrust Life's board of directors.

233.     As alleged herein, Guggenheim promptly commenced a program to conceal EquiTrust Life's true financial condition so it could siphon cash out of EquiTrust Life and keep selling annuities to generate the cash.

234.     A substantial part of EquiTrust Life's current business involves the sale of annuity products in Illinois and nationwide.

010342-12  658147 V1

235.     EquiTrust Life, like Security Benefit Life and Guggenheim Life, markets its annuity products based upon express representations of its financial stability, emphasizing that EquiTrust Life has a positive surplus and otherwise sufficient admitted assets to perform its long-term contractual commitments to its annuitants.

236.     On its website,[9] EquiTrust Life emphasizes:



[9] http://www.equitrust.com/default.htm.

237.    On its website,[10] EquiTrust Life further emphasizes long-term security:



238.    On its website,[11] EquiTrust Life emphasizes its financial strength, assuring

consumers that "You can count on our financial strength."  On the same page, EquiTrust Life

---

[10] http://www.equitrust.com/aboutus/aboutus.htm.

claims to use "conservative investment strategies, anchored by a disciplined …. management style."

239.     Elsewhere on its website,[12] EquiTrust Life provides a "Financial Overview" in which it reiterates that its investment strategies are supposedly "anchored by a disciplined … management style."

240.     These representations are false, because EquiTrust Life engages in the same sort of fraudulent accounting machinations as do Security Benefit Life and Guggenheim Life.

241.     For example, EquiTrust Life in its Annual Statement reported its surplus in 2012 as $707 million.  However, like Security Benefit Life and Guggenheim Life, EquiTrust Life has pledged assets in excess of its reported surplus to the FHLBank.  In 2012, for example, EquiTrust Life had $776 million in FHLB Stock and FHLB Pledged Assets, which alone reduces its true "surplus" to *negative* $69 million.  Not only that, but EquiTrust Life assumed another $698 million of Guggenheim Life's FHLB debt through a reinsurance contract with Guggenheim Life.

242.     Moreover, EquiTrust Life reduced its reported liabilities by ceding $1.17 billion in life insurance obligations *back to affiliated entity Guggenheim Life*:

STATEMENT FOR THE YEAR 2012 OF THE EQUITRUST LIFE INSURANCE COMPANY

## SCHEDULE S - PART 3 - SECTION 1
### Reinsurance Ceded Life Insurance, Annuities, Deposit Funds and Other Liabilities
### Contingencies, and Related Benefits Listed by Reinsuring Company as of Dec

| 1 NAIC Company Code | 2 Federal ID Number | 3 Effective Date | 4 Name of Company | 5 Domiciliary Jurisdiction | 6 Type of Reinsurance Ceded | 7 Amount in Force at End of Year | Reserve Cr 8 Current Year |
|---|---|---|---|---|---|---|---|
| General Account - Authorized - Affiliates - U.S. Affiliates | | | | | | | |
| 83607 | 43-1380564 | 08/01/2012 | GUGGENHEIM LIFE & ANN CO | DE | ACOFW/I | | 315,006,946 |
| 83607 | 43-1380564 | 03/01/2012 | GUGGENHEIM LIFE & ANN CO | DE | ACOFW/I | | 851,617,795 |
| 66044 | 46-0164570 | 01/01/1988 | MIDLAND NATL LIFE INS CO | IA | COI/I | 25,519,855 | 4,390,539 |
| 0199999 Subtotal - General Account - Authorized - Affiliates - U.S. Affiliates | | | | | | 25,519,855 | 1,171,015,280 |
| 0399999 Total - General Account - Authorized - Affiliates | | | | | | 25,519,855 | 1,171,015,280 |

[11] https://agents.equitrust.com/AnnuitiesHome/StrengthofEquiTrust/tabid/213/Default.aspx.

[12] https://agents.equitrust.com/Portals/0/Forms/ET-FINOV.pdf.

243. As shown above, Guggenheim Life itself lacks independent payment ability, and is in no better position to satisfy that obligation than it is to satisfy the $502 million obligation to Security Benefit Life.

244. But it gets worse. EquiTrust Life also reduces its 2012 liabilities by ceding $1.198 billion in insurance to affiliated entity Heritage, which it (like Security Benefit Life) falsely classifies as an "U.S. non-affiliate" in its Schedule S Part 3 – Section 1:

| General Account - Authorized - Non-Affiliates - U.S. Non-Affiliates | | | | | | | |
|---|---|---|---|---|---|---|---|
| 64394 ... | 86-0165716 ... | 10/01/2000 | HERITAGE LIFE INS CO | ... | AZ ... | COFW/I ... | ... | 1,198,321,211 |
| 63088 ... | 42-0623913 ... | 12/30/2011 | FARM BUREAU LIFE INS CO | ... | IA ... | CO/I ... | 530,641,671 ... | 25,830,919 |
| 0499999 Subtotal - General Account - Authorized - Non-Affiliates - U.S. Non-Affiliates | | | | | | | 530,641,671 | 1,224,152,130 |

245. As shown above, Heritage is in fact a Guggenheim affiliate. Accordingly, EquiTrust Life holds some $2.4 billion in uncollectable affiliated reinsurance: $1.2 billion with Guggenheim Life and $1.2 billion with Heritage.

246. Moreover, as with Security Benefit Life and Guggenheim Life, the value of EquiTrust Life's remaining assets are grossly overstated given the illiquid and non-performing nature of those assets. For example, in 2012 EquiTrust Life reported $1.646 billion in undescribed, "other" forms of MBS.

247. When EquiTrust Life's shell games are disregarded – as they must be under the governing statutory accounting rules and principles, including SSAP No.'s 4, 15 & 25 – EquiTrust Life is revealed to have *negative* "surplus" throughout the Class Period, which means that assets backing EquiTrust Life's ability to perform its obligations to its annuity purchasers have necessarily been materially impaired and are materially less than represented.

248. Purchasers of annuity products from EquiTrust Life like Plaintiff Schulzki received a product that was worth far, far less than they paid for them. No reasonable person would purchase annuity products from EquiTrust Life during the Class Period if not deceived.

- 65 -

4.    **Summary:  Defendants have engaged in a massive fraudulent swirl of deceptive non-economic reinsurance transactions designed to falsely present a positive surplus for the Guggenheim Insurers.**

249.    In sum, the represented surplus of all three Guggenheim Insurers plus Paragon in 2012 – $2.028 billion – is eliminated by backing out Defendants' accounting machinations that violate the statutory rules for insurance companies and fraudulently overstate the Insurers' financial solvency.  Indeed, even the $2.89 billion "reinsurance" transaction with secretly affiliated Heritage *alone* eclipses the Guggenheim Insurers' aggregate represented surplus.

250.    The fraudulent movement of current liabilities, as depicted above, around and among the disclosed and concealed Guggenheim affiliated entities lack economic substance and was simply designed to distort the Guggenheim Insurers' true insolvent financial condition.

**G.    Defendants Profit from the Fraud**

251.    Since acquiring the Guggenheim Insurers, Defendants have used them as veritable cash machines, plundering their assets and saddling them with enormous liabilities that have materially impaired the Guggenheim Insurers' obligations to their annuity holders.

252.    As shown below, Defendants used the fraudulent accounting schemes described above to not only fund aggressive, speculative and illiquid investments, but to pay themselves, their affiliates and associates vast amounts of money in the process.

1.    **Guggenheim extracted dividend payments from the Guggenheim Insurers when those insurers did not have the requisite surplus and profits to support paying dividends.**

253.    For the reasons explained above, an insurance company may pay dividends to its parent company only out of genuine surplus and profits.

