# Exhibit A

 

# Private Equity and Hedge Funds Seek to Move into the Insurance Arena

*By Michele Lee Wong, NAIC Capital Markets Bureau Manager, and Ryan Couch, NAIC Reinsurance and Surplus Lines Manager*

◆ **Introduction**

The NAIC Financial Analysis (E) Working Group (FAWG), which coordinates multi-state efforts in addressing solvency problems, including identifying adverse industry trends, recently noted the increased interest by private equity-backed entities and hedge funds in managing life and annuity investment assets, either through the acquisition of life insurers or the reinsurance of life and annuity risks. This growing trend, which has been the subject of recent news articles, was highlighted in a memorandum from FAWG to its parent Financial Condition (E) Committee earlier this summer. The memorandum outlines related concerns and provides potential considerations on how to approach the issue from a regulatory perspective. The E Committee was supportive of FAWG's initial recommendations and recently agreed to establish a new working group to look at the issue more closely. The working group will consider, inter alia, the development of procedures and best practices that regulators can use when considering ways to mitigate or monitor associated risks. Another trend making headlines is the recent establishment of several hedge fund-backed, offshore reinsurers. This article will examine these two growing trends and discuss some of the key regulatory concerns.

◆ **Private Equity Firms Acquire Life Insurers and Annuity Blocks of Business**

In recent years, a non-traditional acquirer of life insurance and annuity businesses has emerged. Private equity-backed entities have entered into the U.S. life insurance market primarily via acquisitions but also through reinsurance agreements. With the protracted low interest rate environment and increasing capital requirements pressuring earnings and profitability, some life insurers have opted to exit certain underperforming segments or blocks of businesses, in particular fixed annuities. However, these assets have been attracting non-traditional, financial buyers such as private equity-backed companies—who are seeking to reduce their reliance on leveraged takeovers and believe they can manage the assets more effectively with more aggressive investment strategies—rather than traditional, strategic buyers such as other insurance companies.

Athene Holding, Ltd. (Athene), which is affiliated with Apollo Global Management LLC, will become the second largest issuer of fixed indexed annuities in the United States, after closing the acquisition of Aviva plc's U.S. annuity and life operations (Aviva USA) later this year.[1] In connection with this acquisition, Athene has agreed to sell, through a reinsurance arrangement, Aviva USA's life insurance business to Commonwealth Annuity and Life Insurance Co.—a wholly owned subsidiary of Global Atlantic Financial Group (formerly the Goldman Sachs Reinsurance Group). Athene has been active in making acquisitions of companies and blocks of business in the fixed annuity market since 2009. According to a Moody's Investors Service (Moody's) report dated May 2013, Athene has completed six fixed annuity acquisitions since that time by either directly purchasing a life insurance company or reinsuring a block of business.

Guggenheim Partners (Guggenheim), through its Delaware Life Holdings affiliate, has also been an active player in this space. In December 2012, Guggenheim agreed to purchase Sun Life Financial's domestic U.S. annuity business and certain life insurance businesses. The annuity business includes both fixed and variable annuities—marking the first time that Guggenheim has ventured away from fixed annuities and into the variable annuity market. Harbinger Capital Partners (Harbinger), a private investment firm specializing in event/distressed strategies, has also ventured into the fixed annuity space. Harbinger agreed to purchase the fixed annuity business of Fidelity & Guaranty Life in August 2010, but has not made any recent acquisitions.

Although private equity firms are well known for their investment expertise, they generally have a higher risk tolerance and invest more aggressively than a typical life insurer. For example, life insurers' investment portfolios are typically more weighted toward less risky and more stable investments (such as government securities, investment grade corporate bonds and/or municipal bonds), while private equity-backed entities tend to invest more heavily in riskier and more volatile investments (such as high-yield bonds and structured securities, which include residential and commercial mortgage-backed securities).

In addition, investors have varying investment horizons and investment strategies depending on their goals and objectives. For instance, life insurers typically engage in a "buy and hold" investment strategy focused on the yield or average rate of return earned if a security is purchased today and held to maturity. Because they traditionally sell long-tailed products in which claims on the policy are not expected to be filed for a long period of time, life insurers have a longer-term investment horizon. They focus on asset

*(Continued on page 3)*

---

[1] The New York Department of Financial Services recently expressed concern over this transaction. See: Spector, Mike and Scism, Leslie, "New York Regulator Targets Insurer Deal," *Wall Street Journal*, July 15, 2013.

