# Exhibit C



December 3, 2012 *via email*

Alfred M. Pollard, Esq.
General Counsel
Federal Housing Finance Agency
Eighth Floor
400 Seventh Street, S.W.
Washington, DC 20024

    **Re:**    **2012-N-14**
               **Advisory Bulletin on Collateralization of Advances and Other Credit Products Provided by Federal Home Loan Banks to Insurance Company Members: Notice with Request for Comments ("Notice")**

Dear Mr. Pollard:

The Federal Home Loan Banks (each, an "FHLBank" and collectively, "FHLBanks") appreciate this opportunity to comment on a proposed Advisory Bulletin ("Proposed AB") that would set forth standards to guide Federal Housing Finance Agency ("Finance Agency") staff in its supervision of an FHLBank's secured lending to its insurance company members. Although the Notice is cast as an Advisory Bulletin directed to Finance Agency staff, the Proposed AB raises important legal and policy issues that could materially impact the way FHLBanks extend secured credit to their insurance company members.

**I. Introduction**

The FHLBanks support prudent underwriting and collateral management processes with respect to insurance company members, as with all borrowing members, and we appreciate the Finance Agency's consideration of the potential risks of lending to insurance companies. The FHLBanks caution the Finance Agency, however, against issuing guidance that results in disparate treatment of insurance company members as a broad category beyond the incremental risks that an individual borrowing member may pose.

The FHLBanks offer the following overall comments to the Notice, as discussed in further detail below in this Section I:

- The risks of lending to insurance company members differ from the risks of lending to insured depositories by degree, not by nature, and the FHLBanks effectively manage these differing risks through robust credit risk frameworks;
- The FHLBanks have experience adjusting their underwriting and secured collateral practices for differing risk profiles, including insurance company members; and

Alfred M. Pollard, Esq.
December 3, 2012
Page 2
2012-N-14

- The final Advisory Bulletin ("Final AB") should provide guiding principles rather than proscriptive practices in order to recognize the multiple methods of lending in a safe and sound manner and to accommodate the differences in each FHLBank's business strategy, operations, geography, and member needs.

Following these introductory remarks, the FHLBanks provide: responses to the Notice's request for comment on three specific issues (Section II); additional comments on particular provisions of the Proposed AB (Section III); and a conclusion (Section IV).

**A. The risks of lending to insurance companies differ by degree, not by nature, and the FHLBanks effectively manage these differing risks through robust credit risk frameworks.**

The FHLBanks recognize that insurance companies have certain characteristics that allow for distinctions to be drawn between insurance company members and other FHLBank members, such as differences in primary regulator, differences in applicable regulations, and differences in business and accounting practices. These differences, however, are largely a matter of degree, and in many respects are similar to the differences that the FHLBanks see between or within other categories of borrowing members.

Each insurance company is primarily regulated by an agency, department or commission of the state in which the insurance company is domiciled.[1] The Notice implies that this regulatory approach is, structurally, a significant departure from the regulation of federally insured depository institutions. However, while the majority of FHLBank members are federally insured, the FDIC is not necessarily the primary regulator of those insured depositories, or the FDIC is merely the primary *federal* regulator. In fact, the Federal Reserve, the OCC, the NCUA, state banking regulators, and state credit union regulators each may be the primary regulator.[2] Moreover, members may pledge collateral through affiliates that are subject to state corporation laws and the federal bankruptcy regime. While the federal regulators do attempt to coordinate their regulations, and similarly state banking regulators do attempt to coordinate their regulations with federal regulations and other states' regulations, there may be subtle differences among their policies and regulations. Similarly, although state insurance regulators attempt to coordinate their policies and regulations through the National Association of Insurance Commissioners, they may continue to have certain nuances among them. Nevertheless, all of these regulators fundamentally maintain oversight of their regulated entities in protection of the public interest. The FHLBanks have long kept abreast of the laws and regulations generated by these various regulators, including state insurance regulators, and we routinely perform additional research or analysis, coordinate with the applicable regulator, and obtain outside legal

---

[1] Insurance companies, of course, are also subject to the powers of the same agency, department or commission acting in its capacity as rehabilitator/liquidator.
[2] Note that state banking regulators technically have the authority to handle a receivership themselves; instead, they generally appoint the FDIC as receiver and the FDIC must accept that appointment. The FDIC may force a state bank into receivership without the consent of the state banking regulator only in limited circumstances.

2

Alfred M. Pollard, Esq.
December 3, 2012
Page 3
2012-N-14

guidance for particular member applications or transactions as the circumstances warrant, whether the member is an insured depository or an insurance company.