254.    Since its acquisition of the Guggenheim Insurers, Guggenheim has arranged the payment of over ***$445 million*** in stockholder dividends from the Guggenheim Insurers to their

respective Guggenheim immediate parents, at a time when (as shown above in Paragraphs 157-249) the Guggenheim Insurers had neither the surplus nor the profit history to do so:

| Stockholder Dividends Paid Since Acquisition | | | | | | |
|---|---|---|---|---|---|---|
| Company | Date of Acquisition by Guggenheim | Dividends Paid in 2010 | Dividends Paid in 2011 | Dividends Paid in 2012 | Dividends Paid Q1 & Q2 2013 | Culmulative Dividends Paid since Acquisition |
| Wellmark Comm. Ins., Inc. (now Gugg L&A) | August 2009 | $0 | $0 | $45,018,582 | $88,254,328 | $133,272,910 |
| Security Benefit Life | July 2010 | $0 | $25,000,000 | $45,605,991 | $119,264,979 | $189,870,970 |
| Equitrust | December 2011 | - | $4,539,211 | $29,470,819 | $92,831,373 | $122,302,192 |
| | Totals: | $0 | $29,539,211 | $120,095,392 | $300,350,680 | $445,446,072 |

255.     As alleged in Paragraph 85 above, such siphoning of funds through payment of dividends is exactly the sort of abuse that the NAIC Examiner's Handbook warns examiners to scrutinize.

**2.      Guggenheim extracted outsized management fees from the Guggenheim Insurers.**

256.     Management fees are common within insurance holding company structures and represent the amounts paid by the insurer to its non-insurer affiliate(s) for "management" of the insurer's operations.  These services provided by the affiliate(s) must be described in a Management Agreement.  The terms are required to be "fair and reasonable," but are often a source of abuse because they are agreed upon by common management and can be a source of significant revenue to the non-insurer affiliated parties.

257.     Since its acquisition of each of the Guggenheim Insurers, Guggenheim has arranged the payment of *$217 million* from the Guggenheim Insurers to Guggenheim affiliates in supposed "management fees," as detailed below:

| Management Fees Paid Since Acquisition | | | | |
|---|---|---|---|---|
| Company | Date of Acquisition by Guggenheim | Management Fees Paid in 2011 | Management Fees Paid in 2012 | Culmulative Management Fees Paid since Acquisition |
| Wellmark Comm. Ins., Inc. (now Gugg L&A) | August 2009 | $14,332,993 | $22,908,461 | $37,241,454 |
| Security Benefit Life | July 2010 | $62,281,485 | $76,911,551 | $139,193,036 |
| Equitrust | December 2011 | $2,130,683 | $41,285,634 | $41,285,634 |
| | Totals: | $78,745,161 | $141,105,646 | $217,720,124 |

- 67 -

Such management fees paid by the Guggenheim Insurers are grossly disproportionate to the level of management fees paid by others in the industry.

258. As alleged in Paragraph 85 above, such payment of outsized fees to affiliated entities is again a form of abuse identified in the NAIC Examiner's Handbook.

**3.** **Guggenheim extracted substantial "investment fees" from the Guggenheim Insurers without delivering corresponding value through *bona fide* investment services.**

259. Since its acquisition of each of the Guggenheim Insurers, Guggenheim has also arranged the payment of another ***$55 million*** from the Guggenheim Insurers to Guggenheim affiliates in supposed "investment fees:"

| Investment Fees Paid Since Acquisition | | | | | |
|---|---|---|---|---|---|
| Company | Date of Acquisition by Guggenheim | Investment Fees Paid in 2010 | Investment Fees Paid in 2011 | Investment Fees Paid in 2012 | Culmulative Management Fees Paid since Acquisition |
| Wellmark Comm. Ins., Inc. (now Gugg L&A) | August 2009 | $2,299,457 | $4,158,294 | $8,526,237 | $14,983,988 |
| Security Benefit Life | July 2010 | $10,509,358 | $9,812,531 | $15,211,587 | $25,024,118 |
| Equitrust | December 2011 | - | $8,398,306 | $15,330,039 | $15,330,039 |
| | Totals: | $12,808,815 | $22,369,131 | $39,067,863 | $55,338,145 |

260. As shown below, these investment fees were unearned, because the Guggenheim investment advisors did little more than sell affiliated Guggenheim notes to Security Benefit Life (not coincidentally generating commissions for those Guggenheim affiliates). The payment of "investment fees" in such instances was thus essentially a vehicle by which funds were siphoned from Security Benefit Life and the other Guggenheim Insurers to Guggenheim and its affiliates, while simultaneously moving the Guggenheim Insurer's funds into Guggenheim's own projects.

261. Such payment of outsized fees to affiliated entities is yet another sort of abuse identified in the NAIC Examiner's Handbook.

**4.** **Guggenheim extracted cash from the Guggenheim Insurers through the use of affiliate loans and promissory notes.**

262. Guggenheim has caused the Guggenheim Insurers to lend enormous amounts of their funds to Guggenheim affiliates.

263. For example, Guggenheim has essentially used Security Benefit Life as a line of credit for Guggenheim projects. As of December 31, 2012, Security Benefit Life had loaned nearly $1 billion to Guggenheim affiliates, through loans classified as either short-term investments (Schedule DA) or long-term investments (Schedule BA).

264. The amount of affiliated paper is even more staggering when one considers the Guggenheim Insurers as a whole. As of December 2012, the Guggenheim Insurers had been "sold" over *$5.1 billion* in affiliated debt instruments (mostly unsecured promissory notes) since their respective acquisitions by Guggenheim:

### All Four Guggenheim Insurers - Affiliated Investments 2012

| Company | Schedule | Investment Type | Amount of Affilated Investment | Reported Surplus |
|---------|----------|-----------------|-------------------------------|------------------|
| SBL | BA (SEP) | Separate Accounts | $925,219,687 | |
| SBL | BA | "Other" Long Term | $314,600,000 | |
| SBL | D Pt 2 | Common Stock | $21,731,662 | |
| SBL | DA | Short Term | $394,340,424 | $766,966,609 |
| GLAC | BA (SEP) | Separate Accounts | $964,370,422 | |
| GLAC | BA | "Other" Long Term | $242,615,120 | |
| GLAC | D | Bonds | $351,010,000 | |
| GLAC | D Pt 2 | Common Stock | $172,410,785 | |
| GLAC | E Pt 2 | Cash Equivalents | $396,918,777 | $487,529,302 |
| EQT | BA | "Other" Long Term | $168,297,751 | |
| EQT | D | Bonds | $484,865,000 | |
| EQT | DA | Short Term | $316,781,488 | |
| EQT | E Pt 2 | Cash Equivalents | $233,552,000 | $706,968,965 |
| Paragon | BA | "Other" Long Term | $25,000,000 | |
| Paragon | D | Bonds | $95,095,000 | |
| Paragon | D Pt 2 | Common Stock | $31,484,689 | $65,553,524 |
| | | **Total** | **$5,138,292,805** | **$2,027,018,400** |

| | |
|---|---|
| Affiliated Investments as % of Reported Surplus: | 253.49% |

265. The total concentration of Guggenheim Insurer investments in Guggenheim-affiliated companies is astounding, particularly when one compares that total ($5.1 billion) with

the total reported surplus for all four Guggenheim companies ($2 billion).  Moreover, this

overconcentration has been concealed by Defendants by placing many of these affiliated

investments in the wrong asset schedules.  While some of these incestuous investments are as

required reported in Schedule D, many others are simply folded into Schedules BA, DA and E

Part 2 where the affiliated nature of the investment is not readily ascertained.

> **5.    Guggenheim used Guggenheim Insurer funds in its highly-leveraged and speculative Dodgers acquisition, and then concealed it in the Guggenheim Insurers' financial statements.**

266.    Perhaps most egregious is Guggenheim's use of over $1.2 billion of the

Guggenheim Insurers' funds to finance its purchase of the Dodgers while concealing the source

and use of the funds in their financial statements.

267.    In July 2012, Guggenheim paid approximately $2.15 billion for the Dodgers, the

largest amount ever paid for a sports franchise in the U.S. and more than $500 million over the

next highest bid.  Over one-half of the acquisition price (some $1.2 billion) was paid using

Guggenheim Insurer funds.

268.    Guggenheim's CEO Walter put together the deal with, among others,

Guggenheim President Boehly, Patton, celebrity Magic Johnson, and others.  Walter is now the

Chairman and controlling owner of the Dodgers.

269.    Walter has admitted that the acquisition was not justified as an investment, let

alone a conservative one:  "I don't want to realize a return on investment on buying the Dodgers.