-liability management, as much as possible, closely matching their assets' duration to that of their longer-term liabilities so that the cash flow streams of the investments are synchronized with when liabilities become due.

Life insurers are generally less sensitive to market value fluctuations as long as their assets and liabilities are properly matched. Statutory accounting requirements—in which life insurers generally report bond investments at amortized cost, subject to valuation requirements for impairments—are well aligned with insurers' "buy and hold" investment strategy. A typical life insurers' longer-term investment horizon also fits in nicely with the regulatory risk-based capital (RBC) framework and the model that is utilized to determine asset risk charges, as it assumes a 10-year time horizon (or holding period).

Private equity-backed life insurance companies, on the other hand, are likely to invest on a total return basis—the percentage gain (or loss) on a security based on the purchase price plus any interest, dividends or other income that may have been received or accrued—in a similar fashion to their parent or affiliated sponsor. Total return investors actively trade in and out of securities with a short-term view of maximizing capital appreciation and income. Their focus is more so on risk-adjusted relative value—where the attractiveness of an investment is measured in terms of risk, liquidity and return relative to another investment—more so than asset liability management. This might possibly lead to an asset/liability mismatch and might result in a timing issue whereby the insurer runs the risk of being forced to sell an investment at an inopportune time to meet an upcoming liability payment. In addition, a private equity-backed insurer's focus on market value and shorter-term investing is inconsistent with the basis of amortized cost in statutory accounting and the time horizon assumptions for bond investments in the RBC framework, respectively.

Private equity firms can have a number of different financial businesses under its umbrella, such as asset managers, broker-dealers or reinsurers, among others. There is, therefore, the potential for intercompany transactions with affiliates that could result in taking cash out of the insurance company. If the affiliated asset manager is hired to manage the assets of the insurance company, the insurer would have to pay a management fee for this service. The management fee should be reasonable and comparable to what others in the market are paying. Sometimes, the asset manager might opt to hire a sub-manager to invest in a specific asset class that it does not have expertise in, creating the potential for additional management fees.

It should also be noted that if the affiliated asset manager invests in funds or transactions managed by the private equity sponsor, there might be additional fees charged. Furthermore, buy or sell transactions with an affiliated broker-dealer might also generate more fees. All of these layers of potential fees would result in cash being extracted out of the insurer and reduce the amount of cash available to meet future liabilities. Affiliated transactions should be monitored closely, with regular reporting of intercompany transactions and/or targeted exams of investment portfolios, or prohibited altogether if determined prudent to do so. Other intercompany transactions that can result in taking cash out of the insurance company is the purchasing and selling of securities with another account managed, maintained or trusteed by the asset manager. The concern is that a transaction will be executed at a price other than the current market price, resulting in a potential conflict of interest. Although this raises concerns, adequate safeguards—such as requiring the documentation of at least two broker quotes from unaffiliated broker-dealers for each transaction—can be put in place to ensure that intercompany transactions are executed at arm's-length.

Although private-equity backed life insurers might follow different investment strategies than traditional life insurance companies, they can likewise effectively manage their assets to meet future liabilities. However, there are some concerns related to their differing investment strategies—which could potentially lead to additional investment risks, as well as a timing issue, with meeting their fixed guaranteed liabilities—and the potential for intercompany transactions—which could lead to cash being extracted out of the insurance company. These concerns can be mitigated somewhat with better transparency and adequate safeguards, such as regular monitoring and reporting. The recent trend of non-traditional acquirers of life insurance assets is expected to persist if traditional insurers continue to opt for exiting certain fixed annuity businesses given the protracted low interest-rate environment.

◆ **HEDGE FUND-BACKED REINSURERS**
Over the past several years, hedge funds have primarily sought investment into the reinsurance market through alternative, or non-traditional, risk-transfer structures (e.g., catastrophe bonds or other insurance-linked securities, collateralized reinsurance vehicles, sidecars, etc.), or by taking equity positions in holding companies that have reinsurance operations within the group. Over the past several months, substantial amounts of capital have been flowing into the non-traditional risk transfer space from hedge funds and

*(Continued on page 4)*

other institutional investors (e.g., pension funds, private equity, sovereign wealth funds, etc.). The primary attraction to this market appears to be diversification from investing in a relatively uncorrelated asset class that is currently providing a favorable yield when compared to other investment options.