Generally, the differences in state insurance company insolvency regimes relate to the degree of procedural requirements for filing and satisfying a claim, not the nature or extent of a secured creditor's rights. Most states' insurance and commercial laws address an insurance company's ability to make investments (*e.g.*, purchase FHLBank capital stock), borrow money and pledge collateral. Additionally, most state insurance codes do not prohibit secured creditors from maintaining possession of pledged collateral and recognize that secured creditors may resort to their collateral security to satisfy their claims and accordingly are generally not subject to the distribution scheme for policyholders and unsecured creditors. State insurance statutory regimes may differ on the specific procedures for the appointment of a receiver, the entry of an order for rehabilitation or liquidation, the timing for filing a claim or the length of any preference period or proscribed stay on the exercise of collateral remedies, but these variations do not alter the fundamental contractual nature of an FHLBank's secured creditor relationship and do recognize the priority and rights of secured creditors.

The experience of the System with insurance company members (and in the insurance industry generally) has been one of very few insurance company receiverships, particularly compared to the number of bank receiverships in recent years. This very small number of insurance company failures reflects the general financial health of the industry and effective regulatory oversight. Although there are substantially fewer examples of insurance company receiverships in recent years, these examples (as well as ongoing dialogue that the FHLBanks have had with several state insurance commissioners) clearly reflect state insurance regulators' recognition of the fundamental contractual position of the FHLBank as a secured creditor. Precedent is established as much by the soundness of the underlying legal and public policy rationale, as by the number of subsequent cases that require its application. Thus, in three recent state insurance company rehabilitation proceedings, three FHLBanks worked constructively with court-appointed rehabilitators, and the FHLBanks' positions as secured creditors were recognized.

For all of these reasons, the FHLBanks do not agree that there are ambiguities in state insurance laws that could result in an insurance commissioner favoring insured parties over secured creditors, and we believe insurance commissioners recognize the priority and rights of secured creditors. As set forth above, although states may differ on specific procedures for rehabilitation and liquidation, the FHLBanks are very confident in their position as secured creditors.

**B. The FHLBanks have experience adjusting their underwriting and collateral practices.**

The FHLBanks have policies and procedures for dealing with a member's receivership or liquidation, such as credit risk scoring, specific underwriting requirements, collateral haircuts, liquidation plans and legal analyses of the FHLBanks' rights as secured creditors. Through the FHLBanks' experience in analyzing and working with regulators to resolve troubled members, including insurance companies, the FHLBanks have gained practical insight into managing

Alfred M. Pollard, Esq.
December 3, 2012
Page 4
2012-N-14

member credit risk prior to failure and collateral valuation practices, which has further enabled the FHLBanks to develop effective underwriting and collateral practices for all members, including insurance companies. Each FHLBank evaluates and monitors borrower creditworthiness based on a borrower's financial reporting, regulatory examination information to the extent available, and their respective underwriting frameworks that take into account the financial ratios and reporting information relevant to each type of borrower. These frameworks typically incorporate the statutory accounting principles used by insurance company members.

The FHLBanks have extensive experience in obtaining a first priority security interest in, valuing, and establishing appropriate haircuts for, securities and whole loan collateral pledged by members, as permitted under Finance Agency regulations.[3] As discussed in greater detail in Section II below, regardless of whether securities or whole loan collateral is pledged by a bank, a credit union, an insurance company, or a corporation, the steps to obtaining and perfecting a first priority security interest in the collateral are the same under Articles 8 and 9 of the Uniform Commercial Code ("UCC").

In establishing haircuts for all collateral types, the FHLBanks routinely consider book value, actual or estimated market value, liquidation risks, market volatility, and collection costs unique to each category of collateral or member. The FHLBanks also consider the creditworthiness of the member and may require additional haircuts, restrict a member to highly liquid collateral and/or place some limitations on the terms of a member's advances if that member's creditworthiness begins to falter. Together, these credit underwriting and collateral valuation standards and processes are both sensitive to an individual member's financial condition and reflective of broader market risks and legal requirements that may apply to pledged collateral.