I want to have a multi-generational relationship that changes my life, Magic's life, Magic's

grandchildren's lives and all of our lives."  As NEW YORK TIMES "Deal Book" columnist

Andrew Ross Sorkin noted in an article dated April 9, 2012,[13] Walter and Boehly "appear to be

---

[13] http://dealbook.nytimes.com/2012/04/09/a-costly-toy-subsidized-by-others/?_r=0.

living out a childhood fantasy using other people's money, some of whom may not even realize it."  Sorkin concluded:  "Paying a record amount for a pro sports team may or may not turn out to be a good bet.  But if rich guys are going to buy their toys, they should probably use only their own money."

270.     Boehly, in May 2013, discussed Guggenheim's acquisition of the Dodgers at the Milken Institute Global Conference, wherein he described that acquisition as an entertainment property.  Boehly acknowledged the speculative nature of the acquisition, stating that the "energy in Dodger Stadium is magnetic, and you can feel that, but you still can't guarantee a winner, and that is also what sports in the big-bucks era is all about."[14]

271.     Although Guggenheim President Boehly has publicly admitted that insurance funds were used for the Dodger acquisition, Defendants have concealed the exact source of the funds in the Annual Statements filed by the Guggenheim Insurers.

272.     Indeed, there is ***no mention*** of the Dodgers or baseball in ***any*** report filed by any of the Guggenheim Insurers since July 2012.  However, Security Benefit Life's Schedule BA-Part 2 dated June 2012 does reflect a $35 million payment from Security Benefit Life to something called "SEC-BEN GBM Investco, LLC," made June 30, 2012.  Likewise, EquiTrust Life's Schedule DA-Part 1 dated December 2012 reflects a $50 million payment from EquiTrust Life on March 28, 2012, to something called "SEC-BEN GBM Investco 4, LLC," – listed as a short-term investment.  Upon information and belief, "GBM" in each of these entries relates to Guggenheim Baseball Management, LLC, the private partnership Guggenheim formed in 2011 to acquire the Dodgers.

---

[14] http://www.hollywoodreporter.com/news/guggenheims-todd-boehly-talks-dodgers-450303.

273.     In addition, on the last day of 2012, Security Benefit Life extended over $925 million dollars in loans to an entity only cryptically identified as "IDF-V":

ANNUAL STATEMENT FOR THE YEAR 2012 OF THE SEPARATE ACCOUNTS OF TH

### SCHEDULE BA - PART 1
Showing Other Long-Term Invested Assets OWNED December 31 of C

| 1 CUSIP Identification | 2 Name or Description | 3 Code | Location 4 City | 5 State | 6 Name of Vendor or General Partner | 7 NAIC Designation | 8 Date Originally Acquired | 9 Type and Strategy | 10 Actual Cost | 11 Fair Value | 12 Book / Adjusted Carrying Value Less Encumbrances |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Any Other Class of Assets - Unaffiliated | | | | | | | | | | | |
| ,000000-00-0 | Series A | | Topeka | KS | IDF-V | | 12/31/2012 | | 350,000,000 | 350,000,000 | 350,000,000 |
| ,000000-00-0 | Series C | | Topeka | KS | IDF-V | | 12/31/2012 | | 300,000,000 | 300,000,000 | 300,000,000 |
| ,000000-00-0 | Series B | | Topeka | KS | IDF-V | | 12/31/2012 | | 275,219,687 | 275,219,687 | 275,219,687 |
| 3799999 - Any Other Class of Assets - Unaffiliated | | | | | | | | | 925,219,687 | 925,219,687 | 925,219,687 |

Notably, Security Benefit Life gives no CUSIP or other identifying information for this nearly $1 billion use of Security Benefit Life funds.  Plaintiffs allege, upon information and belief, that these funds were ultimately used in Guggenheim's acquisition of the Dodgers.

274.     Guggenheim's acquisition of the Dodgers using Guggenheim Insurers' funds is at a minimum a highly speculative and exceptionally illiquid investment, appropriate perhaps for a private equity fund but wholly inappropriate for an insurance company with long-term obligations to its annuity holders.

275.     Since its announcement, the speculative deal has only gotten worse.  On May 29, 2013, it was reported that Guggenheim would be required to pay an additional $135 million a year under Major League Baseball's revenue-sharing agreement, amounting to more than $1 billion in lost expected revenue.

**6.     Guggenheim inappropriately loaned funds to other Guggenheim cronies.**

276.     Extending personal loans to individuals or companies they own is the antithesis of an appropriate, conservative investment for an insurance company.  Yet Defendants have made such loans with Guggenheim Insurer funds, the full extent of which cannot be clearly ascertained from their Annual Statements.

- 72 -

277.     For example, as noted above, Patton teamed up with Guggenheim to acquire the Dodgers using Guggenheim Insurers' funds.  But Guggenheim has also directed additional Guggenheim Insurers' funds to Patton, through a number of LLCs owned by him.

278.     Specifically, in the first quarter of 2013, Security Benefit Life, Guggenheim Life, EquiTrust Life and Paragon reported loans of $914 million to a series of newly formed "unaffiliated" Delaware LLCs:  Eikenberry Secured Holdings, LLC; Elmdale Company Holdings, LLC; Fogell Collateral Holdings Company, LLC; Murillo Company, LLC; Newhook Secured Holdings, LLC; Archfield Secured Holdings, LLC; Burnaby Collateral Holdings, LLC; Medling Collateral Holdings, LLC; and Yorston Company, LLC.  These transfers are confirmed by Schedule BA filings of each of the Guggenheim companies:

MARCH 31, 2013 OF THE Security Benefit Life

### SCHEDULE BA - PART 2

| CUSIP Identification | Name or Description | Vendor or General Partner | Cost at Time of Acquisition |
|---|---|---|---|
| Collateral Loans - Unaffiliated | | | |
| ...000000-00-0... | ELMDALE COLLATERAL LLC | ELMDALE COLLATERAL LLC | 46,500,000 |
| ...000000-00-0... | MURILLO COLLATERAL LLC | MURILLO COLLATERAL LLC | 60,000,000 |
| ...000000-00-0... | BURNABY COLLATERAL LLC | BURNABY COLLATERAL LLC | 33,000,000 |
| ...000000-00-0... | YORSTON COLLATERAL LLC | YORSTON COLLATERAL LLC | 57,500,000 |
| ...000000-00-0... | ARCHFIELD COLLATERAL LLC | ARCHFIELD COLLATERAL LLC | 21,000,000 |
| 2399999 - Collateral Loans - Unaffiliated | | | 218,000,000 |

MARCH 31, 2013 OF THE Guggenheim Life

### SCHEDULE BA - PART 2

| Collateral Loans - Unaffiliated | | | |
|---|---|---|---|
| ...BGH34Z-TG-2... | ELMDALE COMPANY LLC | DIRECT LOAN FUNDING ALTERNATE | 30,000,000 |
| ...BGH34Z-TH-0... | FOGELL COLLATERAL COMPANY LLC | DIRECT LOAN FUNDING ALTERNATE | 33,000,000 |
| ...BGH34Z-TJ-6... | MURILLO COMPANY LLC | DIRECT LOAN FUNDING ALTERNATE | 50,000,000 |
| ...BGH350-B5-1... | EIKENBERRY SECURED HOLDINGS LLC | DIRECT LOAN FUNDING ALTERNATE | 20,000,000 |
| 2399999 - Collateral Loans - Unaffiliated | | | 133,000,000 |