In addition to the third-party capital surging into the non-traditional risk transfer market, several hedge fund managers have recently demonstrated an increased interest in the traditional reinsurance market. Specifically, four start-up reinsurers backed by hedge funds were established in Bermuda during 2012. These include:

- Third Point Re ($780 million) – established in January 2012 by John Berger, former chief executive of Harbour Point.
- AQR Re ($260 million) – established in January 2012 by AQR Capital Management.
- PaCRe ($500 million) – established in April 2012 by executives of Paulson & Co.
- SACRe ($500 million) – established in July 2012 by SAC Capital Advisors.

Each case essentially consisted of capital being sent to Bermuda to establish the reinsurance entity, and then sent back to the United States in order for the hedge fund to manage the respective reinsurer's investment portfolio. Traditional reinsurers generally maintain relatively conservative investment portfolios due to the underwriting risks inherent in their insurance/reinsurance business. In contrast to the traditional model, it is understood that these hedge-fund backed reinsurers intend to take on more risk within their investment portfolio, while assuming less risk from an underwriting perspective. In other words, they are seeking to deploy less of their available capital to underwriting risks as compared to other traditional reinsurers (and, in many cases, assume reinsurance business with more predictable underwriting results), while being exposed to the potential for less-predictable, more volatile results from their invested assets. Naturally, there are questions as to whether the hedge-fund approach to investing aligns with the traditional reinsurance model.

According to a Bloomberg article published in February 2013, the first prominent hedge fund to establish a Bermuda-based traditional reinsurer was Moore Capital Management LP in 1999 with the formation of Max Re Capital Ltd. The article notes that, while it was initially intended for Max Re to invest heavily in the hedge fund, the reinsurer never invested more than 40% of its assets in hedge funds, and currently invests less than 5% in such funds. A few years later, in 2006, Greenlight Capital Inc. established Greenlight Capital Re Ltd. (Greenlight Re) in the Cayman Islands. Greenlight Re, which became a publicly traded company in 2007, has successfully employed the hedge fund-backed reinsurer strategy since that time. However, a recent article published by the website *Artemis.bm* highlights some of the potential risk for increased volatility in a hedge fund-backed reinsurer's investment portfolio. According to the article, Greenlight Re incurred investment losses of $52.2 million, or 4.4% of the value of its investment portfolio, in the fourth quarter of 2012.

From the hedge funds' perspective, investing directly in a traditional reinsurer provides diversification within its overall investment strategy through exposure to a largely uncorrelated risk via reinsurance underwriting. This strategy also provides the hedge fund with a steady inflow of investable cash from the reinsurance premiums collected by the reinsurer, along with fee revenue and a stable pool of assets under management through the investment management arrangement.

Utilizing a Bermuda based entity reportedly provides certain tax advantages, as well. The Bloomberg article referenced in the previous paragraph questioned the legitimacy of three of these arrangements, suggesting that the primary purpose of the transactions was to exploit a tax loophole, resulting in reduced and delayed payment of U.S. income taxes by the hedge funds. Industry representatives, regulators and government representatives from Bermuda strongly rebutted that argument, in part by noting that these reinsurers are subject to the same regulation, oversight and reporting as other Class 4 Bermuda-domiciled reinsurers, and that Bermuda has worked with the United States for many years in the area of tax cooperation.

A.M. Best highlighted the developments related to hedge fund-backed reinsurers in a special report from December 2012. The report indicates that A.M. Best has now added "hedge fund-backed reinsurers" as a fourth category it tracks within the Bermuda market. The report also discusses how these reinsurers plan to take a different approach to the reinsurance market by seeking to balance opportunities between the underwriting and investment sides of the business depending on the respective market conditions. A.M. Best suggests that this model is not likely the new reinsurance model for the future, but notes it may have its niche for some time.

*(Continued on page 5)*

# Private Equity and Hedge Funds Seek to Move into the Insurance Arena (Continued)

A.M. Best has rated at least three of the four reinsurers mentioned above as A-, based, in part, on the fact these reinsurers deploy less of their available capital to the underwriting side of the business than other traditional reinsurers in an effort to offset the increased risk taken on within their investment portfolios. According to a recent article in Global Reinsurance, this model is being reconstructed to fulfill the needs of the investment community. SACRe chief executive Simon Burton is quoted in the article as saying, "The investment community is clearly sending us a message that they are dissatisfied with the packaging of reinsurers."