## C. The Final AB should provide guiding principles rather than proscriptive practices.

Although the Proposed AB may be intended simply to identify principles to guide agency supervisory staff in assessing an FHLBank's lending and collateral practices with respect to insurance companies, we are concerned that the Proposed AB, as currently drafted, is highly detailed and may be mistakenly interpreted and applied as a checklist of immutable rules or "best practices," rather than as a highlighting of the multiple pathways to sound risk management, any one or some combination of which may be appropriate given a particular FHLBank's unique district and membership characteristics. We suggest that language be added in the Final AB to recognize that the credit and lending practices we use for lending to insurance companies, and the criteria used to evaluate such practices, should not be confined to absolute, specific standards, but rather should be based on principles applied in a manner that accounts for differences in state laws, as well as differences in business objectives, membership composition and risk appetites among individual FHLBanks. These factors may lead an FHLBank to the perfectly reasonable conclusion that the risks of lending to insurance company members are, on balance, comparable to those of lending to other members. In such situations, the guidance of

---

[3] 12 C.F.R. § 1266.7. At this time, not all FHLBanks allow insurance company members to pledge whole loans as collateral.

Alfred M. Pollard, Esq.
December 3, 2012
Page 5
2012-N-14

the Proposed AB should contain sufficient flexibility so that FHLBanks are not required to have lending and collateral procedures for insurance companies that are substantially different from their procedures for other members.

## II.     Responses to Specific Requests for Comment

**A.     Comments about the most appropriate method for Banks to obtain "control" of securities collateral and to otherwise obtain a first priority interest under the Uniform Commercial Code in any types of collateral pledged by its insurance company members.**

**Response**:

The FHLBanks manage collateral pledged by our insurance company members the same way we do for all of our other members. As described in more detail below: (i) for securities collateral, the FHLBanks obtain control either using a third-party custodian or having the securities delivered to the FHLBank's securities account; (ii) for other collateral types, the FHLBanks obtain a first-priority perfected security interest by filing a UCC-1 financing statement first, entering into intercreditor agreements where warranted, and/or taking delivery of the collateral where appropriate, depending on the credit risk presented by the particular member. The FHLBanks have successfully used all of the methods described below for taking control and obtaining a first-priority security interest for many years. The Final AB should not limit the FHLBanks' ability to use any of these methods.

As with all FHLBank advances, advances to insurance companies are fully-secured and are managed to a zero-loss expectation. While differences in practices exist across the System, all FHLBanks, in addition to entering into security agreements with all member institutions[4], recognize three key methods by which to perfect their security interest in collateral: through (i) financing statements, (ii) possession, and/or (iii) control. As explained below, all three methods are recognized under the UCC as appropriate ways for a secured creditor to perfect its interest in pledged collateral.

### Securities Collateral

A secured creditor may perfect a security interest in investment property (a catch-all term that includes certificated securities, uncertificated securities, security entitlements, and securities accounts)[5] either by "control," or by filing a financing statement.[6] A secured party that has

---

[4] For a security interest to become effective under the UCC, the security interest must "attach" to collateral. UCC Section 9-203(a). A security interest attaches to collateral when it becomes "enforceable" against the debtor (*e.g.*, a pledging member of an FHLBank). See Section 9-203(a). A security interest becomes enforceable against a pledging member when the member executes a security agreement that describes the collateral (*e.g.*, an FHLBank advances and security agreement), the member has rights in the collateral and value has been given. See Section 9-203(b).

[5] Section 9-102(a)(49).

Alfred M. Pollard, Esq.
December 3, 2012
Page 6
2012-N-14

perfected its security interest in investment property by control, however, has priority over a secured party that perfects simply by filing a financing statement.[7]  As a practical matter, investment property pledged as collateral to the FHLBanks is either uncertificated securities or security entitlements.  To perfect their security interest in securities collateral under the UCC, FHLBanks obtain "control" as defined in UCC Section 8-106.  Specifically, UCC Section 8-106(c) provides that a person has "control" of an uncertificated security through "delivery"[8] or through a tri-party agreement under which the issuer agrees that it will comply with instructions originated by the secured party without further consent by the registered owner.[9]  Similarly, UCC Section 8-106(d) provides that a person has "control" of a security entitlement if the secured party becomes the "entitlement holder" or the securities intermediary enters into what is typically called a securities account control agreement – a tri-party agreement among the securities intermediary or a third-party custodian, as applicable, the secured party (the FHLBank), and the security owner/entitlement holder (the pledging member), providing that under certain circumstances, the securities intermediary or third-party custodian, as applicable, agrees to comply with instructions originated by the FHLBank without further consent by the pledging member.[10]  The UCC does not give one method of control greater deference or legal right over the other.[11]

        Therefore, an FHLBank may obtain control of securities collateral pledged by any member, including insurance company members, either by requiring "delivery" of uncertificated securities by becoming the registered owner on the records of the issuer or becoming the "entitlement holder" by having the security entitlement transferred into the securities account of the FHLBank (usually held by a custodian of the FHLBank), or by entering into a securities account control agreement among the FHLBank, the member, and a third-party custodian or issuer that specifically grants the FHLBank control of the securities and the securities account.  Consequently, the Final AB should not limit the FHLBanks' flexibility to pursue control over securities collateral by either method, regardless of whether the securities collateral is pledged by an insurance company or any other member.