- 73 -



MARCH 31, 2013 OF THE EQUITRUST LIFE INS

## SCHEDULE BA - PART 2

| | | | |
|---|---|---|---|
| BGH350-62-4 | ARCHFIELD SECURED HLDGS LLC 7.050% 03/12/20 | Direct | 78,000,000 |
| BGH350-61-6 | BENVILLE SECURED HLDGS LLC Unaffiliated 6.950% 03/20/20 | Direct | 40,000,000 |
| BGH350-5Z-2 | BURNABY COLLAT HLDGS CO LLC Loans- 6.950% 03/20/20 | Direct | 71,500,000 |
| BGH33V-JU-2 | CAPROCK FUNDING A LLC 7.000% 01/15/18 | Direct | 5,460,000 |
| BGH33V-JV-0 | CAPROCK FUNDING B LLC 7.000% 01/15/18 | Direct | 60,000,000 |
| BGH350-B5-1 | EIKENBERRY SEC HLDGS LLC 6.950% 03/10/20 | Direct | 51,000,000 |
| BGH34Z-TG-2 | ELMDALE COMPANY 6.450% 03/23/18 | Direct | 29,500,000 |
| BGH34Z-TH-0 | FOGELL COLLATERAL CO LLC 6.700% 03/20/18 | Direct | 37,000,000 |
| BGH33V-J5-7 | KITTS HILL FUNDING B LLC 7.000% 01/15/18 | Direct | 62,200,000 |
| BGH34Z-63-2 | MELDING COLLAT HLDG CO LLC 7.050% 03/23/20 | Direct | 5,000,000 |
| BGH34Z-TJ-6 | MURILLO COMPANY LLC 4.000% 03/20/17 | Direct | 65,000,000 |
| BGH34Z-TK-3 | NEWHOOK SECURED HLDGS LLC 6.950% 03/12/20 | Direct | 75,000,000 |
| BGH350-60-8 | YORSTON COMPANY LLC 7.550% 03/10/23 | Direct | 69,000,000 |
| 2399999. Collateral Loans - Unaffiliated | | | 658,660,000 |

Less Caprock & Kitts Hill (Not in Patton Hldg Co):  <$127.660.000>

Total Patton Entities:  **$531.000.000**

MARCH 31, 2013 OF THE Paragon Life Insurance

## SCHEDULE BA - PART 2

| | | | |
|---|---|---|---|
| BGH350-62-4 | ARCHFIELD SECURED HLDGS LLC 7.050% 03/12/2 | DIRECT | 13,000,000 |
| BGH350-5Z-2 | BURNABY COLLAT HLDGS CO LLC Unaffiliated 6.950% 03/20/20 | DIRECT | 10,000,000 |
| BGH34Z-TG-2 | ELMDALE COMPANY Loans- 6.450% 03/23/18 | DIRECT | 13,000,000 |
| BGH34Z-TH-0 | FOGELL COLLATERAL CO LLC 6.700% 03/20/18 | DIRECT | 13,000,000 |
| BGH34Z-63-2 | MELDING COLLAT HLDG CO LLC 7.050% 03/23/20 | DIRECT | 13,000,000 |
| BGH34Z-TJ-6 | MURILLO COMPANY LLC 4.000% 03/20/17 | DIRECT | 13,000,000 |
| BGH350-60-8 | YORSTON COMPANY LLC 7.550% 03/10/23 | DIRECT | 13,000,000 |
| 2399999. Collateral Loans - Unaffiliated | | | 88,000,000 |

279.   No publicly available Security Benefit Life, Guggenheim Life, EquiTrust Life or Paragon document identifies the ownership of these entities.  However, a statement filed by Heritage in June 2013 reveals that the recipient LLCs are in fact indirectly owned by Patton:



280.     Defendants have thus transferred nearly $1 billion of Guggenheim Insurer funds for the use and benefit of Patton, a co-owner of the Dodgers.  Such loans should not have shown as unaffiliated since Patton and his company are affiliated with Guggenheim.

281.     As three further examples, Security Benefit Life's 2012 Schedule BA – Part 1 reveals that Security Benefit Life has also extended personal loans to Lowell Kraft, to David Palmer, and to a company affiliated with Palmer, all dated December 31, 2011.

**7.     Concerns About Private Equity Have Been Realized.**

282.     In sum, the industry concerns regarding equity fund ownership and exploitation of insurance companies has been sadly realized in Guggenheim's acquisition and draining of the Guggenheim Insurers.  Guggenheim has essentially operated the Guggenheim Insurers like a cash machine, spending their policyholder and annuity holder revenues on payments to

- 75 -

Guggenheim affiliates and cronies and on speculation in highly illiquid assets. This looting was enabled and concealed by a fraudulent scheme of sham transactions between affiliated entities and other misrepresentations that falsely portrayed the positive surplus and financial stability of each Guggenheim Insurer. The result, as detailed in Paragraphs 157-249 above, is that the Guggenheim Insurers all have *negative* surplus and have thus necessarily impaired their ability to satisfy their long-term obligations to their annuity holders.

## H. The Fraudulent Scheme Has Accelerated in 2013

283. The foregoing analysis is based on Annual Statements filed by the Guggenheim Insurers from 2010 through 2012. Available quarterly reports for 2013 confirm that Defendants' pattern and practice has not only continued, it has accelerated.

284. For example, in the first quarter of 2013 alone, purportedly non-affiliated Heritage had a sudden surge of invested assets: from only $150 million at December 31, 2012, to more than *$3.9 billion* 90 days later on March 31, 2013. Heritage listed nearly all of those assets as having been acquired directly from Security Benefit Life and EquiTrust Life. Although Heritage's Schedule S regarding reinsurance does not describe any changes in the reinsurance from year-end 2012, it appears that the assets were sent out of Security Benefit Life and EquiTrust Life to Heritage in connection with its reported "non-affiliated" reinsurance.

285. Moreover, in its filed Schedules, Heritage continues to mischaracterize Security Benefit Life as "unaffiliated:"

STATEMENT AS OF MARCH 31, 2013 OF THE HERITAGE LIFE

## SCHEDULE BA - PART 2

Showing Other Long-Term Invested Assets ACQUIRED AND ADDITIONS MADE

| 1 CUSIP Identification | 2 Name or Description | Location | | 5 Name of Vendor or General Partner | 6 NAIC Designation |
|---|---|---|---|---|---|
| | | 3 City | 4 State | | |
| 81x120-AA-9 | SECURITY BENEFIT LIFE INSURANG 144A SURPLUS NOTES   8.750% 05/15/16 | | | EquiTrust Life Ins Co | 3FE |
| 81x120-AC-5 | SECURITY BENEFIT LIFE INSURANG 7.45% 10/1/2033 SURPLUS NOTES   7.450% 10/01/33 | | | EquiTrust Life Ins Co | 3FE |
| 2199999. Surplus Debentures, etc - Unaffiliated | | | | | |

010342-12  658147 V1

286.     Meanwhile, Security Benefit Life and the other Guggenheim Insurers continue to sell their annuities aggressively, attracting consumers with supposedly safe and secure annuity products that they do not have the assets to back. According to Beacon Research's most recent Fixed Annuity Premium Study, Security Benefit Life achieved a first-place ranking in total fixed annuity sales for the 4th quarter of 2012, and a second-place ranking in total fixed indexed annuity (FIA) sales during the same period.  Security Benefit Life's Total Value Annuity (TVA) – the same annuity product sold to Plaintiffs – was ranked #1 and #2 respectively in FIA sales for the last half of 2012, according to the report.[15]

287.     Not coincidently, on May 23, 2013, Security Benefit Life paid yet another cash dividend, of over $119 million, to its Guggenheim parent.

288.     And effective August 1, 2013, Guggenheim acquired yet another vulnerable insurance company, purchasing the domestic U.S. annuity business and certain life insurance businesses of Sun Life Financial Inc. ("Sun Life") and placing it in Delaware Life Holdings, LLC, a  subsidiary formed by Guggenheim in December 2012 and controlled by Walter.

## V.       RICO ALLEGATIONS

**A.       Standing, Injury, and Proximate Cause**

289.     Plaintiffs and the members of the putative Class are each "persons" within the meaning of 18 U.S.C. § 1961(3).

290.     Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

291.     Plaintiffs and each member of the putative Class has sustained injury to his or her business or property by reason of the acts and the conduct of Defendants alleged in this

---

[15] Security Benefit Life Press Release, May 2, 2013,
https://www.securitybenefit.com/news/05022013/fixed-annuity-sales.aspx

Complaint, including their loss of money due to their overpayment at the time of sale for the annuity products sold to them during the Class Period by the Guggenheim Insurers.

292.     But for the conduct of Defendants alleged in this Complaint, Plaintiffs and the putative Class would not have been injured.

293.     The loss suffered by Plaintiffs and each member of the Class was proximately caused by Defendants, as the alleged fraudulent scheme and enterprise was a direct and substantial factor in causing their injury.  As in *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), the injury suffered by Plaintiffs and each member of the Class here was "a foreseeable and natural consequence of [Defendants'] scheme" to continue selling annuity products based on misrepresentation of the Guggenheim Insurers' positive surplus and financial stability.  Moreover, there are no victims beyond Plaintiffs and the putative Class more directly injured by Defendants' scheme and enterprise who can be counted on to seek remedies under RICO.