From the U.S. regulatory perspective, state insurance regulators remain focused on the ability of an insurance company to pay claims. While these entities are not directly supervised by state insurance regulators, it is likely that these reinsurers will assume business from U.S. ceding insurers. With respect to reinsurance, state insurance regulators are primarily concerned with the solvency of U.S.-domiciled ceding insurers, the potential impact that reinsurance agreements have on their financial condition, and ultimately, the potential impact to insurance consumers. With any reinsurer assuming business from a U.S. ceding insurer, the primary regulatory concern is with the quality of reinsurance protection provided; i.e., that the reinsurer is willing and able to meet its obligations to U.S. ceding insurers when called upon to do so. Reinsurance is essentially a contractual promise that a reinsurer will indemnify a ceding insurer for losses the ceding insurer incurs with respect to its underlying policies. In many cases, the reinsurer is not called upon to fulfill that promise until many years after the contractual obligation is created.

Without having any specific information regarding the investment portfolios of offshore reinsurers, a logical concern with any reinsurer is that it has the assets available to sufficiently meet its obligations when those assets are needed.

While no NAIC committee or working group has specifically discussed this development or taken any position with respect to these particular hedge fund-backed reinsurers, generally speaking, the potential for increased volatility within a reinsurer's investment portfolio is a reasonable cause for concern as to the reinsurer's potential ability to meet its reinsurance obligations when they come due.

U.S. state insurance laws regulate the credit for reinsurance a U.S. ceding insurer is allowed to reflect in its financial statements based on characteristics of the reinsurer and the reinsurance contract itself. The U.S. regulatory framework includes substantial reporting and disclosure requirements designed to monitor specific details with respect to U.S. ceding insurers' counterparty exposures, and is designed to ensure that reinsurance agreements are transparently and accurately reflected in the statutory financial statements. It is critical for ceding insurers to effectively manage their exposure to reinsurance counterparty risk, and it is equally important for insurance regulators to evaluate whether ceding insurers are doing so in an acceptable manner.

The U.S. system does include certain mechanisms that have been developed in an effort to minimize this risk (e.g., collateral requirements applicable to reinsurance ceded to unauthorized reinsurers, and a new certification process for reinsurers domiciled in qualified jurisdictions in accordance with the recent revisions to the NAIC credit for reinsurance models).[2] The NAIC and state insurance regulators will continue to monitor these developments in the reinsurance market in an effort to address any concerns.

---

[2] *Credit for Reinsurance Model Law* (#785) and *Credit for Reinsurance Model Regulation* (#786).

 

**NAIC Central Office**
**Center for Insurance Policy and Research**
1100 Walnut Street, Suite 1500
Kansas City, MO 64106-2197
Phone: 816-842-3600
Fax: 816-783-8175

http://www.naic.org

http://cipr.naic.org

© Copyright 2013 National Association of Insurance Commissioners, all rights reserved.

The National Association of Insurance Commissioners (NAIC) is the U.S. standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia and five U.S. territories. Through the NAIC, state insurance regulators establish standards and best practices, conduct peer review, and coordinate their regulatory oversight. NAIC staff supports these efforts and represents the collective views of state regulators domestically and internationally. NAIC members, together with the central resources of the NAIC, form the national system of state-based insurance regulation in the U.S. For more information, visit www.naic.org.

**The views expressed in this publication do not necessarily represent the views of NAIC, its officers or members.** All information contained in this document is obtained from sources believed by the NAIC to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, such information is provided "as is" without warranty of any kind. **NO WARRANTY IS MADE, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY OPINION OR INFORMATION GIVEN OR MADE IN THIS PUBLICATION.**

This publication is provided solely to subscribers and then solely in connection with and in furtherance of the regulatory purposes and objectives of the NAIC and state insurance regulation. Data or information discussed or shown may be confidential and or proprietary. Further distribution of this publication by the recipient to anyone is strictly prohibited. Anyone desiring to become a subscriber should contact the Center for Insurance Policy and Research Department directly.