---

[6] Sections 9-312(a) and 9-314(a).

[7] Section 9-328.

[8] "Delivery" occurs when the secured party, or another person acting on the secured party's behalf (other than a securities intermediary), becomes the registered owner on the books of the issuer.  See Official Comment 3 to Section 8-106; see also Section 8-301(b).

[9] Section 8-106(c)(2).

[10] Section 8-106(d).  Similarly, the official comments to Section 9-106 note that "an agreement that provides that (without further consent of the debtor) the securities intermediary or commodity intermediary will honor instructions from the secured party concerning a securities account or commodity account described as such is sufficient.  Such an agreement necessarily implies that the intermediary will honor instructions concerning all security entitlements or commodity contracts carried in the account and thus affords the secured party control of all the security entitlements or commodity contracts."

[11] See Sections 9-328(1), 9-106(a), and 8-106(d).

Alfred M. Pollard, Esq.
December 3, 2012
Page 7
2012-N-14

### Mortgage Loan Collateral

A secured creditor can perfect a security interest in an instrument (a term that includes mortgage notes[12]) either by possessing such collateral (including possession through a third-party custodian), or by filing a financing statement.[13]  Generally, the first to file a financing statement has first priority in the corresponding pledged collateral.[14]  The secured party that has perfected a security interest in an instrument by possession, however, typically has priority over a secured party that perfects simply by filing.[15]  Importantly, perfection of a security interest in a mortgage note also perfects a security interest in the mortgage securing such note.[16]

Moreover, if an insurance company member's credit or risk rating declines to an unsatisfactory level, as with any other member, then an FHLBank will take further action to ensure its continued first priority in the subject collateral, including but not limited to: (i) requiring the member to endorse promissory notes to the FHLBank, or otherwise affix a legend to give subsequent secured creditors notice of the FHLBank's first priority interest; (ii) requiring the member to segregate the collateral and clearly indicate the FHLBank's first lien position in the segregated collateral; (iii) requiring a vault lease for the collateral; or (iv) otherwise taking physical possession when necessary, all to assure the continued first priority of its security interests.[17]

**B.**  **Comments on the use of funding agreements as a means of documenting advances and whether the FHLBanks have confirmed under state law that a Bank would be recognized as a secured creditor with a property interest in the collateral that is pledged to the Bank under a funding agreement.**

**Response:**

The FHLBanks that accept funding agreements from their insurance company members do not rely solely on the funding agreements as the contractual means of documenting advance

---

[12] Section 9-102(a)(47).

[13] Sections 9-312(a) and 9-313(a).

[14] Section 9-322(a).

[15] Sections 9-330(d) and 9-331.  A secured party who perfects its interest by taking and maintaining possession of an instrument, without filing a financing statement, will have priority over a later filed secured party in the same collateral.  A secured party who perfects by possession and asserts priority over an earlier filed financing statement, has priority if the party has satisfied the requirements of Section 9-330(d).

[16] Sections 9-203(g) and 9-308(e); see Permanent Editorial Board for the UCC, *Report to the Permanent Editorial Board for the UCC, Application of the UCC to Selected Issues Related to Mortgage Notes*, November 14, 2011, at 12.

[17] As with all members, the FHLBanks manage lien priority risk arising from possession of instruments constituting loan collateral.  An FHLBank with a first filed financing statement in instruments, but without physical possession, manages risk that another secured party may take possession of instruments and obtain priority through such possession if it satisfies the requirements of Section 9-330(d).  Other tools to manage priority are available as well, including subordination agreements with other secured creditors.  See Section 9-339.  The FHLBanks manage the risk of conflicting secured creditor claims through credit underwriting, monitoring, and risk evaluation of the member, while taking into account the expense and administrative burden of obtaining lien priority by possession.

Alfred M. Pollard, Esq.
December 3, 2012
Page 8
2012-N-14

indebtedness incurred by those insurance companies. Rather, those FHLBanks allow insurance companies to issue funding agreements as part of an advance transaction so that the insurance company can treat advance proceeds as deposit-type policyholder obligations. Prior to issuing funding agreements, an insurance company generally must file the proposed agreement with the applicable state insurance department. Furthermore, users of FHLBank funding agreement advances must report their existence, magnitude, and that they have investments being used as collateral on their statutory filings.