294.     The harm suffered by Plaintiffs and each member of the Class amounts to compensable injury caused by Defendants' conduct of an enterprise through a pattern of racketeering.  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985).

295.     Plaintiffs and the Class were the targets of the RICO scheme.  They purchased annuities issued by the Guggenheim Insurers based on false express and implied representations of positive surplus and financial stability.  Plaintiffs and the Class would not have purchased the annuities had they known the Guggenheim Insurers' true financial condition, including in particular their negative "surplus" situation.

296.     In addition, Plaintiffs and each member of the Class was injured by the overt acts taken by the Defendants in furtherance of their conspiracy to violate Section 1962(c) which are

- 78 -

themselves predicate acts, including the generation of bogus reinsurance credits used to depict the Guggenheim Insurers as having positive surplus when these companies were actually insolvent by hiding liabilities through a series of fraudulent transactions among the Guggenheim Insurers, Paragon and Heritage and fraudulently overstating assets in violation of statutory accounting rules.

**B.      The Alleged Associated-in-Fact RICO Enterprise**

297.    The following group of individuals associated-in-fact as an "enterprise" within the meaning of 18 U.S.C. § 1961(4) to market and sell the Guggenheim Insurers' annuity products during the Class Period while concealing the Guggenheim Insurers' true financial condition:

- Guggenheim;

- Walters and Boehly;

- the Guggenheim Insurers (Security Benefit Life, Guggenheim Life, and EquiTrust Life);

- Paragon;

- Patton; and

- Heritage.

This association-in-fact is referred to herein as the "RICO Enterprise."

298.    As set forth herein, the RICO Enterprise has an ascertainable structure that is separate and distinct from the persons that constitute the enterprise and it is separate and apart from the pattern of racketeering activity alleged herein.

299.    As alleged more fully below, Defendants conducted affairs of the RICO Enterprise through a pattern of racketeering activity.  Defendants fraudulently concealed and conspired to fraudulently conceal (1) the true negative surplus condition and financial instability

of the Guggenheim Insurers, (2) the true value of the Guggenheim Insurers' annuity products, and (3) the siphoning of Guggenheim Insurer cash for the use and benefit of individual enterprise members.

300.    As a direct result of this fraudulent scheme, Defendants were able to and did charge Plaintiffs and the Class excessive prices for the Guggenheim Insurers' annuity products. As a direct result of this fraudulent scheme, Defendants were able to raid the Guggenheim Insurers of billions of dollars, leaving the annuity holders holding products they never would have purchased had they known the true financial condition of the Guggenheim Insurers.

301.    The alleged RICO Enterprise has a sufficiently ascertainable structure in that it has (1) a purpose, (2) relationships among the associates, and (3) longevity sufficient to achieve its purpose. *Boyle v. United States*, 129 S. Ct. 2237 (2009).

## C.    Purpose

302.    The RICO Enterprise is an ongoing and continuing organization of companies associated for the common or shared purpose of continuing to market and sell the life insurance and annuity products of the Guggenheim Insurers as a source of funds for Guggenheim, Walter, Boehly, and Patton while concealing the negative surpluses and financial instability of the Guggenheim Insurers through Heritage and Paragon.

303.    The RICO Enterprise functions, in part, by deceiving prospective annuity purchasers regarding the value of the Guggenheim Insurers' annuity products sold to them during the Class Period.  If truly objective and disinterested, and if not used as a ruse to promote and effectuate the sale of these the Guggenheim Insurers' annuity products, many of these services and products could be legitimate and non-fraudulent.  However, Defendants have through the RICO Enterprise engaged in a pattern of racketeering activity which involves a

fraudulent scheme to increase revenues for Guggenheim through the sale of the Guggenheim Insurers' annuities policies by concealing their true financial condition.

**D.      Relationships among Separate and Distinct Associates**

304.     Each associate of the RICO Enterprise has an existence separate and distinct from its participation in the racketeering activities of the RICO Enterprise.  Guggenheim, Security Benefit Life, EquiTrust Life, Guggenheim Life, Heritage, and Paragon are all organized as separate companies, with separate boards, separate books and records, separate accounts and separate existences for legal and regulatory purposes.  Security Benefit Life, EquiTrust Life, and Guggenheim Life facilitated and knowingly participated in the fraudulent scheme orchestrated by Guggenheim.  So too did Heritage, which is separately indirectly owned by Patton and was corrupted as part of the scheme.

305.     The RICO Enterprise also has an existence and structure that is separate and distinct from other affairs of its members.  Members of the RICO Enterprise engage in business operations separate and apart from their activities on behalf of the Enterprise.  Guggenheim, for example, is a privately held global financial services firm with more than $190 billion in assets under management; Guggenheim provides asset management, investment banking and capital markets services, insurance services, institutional finance and investment advisory solutions to institutions, governments and agencies, corporations, investment advisors, family offices, and individuals.

306.     Defendants nevertheless became associated with the RICO Enterprise, and conducted or participated in the affairs of the RICO Enterprise in addition to their own affairs. The activities engaged in by the associates of the RICO Enterprise facilitating the racketeering activities are not, however, ordinary legitimate business activities and, in fact, were unlawful and

- 81 -

would be inimical to the interests of the RICO Enterprise members if understood by regulatory or law enforcement officials.

307.     Each member of the RICO Enterprise has a clearly defined role and relationship in the conduct of the affairs of the RICO Enterprise, and as alleged above all of the associates took some part in directing the RICO Enterprise's affairs:

- Guggenheim, Walter, Boehly, and Patton engaged in the siphoning of funds from the Guggenheim Insurers.

- Guggenheim, Walter, Boehly, and Patton coordinated the transfer of current liabilities off the Guggenheim Insurers' Annual Statements so as to give the false impression of positive surplus and financial stability and to permit the illicit siphoning of cash from the Guggenheim Insurers.

- Walter, Boehly, and Patton used a substantial amount of the siphoned funds for personal purposes or purposes not in the interests of the Guggenheim Insurers, including for the speculative Dodgers purchase.

- The Guggenheim Insurers designed and sold annuity and life insurance products promising to perform obligations for which they lacked the admitted assets to support, and collected the proceeds for the RICO Enterprise.

- Heritage served as a corrupt and purportedly "unaffiliated" entity that accepted ceded liabilities from the Guggenheim Insurers to allow them to falsely represent themselves as having positive surplus.

- Paragon served as a corrupt and affiliated entity that accepted ceded liabilities from the Guggenheim Insurers to allow them to falsely represent themselves as having positive surplus.

- Officials from each company involved themselves in the affairs of the others.  For example, as more particularly alleged supra in Paragraphs 143, 159, 214 and 231, as the primary conductors and beneficiaries of the fraudulent Scheme Guggenheim's Walter and Boehly assumed positions of control within the Guggenheim Insurers and Patton acquired control over Heritage. As an additional example, on December 31, 2012, major officer and director

positions of Heritage were held by people who worked at Guggenheim and the Guggenheim Insurers, as more particularly alleged *supra* in Paragraph 152.

308.     In these ways and others, each of the Defendants directly or indirectly participated in, or managed aspects of, facilitated or otherwise took some part in directing the unlawful activities comprising the RICO Enterprises' affairs.

309.     The cooperation exhibited by the members of the RICO Enterprise fell outside the bounds of the parties' normal commercial relationships and was undertaken to advance the corrupt purposes of the RICO Enterprise.

310.     Guggenheim has taken over and manipulated Guggenheim Life, Security Benefit Life, and EquiTrust Life.  Guggenheim's acquisition and use of these subsidiaries made it easier to commit and conceal the fraud, because it allowed the generation of phony reserve credits through circular, non-economic reinsurance transaction among the controlled entities.

311.     Guggenheim and Patton also infiltrated and manipulated Heritage, which agreed to and did falsely report itself as not affiliated with the Guggenheim Insurers. Guggenheim and Patton thus involved themselves in the affairs of Heritage for an illicit purpose, arranging for it to assume billions of dollars in liabilities so as to generate phony reserve credits for Security Benefit Life and EquiTrust Life while hundreds of millions of dollars have been siphoned off to members of the RICO Enterprise.