When an insurance company issues a funding agreement as part of an FHLBank advance transaction, it does so based on the security agreement executed with the FHLBank, and as such is required to fully secure the advance.[18] An advance transaction involving a funding agreement may provide an FHLBank with certain statutory rights akin to those of policyholders; however, an FHLBank would look to its security agreement and the collateral pledged thereunder as the governing contract for any advance transaction involving a funding agreement.

While in general there is a high degree of consistency among state insurance laws, each state's treatment of funding agreements may be one area in which some variations are evident. We agree that each FHLBank should review the laws within its district and otherwise take any steps necessary to mitigate any risk that funding agreements could compromise an FHLBank's status as a secured creditor. However, based upon legal analyses already undertaken by potentially affected FHLBanks, we do not believe that any policyholder rights conferred though a funding agreement would diminish or undermine an FHLBank's security interest in collateral pledged to support a related advance transaction.

**C.      Comments on whether the FHFA should consider establishing specific and uniform standards for making advances to insurance companies.**

**Response:**

The current differences in lending practices among the FHLBanks reflect variations in insurance company composition (*e.g.*, concentration, type, size), insurance laws, commitment to serving the sector, and experience. Since the composition of FHLBank-eligible member institutions varies greatly from one state to the next, the FHLBank regional structure permits each FHLBank to uphold its cooperative structure and serve the unique needs of the members within its district. Consequently, lending policies differ across the System for banks, thrifts, CFIs, credit unions, CDFIs, and insurance companies. However, while lending policies may differ due to membership composition, each FHLBank lends on a fully-secured basis and manages to a zero-loss expectation for advances.

Due to collaborative efforts on issues relating to business with insurance companies, a greater degree of uniformity with insurance company lending has developed within the

---

[18] One approach to achieving the appropriate documentation is to expressly identify the funding agreement as indebtedness subject to the advances, pledge and security agreement between the insurance company member and the FHLBank.

8

Alfred M. Pollard, Esq.
December 3, 2012
Page 9
2012-N-14

FHLBank System over the past several years. We believe, however, that regulatory mandates imposing a one-size-fits-all approach for underwriting and collateral policies would be counterproductive and would effectively override the authority and regional autonomy of each FHLBank. We recommend that the Final AB provide guidance for evaluation under a consistent framework that also requires examiners to consider the unique aspects of each FHLBank's district, experience, business plan, practices and structure.

## III.   Comments on Specific Proposed Evaluation Topics

The FHLBanks offer the following additional comments with respect to several of the specific evaluation points set forth in the Proposed AB:

*The level of the FHLBank's risk exposure to insurance companies in relation to its capital structure and retained earnings.*

The FHLBanks are very concerned that this evaluation point may lead the Finance Agency to impose limits on the amount an FHLBank may advance to insurance companies, when no such limitations are in place for other types of FHLBank borrowers. As the FHLBanks have always maintained, the risk of losses from advances—with respect to any member—is remote, because advances are fully secured, the security agreements provide substantial tools for the FHLBanks to mitigate risk, and the FHLBanks' credit frameworks are designed to manage those risks. No FHLBank has ever incurred a credit loss on an advance. The information and background we have provided throughout this letter should help illustrate and convey the FHLBanks' effective analysis and management of risks regarding their insurance company members. Those risks do not justify changes to the FHLBanks' capital structure or increases to retained earnings. Moreover, any such limitations on FHLBanks' exposure to insurance companies will reduce those companies' access to FHLBanks' advances and participation in the FHLBanks' mission, and negatively affect the value of their FHLBank memberships.

There is no sound basis for requiring the FHLBanks to modify their capital structure or increase retained earnings based simply on their risk exposure to insurance companies, when such requirements are not imposed relative to other types of FHLBank members.

*Whether the FHLBank has an established documented analytical framework and procedures for assessing the creditworthiness of insurance company members at least quarterly using both internal and third-party sources.*

The FHLBanks maintain credit underwriting policies and supporting procedures regarding the regular credit underwriting of all of their members, including insurance company members. In view of the differences between depository institutions and insurance companies, each FHLBank has credit underwriting standards and processes for insurance company members that consider these differences. Each FHLBank maintains insurance company underwriting standards that are documented and are regularly applied by the FHLBanks in their periodic analyses of their insurance company members. As with underwriting processes for members generally, the frequency of underwriting performed on insurance company members may follow

Alfred M. Pollard, Esq.
December 3, 2012
Page 10
2012-N-14

a risk-based approach.  For example, if a depository institution or insurance company is not borrowing from its FHLBank, then the frequency of the underwriting analysis may be reduced, and the FHLBank's procedures may require a broader credit underwriting analysis be performed prior to an actual borrowing by such member.