312.     The RICO Enterprise's decision to operate through the Guggenheim Insurers, Paragon and Heritage thus facilitated its unlawful activity. Defendants consciously used the separate corporate forms of the Guggenheim Insurers and Paragon in order to make the fraudulent scheme harder to detect and better conceal the nature and extent of their misrepresentations and wrongdoing. Indeed, the success of the RICO Enterprise depended upon

- 83 -

the appearance of distinctness between Guggenheim, the Guggenheim Insurers, Paragon and Heritage.

313.    Moreover, the Guggenheim Insurers took actions inimical to their own self-interest, such as transferring billions of dollars of their funds to Guggenheim affiliates and to highly illiquid, speculative ventures like the Dodgers that would otherwise be available to make payments its annuity holders or to its policyholders.

**E.    Continuous Existence**

314.    The RICO Enterprise has had an ongoing and continuous existence during the Class Period sufficient to permit the Defendants to pursue the RICO Enterprise's purpose. Throughout the Class Period, the members of the RICO Enterprise associated in fact to market and sell the Guggenheim Insurer's annuity products while concealing their true financial condition, on an ongoing rather than *ad hoc* basis.  None of the Defendants acted independently or in competition with one another, or otherwise in a manner contrary to the RICO Enterprise's purpose.

315.    The phony reserve credits reported by the Guggenheim Insurers were not generated independently and without coordination; to the contrary, the fundamental circularity of the non-economic reinsurance transactions could only have been accomplished with the coordination and cooperation of each member of the RICO Enterprise, including in particular supposedly non-affiliated Heritage.  No associate of the RICO Enterprise could have accomplished the goals of the liability-dumping scheme on its own initiative.

316.    The RICO Enterprise has displayed a continuity of membership during the Class Period exceeding two years, during which time Defendants acted continuously in their respective roles in the RICO Enterprise.  And there is a very real threat of continued misconduct.  As

alleged *supra* in Section III.G., available quarterly reports for 2013 confirm that Defendants'

pattern and practice is continuing, even accelerating.

317.    During the Class Period, each associate in the RICO Enterprise was aware of the

scheme to misstate the Guggenheim Insurers' true financial condition and was a knowing and

willing participant in that scheme.

## F.    Interstate Commerce

318.    The RICO Enterprise engages in and affects interstate commerce because it

involves activities across state boundaries, such as the fraudulent marketing, promotion,

advertisement, and sale of the Guggenheim Insurers' annuity products, the receipt of inflated

annuity payments from such fraudulent sales, and the transmission of false financial statements

to the respective state regulators and to the NAIC.

## G.    Pattern of Racketeering Activity

319.    As alleged above, Defendants have consistently violated the governing reporting

requirements with respect to their reporting of the Guggenheim Insurers' financial condition –

including specifically SSAP 4, 15 and 25 – filing Annual Statements for each year (and for

intervening quarters) that, among other things, fraudulently misrepresented their statutory surplus

as positive and fraudulently misrepresented their status with Heritage as unaffiliated.

320.    Defendants have engaged in a "pattern of racketeering activity," as defined by 18

U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least two acts of

racketeering activity, *i.e.*, indictable violations of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C.

§ 1343 (wire fraud) as described above, within the past three years.  In fact, Defendants have

committed or aided and abetted in the commission of countless acts of racketeering activity,

including the misreported financial condition following Guggenheim's acquisition of the

Guggenheim Insurers for each year during the Class Period.  Each racketeering act was related,

had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted similar victims, including the Plaintiffs and other members of the Class.

321.    The multiple predicate acts of racketeering activity that Defendants committed and/or conspired to, or aided and abetted in the commission of, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

## H.    Predicate Acts

322.    Section 1961(1)(B) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud).  As set forth below, Defendants have engaged and continue to engage in conduct violating each of these laws to effectuate their scheme.

323.    For the purpose of executing and/or attempting to execute the above-described scheme to sell the Guggenheim Insurers' annuity products by concealing their negative surplus and financial instability, which if disclosed, would reveal these annuity products to be inferior to alternative investments, Defendants, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carriers, and received matter and things from the Postal Service and/or commercial interstate carriers, including, but not limited to, marketing brochures, annuity disclosure forms, performance illustrations, applications, contracts, training manuals, video tapes, correspondence, annuitant leads lists, annuity payments and commission payments, reports, data, summaries, statements and other materials relating to the marketing and sale of the Guggenheim Insurers' annuity products, and the transmission of false financial statements to the respective state regulators and to the NAIC.

- 86 -

324.     As alleged above, each Annual Statement submitted by the Guggenheim Insurers to the NAIC and it their respective regulators included fraudulent representations of, among other things, positive surplus and non-affiliation with Heritage, including:

- Security Benefit Life's 2011 Annual Statement;

- Security Benefit Life's 2012 Annual Statement;

- Guggenheim Life's 2011 Annual Statement;

- Guggenheim Life's 2012 Annual Statement; and

- EquiTrust Life's 2012 Annual Statement.

Similarly false was each Quarterly Statement filed by each of the Guggenheim Insurers after these Annual Statements.

325.     For the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, also in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things, which include, but are not limited to, marketing brochures, consumer brochures, annuity applications, annuity disclosure forms, field memos, correspondence, prospective lead lists, annuity payments and commission payments, reports, data, summaries, account statements, faxes, other annuity marketing and sales materials, and wire transfers by and among affiliates for purposes of moving liabilities off balance sheet.  In addition, pursuant to and as part of the scheme to defraud, Defendants intended to and did receive payments from Plaintiffs and other Class members that were transmitted or cleared through the use of interstate wires in violation of 18 U.S.C. § 1343.

010342-12  658147 V1

326.     As alleged above, each Annual Statement submitted by the Guggenheim Insurers to the NAIC and it their respective regulators included fraudulent representations of, among other things, positive surplus and non-affiliation with Heritage, including:

- Security Benefit Life's 2011 Annual Statement;

- Security Benefit Life's 2012 Annual Statement;

- Guggenheim Life's 2011 Annual Statement;

- Guggenheim Life's 2012 Annual Statement; and

- EquiTrust Life's 2012 Annual Statement.

327.     Similarly false was each Quarterly Statement filed by each of the Guggenheim Insurers after these Annual Statements.

328.     Moreover, on its website[16] Security Benefit Life falsely reports positive surplus as of December 31, 2011, December 31, 2012, and June 30, 2013.  At the same page, Security Benefit Life represents that "Assets, liabilities and surplus are presented on a Statutory Accounting Basis as promulgated by the NAIC and/or the laws of the Company's domiciliary state [Kansas]."

329.     Defendants at a minimum aided and abetted violations of the above laws, thereby rendering them indictable as a principals in the 18 U.S.C. §§ 341 and 1343 offenses pursuant to 18 U.S.C. § 2.

330.     Many of the precise dates of Defendants' fraudulent uses of the U.S. Mail and wire facilities have been deliberately hidden and cannot be alleged without access to Defendants' books and records.  Indeed, the success of Defendants' scheme depends upon concealment, and Defendants have withheld details of their scheme from Plaintiffs and Class members.  Generally,

---

[16] https://www.securitybenefit.com/media/101421/sbl_statutory_information.pdf.

010342-12  658147 V1

however, Plaintiffs can describe the occasions on which the predicate acts of mail and wire fraud would have occurred, and how those acts were in furtherance of a scheme. They include thousands of communications to perpetuate and maintain the scheme, including, among other things:

- transmitting and receiving promotional materials extolling the Guggenheim Insurer's purportedly positive surplus and stable financial condition;

- transmitting false financial statements to the respective state regulators and to the NAIC (including those excerpted above in this Complaint);

- sharing information about prospective purchasers of the Guggenheim Insurers' annuity products;

- processing applications for the Guggenheim Insurers' annuity products; and

- processing premium payments received from the annuity holders, including those of Plaintiff Whitmore and Plaintiff Schulzki.

331. The materials sent or received by Defendants via the U.S. Mail, commercial carrier, wire, or other interstate electronic media, contained, *inter alia*, fraudulent material misrepresentations and omissions about the undisclosed risks of the Guggenheim Insurers' annuity products, including the risk of default given the Guggenheim Insurers' negative surplus and financial instability, calculated to deceive persons of ordinary prudence and comprehension. Defendants used "dishonest methods or schemes" involving "the deprivation of something of value by tick, deceit chicane or overreaching." *McNally v. United States*, 483 U.S. 350, 358 (1987).