*Whether the FHLBank has experienced staff trained to analyze SAP and GAAP financial statements of insurance companies to assess their financial condition and creditworthiness.*

The FHLBanks suggest that that the word "knowledgeable" be used instead of "experienced" to describe the FHLBank staff analyzing SAP and GAAP financial statements of insurance companies.  The FHLBanks agree that it is important that their credit underwriting staff members responsible for underwriting insurance company members are sufficiently knowledgeable to effectively assess insurance company members' financial condition to complete their credit underwriting analyses.

The FHLBanks further note that the Finance Agency has indicated state-by-state variation in SAP as a possible risk.  Although it is true that states may differ in their reporting requirements, SAP is based on NAIC accounting procedures.  There is no variation in SAP.  The FHLBanks recommend that this distinction be clarified in the Final AB.

*Whether the FHLBank has evaluated and documented the methodology used to establish haircuts for insurance company collateral.  In particular, whether the relative risk of failure of an insurer has been taken into account (such as a tiered haircut methodology based upon credit quality). An FHLBank should have objective standards to measure credit quality and should be prepared to take further action, if warranted, to protect its interests in the case of default.*

*Whether the FHLBank has documented procedures for obtaining market or fair value estimates of securities collateral on at least a monthly basis.  Whether the FHLBank uses more than one pricing service and how it resolves discrepancies among valuation estimates.*

*Whether the FHLBank accepts commercial real estate (CRE) loans as collateral and, if so, the extent to which the FHLBank:*

- *Obtains a first priority security interest in CRE loan collateral by taking physical possession of the note;*
- *Has documented procedures and experienced staff to collect and analyze pertinent information on the quality of the CRE loan collateral on a regular basis;*
- *Has documented procedures for obtaining market or fair value estimates of loan collateral regularly and periodically; and*
- *Uses a pricing service and benchmarks the service regularly.*

These proposed standards illustrate the FHLBanks' concerns described above in Part C of Section I: that a bullet point from the Final AB may be mistakenly interpreted and applied as a

Alfred M. Pollard, Esq.
December 3, 2012
Page 11
2012-N-14

checklist or "best practice." As drafted, these standards presuppose that there are specific solutions to identified risks without considering the overall risk mitigation practices in place at each FHLBank.

The FHLBanks maintain documentation regarding the haircuts and valuation for all of their members' pledged collateral, not just collateral pledged by insurance companies. Each FHLBank in its collateral policies/practices determines the manner in which it applies and adjusts collateral haircuts to ensure that its exposure to its members (including its insurance company members) is sufficiently collateralized.

*Whether the FHLBank uses market values in excess of book values when assessing collateral and, if so, whether it uses haircuts appropriately to account for price volatility.*

The FHLBanks agree that haircuts should account for price volatility, especially in instances when market values are in excess of book values.

Generally, FHLBanks lend to insurance companies against the market value of securities and apply market pricing data to loan collateral by relying on prices determined by third-party vendors, or in some cases for whole loans, determined internally and benchmarked against third-party vendors. Some FHLBanks may limit market value premium of collateral that can be recognized when determining lending capacity; however, all FHLBanks establish haircuts for securities and loan collateral, which may consider the following: market price volatility, liquidation costs, prepayment speeds, liquidity premiums, appropriate liquidation periods and other criteria. Because of the close relationship between collateral price, pricing frequency and haircuts, the FHLBanks are adequately protected against fluctuations in value, and the introduction of a restriction on the value of collateral may have an adverse impact on an FHLBank. For example, by encouraging a member to post discount securities only, the collateral may result in a lower credit quality and/or less liquid investment.