332. Defendants' corporate headquarters have communicated by U.S. Mail and by facsimile with each other and with various regional offices, subsidiaries, and affiliates in furtherance of their scheme.

- 89 -

333.     Defendants' omissions of material facts, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving Plaintiffs and the Class into purchasing the overpriced Guggenheim Insurers' annuity products.

334.     Defendants either knew or recklessly disregarded the fact that their omissions and misrepresentations were material and were relied upon by Plaintiffs and the Class as shown by their payments for the Guggenheim Insurers' annuity products.

335.     Although not necessary to make out a violation of the mail or wire fraud statutes, Plaintiffs and the Class relied, to their detriment, on Defendants' fraudulent material omissions and misrepresentations of Guggenheim Insurers' true financial condition, which were made by means of Web sites, mass mailings, newspaper advertisements, telephone calls, marketing materials, and virtually uniform representations or omissions.  Reliance by at least some of the purchasers of the Guggenheim Insurers' annuity products allowed the Defendants to charge an excessive price for the annuity products, injuring all those who purchased them during the Class Period.  *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008).

336.     Defendants knew Plaintiffs and the Class relied on their misrepresentations and omissions concerning the true financial condition of the Guggenheim Insurers, and knew that purchasing annuitants would incur substantial loss as a result.

337.     Accordingly, Defendants have obtained money and property belonging to the Plaintiffs and Class Members, and Plaintiffs and the members of the Class have been injured in their business or property by Defendants' overt acts of mail and wire fraud, and by their aiding and abetting each other's acts of mail and wire fraud.

**PLAINTIFFS' PURCHASE OF GUGGENHEIM INSURER'S ANNUITIES**

A.     **Plaintiff Whitmore**

338.     Plaintiff Whitmore in June 2012 purchased a Security Benefit Life Total Value annuity based on Security Benefit Life's express and implied representations of Security Benefit Life's positive surplus and financial stability.

339.     Plaintiff Whitmore paid $44,827.45 for the Security Benefit Life annuity, which in turn obligated Security Benefit Life to make future monthly annuity payments to her.

340.     To fulfill its contractual obligations to Plaintiff Whitmore, Security Benefit Life must be financially viable, at a minimum, through June 2070.

341.     Plaintiff Whitmore would not have purchased the Security Benefit Life annuity had she known Security Benefit Life's true financial condition, including in particular its negative surplus situation.

342.     The first "investment" by Security Benefit Life after Plaintiff Whitmore paid her nearly $45,000 annuity purchase price was $35 million loan to GBM in connection with Guggenheim's purchase of the L.A. Dodgers.

343.     Plaintiff Whitmore requested Security Benefit Life rescind the annuity and refund her money, but Security Benefit Life refused.

344.     Plaintiff Whitmore in January 2014 surrendered the Security Benefit Life annuity, receiving in return $39,852.93, due in part to a surrender charge of $4,778.34.

345.     The Security Benefit Life annuity sold to Plaintiff Whitmore was worth significantly less than represented given Security Benefit Life's true financial condition.  Indeed, Plaintiff Whitmore on the date she purchased the Security Benefit Life annuity sustained damages of $12,448 – suffering an immediate loss of more than 25% of her principal investment – proximately caused by the Defendants' fraudulent scheme.  Plaintiff Whitmore sustained

additional damages in the form of $4,778.34 in surrender charges also attributable to Defendants' wrongful conduct, as alleged herein, when she surrendered the Security Benefit Life annuity after learning of the financial manipulations, false representations of financial strength and other misrepresentations alleged above.

346. Plaintiff Whitmore in particular has standing to assert her RICO claims against Defendants because she is a person who has suffered injury to her business or property by reason of the Defendants' alleged RICO violations.

347. Plaintiff Whitmore's injury (1) is in the form of direct, concrete financial loss occurred upon her purchase of the Security Benefit Life annuity, (2) is ripe, and (3) is not contingent on future events that may or may not occur.

Defendants used interstate mail and wire to transmit and receive a variety of materials to effectuate the sale of the Security Benefit Life annuity to Plaintiff Whitmore. Defendants also used the mail and wire to process Plaintiff Whitmore's Security Benefit Life annuity application, process the premium payment, and pay the commission from the sale of the annuity.

348. In short, at the time Plaintiff Whitmore purchased her annuity product, and continuing through the present, Security Benefit Life has grossly misrepresented its positive surplus available to satisfy its obligations to its annuity holders, causing Plaintiff Whitmore to purchase an annuity product that was far riskier and thus worth far less than represented.

**B.    Plaintiff Schulzki**

349. Plaintiff Schulzki in April 2013 purchased an EquiTrust Life single premium fixed and equity index deferred annuity based on EquiTrust Life's express and implied representations of EquiTrust Life's positive surplus and financial stability.

350. Plaintiff Schulzki paid over $326,500 for the EquiTrust Life annuity, which in turn obligated EquiTrust Life to make future monthly annuity payments to her.

351.     Plaintiff Schulzki would not have purchased the EquiTrust Life annuity had she known EquiTrust Life's true financial condition, including in particular its negative surplus situation.

352.     The EquiTrust Life annuity sold to Plaintiff Schulzki was worth significantly less than represented given EquiTrust Life's true financial condition.  Indeed, Plaintiff Schulzki on the date she purchased the EquiTrust Life annuity sustained damages of $117,115 – suffering an immediate loss of more than 35% of her principal investment – proximately caused by the Defendants' fraudulent scheme.

353.     Plaintiff Schulzki in particular has standing to assert her RICO claims against Defendants because she is a person who has suffered injury to her business or property by reason of the Defendants' alleged RICO violations.

354.     Plaintiff Schulzki's injury (1) is in the form of direct, concrete financial loss occurred upon her purchase of the Security Benefit Life annuity, (2) is ripe, and (3) is not contingent on future events that may or may not occur.

355.     Defendants used interstate mail and wire to transmit and receive a variety of materials to effectuate the sale of the EquiTrust Life annuity to Plaintiff Schulzki.  Defendants also used the mail and wire to process Plaintiff Schulzki's EquiTrust Life annuity application, process the premium payment, and pay the commission from the sale of the annuity.

356.     In short, at the time Plaintiff Schulzki purchased her annuity product, and continuing through the present, EquiTrust Life has grossly misrepresented its positive surplus available to satisfy its obligations to its annuity holders, causing Plaintiff Schulzki to purchase an annuity product that was far riskier and thus worth far less than represented.

## VII.  CLASS ALLEGATIONS

357.  Plaintiffs bring this action on behalf of themselves and all other similarly situated

Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure

and seeks certification of the following Class ("the Class") for violations of federal laws and

declaratory judgment:

> All persons in the United States who between January 1, 2010 and
> the date class notice is disseminated purchased an annuity product
> from a Guggenheim Insurer subsequent to its acquisition by
> Guggenheim.

Excluded from the Class are Defendants and their officers, directors and employees.

**358.  *Numerosity.***  The members of the Class are so numerous that individual joinder of

all members is impracticable.  In 2011, Security Benefit Life received in excess of $1.6 billion in

annuity payments and received in excess of $75 million in annuity payments in Illinois alone; in

2012 Security Benefit Life received another $195 million in Illinois alone.  The identity and

precise number of Class members, though unknown to Plaintiffs, is reasonably ascertainable

from the Guggenheim Insurers' records.