*Whether the FHLBank has established policies related to lending to captive insurance companies that take into account the extent of their insurance activities and whether or not they are affiliated with entities that are subject to regimes of "inspection and regulation" comparable to those of insured depositories or operating insurance companies.*

This evaluation point appears to be premised on two implicit but distinct assumptions. The first is that there is or should be some direct correlation between the "extent" of a captive insurance company's "insurance activities" and (a) its ability to support an FHLBank's housing and economic development mission or (b) its suitability to obtain FHLBank advances in a safe and sound manner. The second implied assumption is that FHLBank membership is somehow less appropriate for entities that do not have a corporate affiliate that is subject to "regimes of 'inspection and regulation' comparable to those of insured depositories or operating insurance companies." We respectfully submit, however, that these assumptions are not consistent with the

Alfred M. Pollard, Esq.
December 3, 2012
Page 12
2012-N-14

letter or spirit of the Federal Home Loan Bank Act ("FHLBank Act") and Finance Agency regulations and perhaps misapprehend the nature and features of captive insurers.[19]

By way of useful background and perspective, we offer the following facts: captive insurance companies are established by a group or an individual entity for specific risk management purposes. A captive insurer primarily insures the risks of other businesses that are related to it through common ownership; thus, the captive's business is primarily supplied by and controlled by its owner(s). By creating a captive, an organization retains part of its risk internally. Once formed, a captive operates much like a commercial insurer by issuing insurance policies to its owner(s) in exchange for payments of premiums. Like other entities within the insurance sector, however, captive insurance company business models are diverse and resist generalizations.[20]

Because the use of a captive insurer is an established, well-recognized and accepted business model for risk allocation by the insurance industry, 37 states currently have laws that expressly authorize the formation of captive insurance companies.[21] Captive insurers are comprehensively regulated by the same state agencies as other insurers, and are generally subject to very similar regulatory restrictions pertaining to administrative supervision, conservation, rehabilitation, receivership, and liquidation. Thus, for example, a captive will be thoroughly analyzed by the state regulator before it receives authorization to do business in that state, will be required to makes its records available for inspection by the state regulator, and will have capital and reserve requirements to which it must adhere. Like other insuring entities, captive insurance companies are in fact "operating insurance companies." Hence, captives should not be automatically and categorically distinguished from other types of insurers relative to an FHLBank's lending policies. Rather, each captive insurer must be evaluated for FHLBank membership and underwritten on an individual basis, based, of course, on the requirements of the Finance Agency's membership regulation.

The FHLBank Act and Finance Agency regulations do not require evaluation of the regulatory status of parent and/or affiliates of prospective member applicants (or housing associate applicants, as applicable) for purposes of either threshold membership requirements or safe and sound lending practices.[22] This is true irrespective of the type of entity applying for membership. Moreover, we are aware of no regulatory standards by which the FHLBanks could evaluate the affiliates of bank, credit union, insurance company, CDFI, or state housing finance agency or other housing associate affiliates or holding companies, or determine an appropriate

---

[19] Under current business policies, the Federal Home Loan Bank of New York is not permitted to grant membership to captive insurance companies.

[20] The following are but a few examples of types of captive insurers: pure captive (insures risks of its parent, affiliates and/or controlled unaffiliated businesses); association captive (insures risks of member organizations and their affiliates); special purpose financial captive (insures or reinsures the risks of its counterparty and may purchase reinsurance to cede the risks assumed).

[21] As of July 2012, there were over 2,300 captive insurance companies licensed in 26 states.

[22] 12 U.S.C. § 1424; 12 C.F.R. Parts 1263 and 1266.

Alfred M. Pollard, Esq.
December 3, 2012
Page 13
2012-N-14

nexus between the *affiliate's* regulatory status and the captive member's opportunities to obtain advances.[23]

    The reasons insurers were permitted to become FHLBank members by the FHLBank Act were not because they wrote a predetermined amount of insurance *per se*, but because their investment activities support the FHLBanks' mission and they are subject to acceptable state regulation.[24] In the same vein, banks were permitted to join the FHLB System not because they accept deposits, but because the FIRREA legislation of 1989 determined that their investing and lending activities support the FHLBanks' mission and they are subject to state and/or federal regulation. Thus, the experience of the FHLBanks that have approved memberships for captive insurers is that the extent or nature of a captive's (or any other insurance company's) insurance activities is not dispositive of its ability to satisfy the Finance Agency's membership regulations or support the FHLBank's mission, and does not *ipso facto* affect the FHLBank's ability to transact advances business with the captive on a safe and sound basis.

    Under the FHLBank Act, the FHLBanks may only lend to member institutions. As previously noted, the FHLBanks are required to underwrite the financial strength of each member institution individually before extending credit and can legally only lend on a fully-secured basis. In the case of captive insurers, the FHLBanks that choose to lend to captive insurers do so on both a fully-secured and perfected, first priority basis. Further, because dividends and intercompany transactions involving captives would be monitored and regulated by the state insurance commissioner, the regulatory status of a captive's affiliates and holding company should be irrelevant in an FHLBank's underwriting decisions. However, we also note that, as with FHLBank underwriting of depository institution members, in underwriting insurance company applicants and members, FHLBanks consider credit risks comprehensively, including the risks presented by activities of any insurance company member's affiliates.