359.  ***Commonality and Predominance.***  This action involves common questions of

law and fact, which predominate over any questions affecting individual Class members.  These

common legal and factual questions include, but are not limited to, the following:

(a)     the nature and extent of Defendants' undisclosed affiliation with
Heritage;

(b)     the nature and validity of the Guggenheim Insurers' liabilities
ceded to Heritage;

(c)     the nature and validity of the Guggenheim Insurers' liabilities
ceded to Paragon;

(d)     the nature and validity of the Guggenheim Insurers' liabilities
ceded to one another;

(e)     the propriety of the statutory accounting for the reinsurance ceded by the Guggenheim Insurers to Heritage;

(f)     the propriety of the Guggenheim Insurers' statutory accounting for the reinsurance ceded to Paragon;

(g)     the propriety of the Guggenheim Insurers' statutory accounting for the reinsurance ceded to one another;

(h)     the true financial condition and statutory solvency of the Guggenheim Insurers once the ceded reinsurance to Heritage is properly accounted for;

(i)     the financial condition and statutory solvency of the Guggenheim Insurers once the reinsurance ceded to Paragon is properly accounted for;

(j)     the financial condition and statutory solvency of the Guggenheim Insurers once the reinsurance ceded to one another is properly accounted for;

(k)     the manner and extent to which the Guggenheim Insurers obtained yet concealed FHLB Advances;

(l)     the propriety of the Guggenheim Insurers' statutory accounting for the FHLB Advances and FHLB Pledged Assets;

(m)     the financial condition and statutory solvency of the Guggenheim Insurers once the FHLB Advances, FHLB Stock, and FHLB Pledged Assets are properly accounted for;

(n)     whether Defendants engaged in mail and/or wire fraud;

(o)     whether Defendants engaged in a pattern of racketeering activity;

(p)     whether the alleged RICO Enterprise is an "enterprise" within the meaning of 18 U.S.C. § 1961(4);

(q)     whether Defendants conducted or participated in the affairs of the RICO Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c);

(r)     whether Plaintiffs and the Class members are entitled to appropriate equitable remedies, including declaratory and injunctive relief; and

(s)     whether Plaintiffs and the Class are entitled to monetary damages, including treble damages under federal RICO law.

360. ***Typicality***.  Plaintiffs' claims are typical of the claims of the members of each Class because, *inter alia*, all Class members were injured through the same alleged uniform misconduct described above.

361. ***Adequacy of Representation***.  Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no interests adverse or antagonistic to those of the Class.

362. ***Superiority***.  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants.  It would thus be virtually impossible for Plaintiffs and Class members, on an individual basis, to obtain effective redress for the wrongs done to them.  Furthermore, even if Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

363. ***Propriety of Declaratory Relief.***  Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## VIII.  COUNTS

## COUNT ONE

## (VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c))

364.    Plaintiffs and the Class repeat and reallege all allegations contained in the paragraphs above as if set forth separately in this Claim for Relief.

365.    This claim arises under 18 U.S.C. § 1962(c), which provides in relevant part:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ….

355.    In violation of 18 U.S.C. § 1962(c), Defendants have conducted or participated, directly or indirectly, in the conduct of the affairs of the RICO Enterprise through a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5).  Therefore, Defendants have violated 18 U.S.C. § 1962(c).

356.    The injuries of Plaintiffs and the Class were directly and proximately caused by Defendants' racketeering activity.  Reliance by at least some of the purchasers of the Guggenheim Insurers' annuity products allowed the Defendants to charge an excessive price for the annuity products, injuring all those who purchased them during the Class Period.  *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008).

357.    As a result and by reason of the foregoing, the Plaintiffs and Class Members have been injured, suffered harm and sustained damage to their business and property, and are therefore entitled to recover actual and treble damages, and their costs of suit, including reasonable attorney fees, pursuant to 18 U.S.C. § 1964(c).

# COUNT TWO

## (VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d))

358.    Plaintiffs and the Class repeat and reallege all allegations contained in the paragraphs above as if set forth separately in this Claim for Relief.

359.    This claim arises under 18 U.S.C. § 1962(d), which provides in relevant part:  "It shall be unlawful for any person to conspire to violate any of the provisions of subsection …(c) of this section."

360.    In violation of 18 U.S.C. § 1962(d), Defendants conspired to defraud the Plaintiffs and other Class Members of their money and property through the sale of overpriced annuity and life insurance products pursuant to the pattern of racketeering activity and the scheme described above.  Defendants agreed to conduct or to participate in the affairs of the enterprise and agreed to commit at least two of the predicate acts identified above.

361.    The injuries of Plaintiffs and the Class were directly and proximately caused by Defendants' racketeering activity.  Reliance by at least some of the purchasers of the Guggenheim Insurers' annuity products allowed the Defendants to charge an excessive price for the annuity products, injuring all those who purchased them during the Class Period.  *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008).

362.    As a result and by reason of the foregoing, the Plaintiffs and Class Members have been injured, suffered harm and sustained damage to their business and property, and are therefore entitled to recover actual and treble damages, and their costs of suit, including reasonable attorney fees, pursuant to 18 U.S.C. § 1964(c).

363.    In addition, as set forth above, Defendants have violated 18 U.S.C. §§ 1962 (c), and (d), and will continue to do so in the future.  Enjoining Defendants from committing these

RICO violations in the future and/or declaring their invalidity is appropriate pursuant to 18 U.S.C. § 1964(a), which authorizes the district courts to enjoin violations of 18 U.S.C. § 1962.

## COUNT THREE

## (DECLARATORY RELIEF)

364. Plaintiffs repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

365. An actual controversy has arisen and now exists between (a) Plaintiff Whitmore and Security Benefit Life and (b) Plaintiff Schulzki and EquiTrust Life as to the propriety of the statutory accounting methods used to establish the statutory solvency of Security Benefit Life and EquiTrust Life.

366. Under the circumstances, Plaintiffs are entitled to a declaration (1) that the statutory accounting methods of Security Benefit Life and EquiTrust Life challenged in this suit do not comply with SAP, (2) that the non-compliant accounting methods must be reversed, and (3) that the statutorily required reserves must be established by Security Benefit Life and EquiTrust Life using assets that are properly deemed admitted (and not FHLB Pledged Assets).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for a judgment:

A.    Certifying the Class as requested herein;

B.    Awarding Plaintiffs and Class members compensatory damages, trebled, in an amount to be determined at trial;

C.    Awarding Plaintiffs declaratory and injunctive relief;

D.    Awarding Plaintiffs and Class members attorneys' fees and costs; and

E.    Affording Plaintiffs and Class members with such further and other relief as deemed just and proper by the Court.

## JURY DEMAND

Plaintiffs demand a jury trial of all issues triable by right by jury.


DATED:  February 11, 2014                    HAGENS BERMAN SOBOL SHAPIRO LLP

By: _____*/s/ Steve W. Berman*_____
                    Steve W. Berman
Sean R. Matt (to be admitted *Pro Hac Vice*)
Hagens Berman Sobol Shapiro LLP
1918 Eighth Ave., Suite 3300
Seattle, WA 98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
E-mail: steve@hbsslaw.com
E-mail: sean@hbsslaw.com


Elizabeth A. Fegan
Hagens Berman Sobol Shapiro LLP
1144 W. Lake Street, Suite 400
Oak Park, IL 60301
Telephone:  (708) 628-4949
Facsimile:  (708) 628-4950
E-mail:  beth@hbsslaw.com


Robert B. Carey (to be admitted *Pro Hac Vice*)
Hagens Berman Sobol Shapiro LLP
11 West Jefferson, Suite 1000
Phoenix, AZ  85003
Telephone: (602) 840-5900
Facsimile:  (602) 840-3012
E-mail:  rob@hbsslaw.com


Andrew S. Friedman (to be admitted *Pro Hac Vice*)
Francis J. Balint, Jr. (to be admitted *Pro Hac Vice*)
235 East Camelback Road
Suite 300
Phoenix, AZ  85016
Telephone:  (602) 274-1100
Facsimile:  (602) 274-1199
E-mail:  afriedman@bffb.com
E-mail:  fbalint@bffb.com

010342-12  658147 V1

Erin Dickinson (to be admitted *Pro Hac Vice*)
Chuck Crueger (to be admitted *Pro Hac Vice*)
Hansen Reynolds Dickinson Crueger LLC
316 N. Milwaukee St., Suite 200
Milwaukee, WI 53202
Telephone: (414) 273-8474
Facsimile: (414) 273-8476

Ingrid M. Evans (to be admitted *Pro Hac Vice*)
Elliot Wong (to be admitted *Pro Hac Vice*)
Evans Law Firm, Inc.
3053 Fillmore Street, # 236
San Francisco, CA 94123
Telephone: (415) 441-8669
Facsimile: (888)891-4906

*Attorneys for Plaintiffs*

010342-12 658147 V1