    Finally, captive insurance company members are subject to the same credit and collateral policies as other members. These policies are self-reinforcing, encourage advance usage for housing-related purposes, and provide incentives to increase members' commitment to housing

---

[23] We note for historical perspective that, prior to the enactment of the Gramm-Leach-Bliley Act in 1999, commercial and industrial companies were authorized to own one federal savings institution. Moreover, prior to 1989, all federal savings banks were *required* to be a member of an FHLBank. Therefore, it's highly likely that there have been numerous FHLBank members that were subsidiaries of companies that were not subject to "regimes of 'inspection and regulation' comparable to those of insured depositories or operating insurance companies." We are aware of no instance in which this sort of member affiliation with an "unregulated" entity negatively affected an FHLBank's ability to safely and soundly make advances to the member.

[24] The Finance Agency membership regulation acknowledges this fact and makes no mention of considering the "extent" of a member's (or a prospective member's) "insurance activities." Section 1263.16(a) of the regulation provides:

    "*Insurance companies.* An insurance company applicant shall be deemed to meet the financial condition requirement of § 1263.6(a)(4) if, based on the information contained in the applicant's most recent regulatory financial report filed with its appropriate regulator, the applicant meets all of its minimum statutory and regulatory capital requirements and the capital standards established by the National Association of Insurance Commissioners."

13

Alfred M. Pollard, Esq.
December 3, 2012
Page 14
2012-N-14

and community and economic development.  Given these factors, we urge the Finance Agency not to issue examination guidance that could result in additional barriers to FHLBank membership and the fulfillment of the FHLBanks' mission, or could effectively establish lending standards that require different and unjustified treatment of captive insurers.

*Whether the FHLBank has been in contact with the state insurance regulator in each state where it has an insurance company member to establish an effective understanding with respect to the prudential operations of the insurance company.*

Understanding the "prudential operations" or overall risk management of an individual insurance company is part of an FHLBank's underwriting process and must be undertaken on a case-by-case basis, including discussions with the company's management team if needed. Accordingly, the FHLBanks propose that this evaluation topic be revised as follows, in order to achieve greater clarity and to better reflect our goals in establishing relationships with state insurance regulators:

- Whether the FHLBank has been in contact with the state insurance regulator in each state where it has an insurance company member to explain the benefits of FHLBank membership and products to insurance companies, summarize FHLBank lending and collateral policies, and establish channels of communication in the event an insurance company experiences financial difficulties.

**IV.    Conclusion**

The FHLBanks appreciate the opportunity to provide comments on the Notice and Proposed AB.  As the Finance Agency has recognized, the growth and strength of advances portfolios relative to insurance company members are key long-term strategies for several of the FHLBanks, and therefore of central strategic importance to the FHLBank System as a whole. Through their underwriting, collateral management and ongoing attention to their legal and contractual rights as a secured creditor with respect to all members, including insurance companies, the FHLBanks are well-positioned to identify and manage the risks that may accompany such growth.  However, more stringent regulatory or supervisory standards in relation to insurance companies—including, for example, enhanced capital or retained earnings requirements or one-size-fits-all approaches—would reduce insurance companies' access to the FHLBanks and would not be warranted by the FHLBanks' 80-year history.

14

Alfred M. Pollard, Esq.
December 3, 2012
Page 15
2012-N-14


      Thank you for your consideration.

Sincerely,


Edward A. Hjerpe, III
President and CEO
Federal Home Loan Bank of Boston


Alfred A. DelliBovi
President
Federal Home Loan Bank of New York


Winthrop Watson
President and CEO
Federal Home Loan Bank of Pittsburgh


W. Wesley McMullan
President and CEO
Federal Home Loan Bank of Atlanta


Andrew S. Howell
President and CEO
Federal Home Loan Bank of Cincinnati


Milton J. Miller
President and CEO
Federal Home Loan Bank of Indianapolis

Alfred M. Pollard, Esq.
December 3, 2012
Page 16
2012-N-14

Matthew R. Feldman
President and CEO
Federal Home Loan Bank of Chicago

Richard S. Swanson
President and CEO
Federal Home Loan Bank of Des Moines

Terry C. Smith
President and CEO
Federal Home Loan Bank of Dallas

Andrew J. Jetter
President and CEO
Federal Home Loan Bank of Topeka

Dean Schultz
President
Federal Home Loan Bank of San Francisco

Michael L. Wilson
President and CEO
Federal Home Loan Bank of Seattle