# Exhibit D

# MEMORANDUM

**Date:**      June 19, 2013

**To:**         NAIC FHLBank Legislation Subgroup

**From:**      FHLBanks of Atlanta, Boston, Chicago, Cincinnati, Dallas, Des Moines, Indianapolis, Pittsburgh, San Francisco, Topeka

**Subject:**    **Background Materials for June 24, 2013 Conference Call**

## I.     Background

The FHLBanks have followed a work plan established by the NAIC FHLBank Legislation Subgroup (NAIC Subgroup) setting forth the issues and questions identified by the NAIC Subgroup for consideration and analysis.  The FHLBanks have submitted materials responsive to these issues and questions and participated in conference calls with the NAIC Subgroup to discuss issues and respond to questions.  As stated on the last conference call, the NAIC Subgroup expects that its approach to state departments of insurance on the FHLBank proposed legislation will be in the form of guidelines.  Such guidelines will use revisions to applicable sections of the Insurer Receivership Model Act (IRMA) to illustrate provisions that individual state commissioners should consider for revision to implement the proposed legislative change in individual state insolvency statutes.  It was stated on the most recent conference call that it is not expected that the NAIC will pursue actual changes to IRMA.

The FHLBanks have expressed support for revisions to IRMA Sections 108 and 604, addressing stays and voidable preferences, respectively, and comparable/related provisions at Sections 114, 504A(8), and 605 raising similar concerns for the FHLBanks.  By its terms, the proposed legislative language specifically relates only to the FHLBanks.  The FHLBanks understand that the NAIC is reviewing the proposed legislative revisions to determine if the language may result in any unintended impact on IRMA.  As previously noted, the FHLBanks will quickly respond to any legal analysis and issues identified by the NAIC legal staff.

As noted in a prior submission to the NAIC Subgroup, two states, Indiana and Michigan, enacted important legislation on this topic utilizing a different approach.  Specifically, those states chose to modify their versions of IRMA Section 711.  The FHLBanks now have useful statutory clarity in those states, which further enhances the FHLBanks' ability to provide competitive borrowing opportunities for insurance company members domiciled in those states.  As noted by a NAIC Subgroup member on a recent call, individual state departments of insurance already have determined and are comfortable with this approach as an alternative to the FHLBanks' proposed IRMA language above.

II.     **Proposed Revisions to IRMA; Illustrative Guidelines for Individual State
        Departments of Insurance**

A.  Full exemption from the stay provision versus capping the stay period at a specified number
    of days.

The FHLBanks are seeking exemption from the stay provisions of the state insurance company insolvency statutes.  On the last NAIC Subgroup call, a request was made for the FHLBanks to consider, instead of a complete exemption, a capped stay period of 90 or 120 days.  The FHLBanks have considered this request and determined that a capped stay period as proposed would not remove the incremental risk caused by the stay period, which causes the FHLBanks to impose more conservative collateral terms on their insurance company members than their depository institution members.  Currently, at least 9 of the 12 FHLBanks calculate their collateral requirements for insurance company members considering credit quality and the potential risk of a stay period.  A capped stay period will not enable an FHLBank to revise its collateral requirements for insurance company members to reduce the collateral necessary to cover market volatility because the FHLBanks will still face the risk of market value fluctuation during that period.  Finally, in some states, the expected or assumed stay period that an FHLBank could face (and on which such FHLBanks base their required collateral calculations) is already 180 days, such that capping the stay period as proposed would not result in any reduction in the collateral requirements for their insurance company members.

Using one FHLBank's collateral valuation methodology (attached as Exhibit 1 which shows different collateral levels and incorporates credit quality) as an illustration of the different collateral discounts/haircuts for insurance company members and the resulting required collateral levels, the impact of more conservative collateral requirements on an insurance company member resulting from the risk of market value fluctuation during a stay period can be analyzed.  Applying the haircuts in Exhibit 1, an insurance company member pledging U.S. Treasury securities to secure an FHLBank advance in the amount of $5 million loses anywhere between $96,000 and $778,000 in lending value on those securities as compared to a depository institution member.  This means that the insurance company member is not able to obtain the best execution in its FHLBank borrowing, which increases the cost of borrowing to the insurance company as it cannot use that amount to pledge elsewhere (for example, to meet derivatives clearing collateral calls) or otherwise use this collateral value.

With the June 10, 2013 implementation of derivatives clearing and the additional collateral requirements on insurance companies in executing cleared derivatives, it is now more important than ever that insurance companies are able to most efficiently use their assets in their secured transactions.  Additionally, with insurance companies facing increased demands for securities collateral to pledge to support their cleared derivatives transactions, the ability to pledge other assets (for example, commercial real estate mortgages) to secure their FHLBank borrowings is important.  Due to, among other things, the uncertainty caused by the stay period, at this point, some FHLBanks will not accept such mortgage collateral from their insurance company members.  Moreover, those that do accept such collateral, impose different haircuts requiring insurance company members to pledge additional collateral (in comparison to depository institution members as illustrated in Exhibit 1) to address the risk of a stay period.  Improving the ability of insurance companies to liquefy their less liquid assets enhances insurance companies' liquidity.

Using the Exhibit 1 data, an insurance company member that borrows $5 million from an FHLBank and pledges commercial real estate mortgages to secure such an advance would be

subject to a greater haircut on such collateral, potentially needing to pledge as much as $1.75 million more of such mortgages than a depository institution member of a similar credit quality. If proposed legislation that exempts the FHLBanks from the stay period is passed in a particular state, the collateral market volatility risk faced by the FHLBank on account of the stay period when lending to insurance company members domiciled in such state would be nearly eliminated.  Accordingly, each FHLBank with insurance company members domiciled in such state could reduce the heightened collateral levels presently required for such insurance company members on account of the stay period and thereby provide such insurance company members with increased asset value for use by such insurance companies.  This will have a significant positive financial impact on such insurance company members, as demonstrated in the memorandum from FHLBank Topeka attached as Exhibit 4, which explains the benefit for insurance company members in those states where the proposed legislation has been enacted. If the proposed legislation is broadly passed in states across the country, the potential positive financial impact on the insurance industry more generally is significant in light of insurance company members having nearly $53 billion in outstanding advances from the FHLBanks at March 31, 2013.

From a receiver's perspective, the additional collateral value required to be pledged to cover a stay period (including a capped stay period) means that such incremental asset value pledged to an FHLBank is not available to a receiver until the receiver repays the insurance company's outstanding borrowings from such FHLBank.  As a secured creditor, an FHLBank is required, following (but not before) repayment of the debtor's outstanding obligations, to return any excess collateral value.  The FHLBanks' practice is to promptly return excess collateral following repayment of a member's outstanding obligations.

It is the FHLBanks' understanding that a possible reason that a capped stay period (as opposed to a complete exemption) has been proposed is to provide a receiver with time to assess whether there was fraud in connection with an insurance company's borrowing from an FHLBank.  The FHLBanks believe that it is highly unlikely that there would be fraud in connection with their lending to their insurance company members (or any other members) given the FHLBanks': 1) federal instrumentality status and statutory mission of providing liquidity to their members via secured advances; 2) comprehensive highly regulated nature, including annual examinations; 3) over 80 year history of secured lending to their members, including well-established collateral practices annually examined by the Finance Agency; and 4) close cooperation with FHLBank members' regulators.  Additionally, the FHLBanks have not proposed, and do not intend to propose, legislation in any state that would exempt the FHLBanks from liability for actual fraud.  Consequently, a capped stay period seems unnecessary to address the very low level of fraud risk presented by FHLBank lending to insurance company members, particularly in light of the fact that the FHLBanks would remain liable for any actual fraud perpetrated by the FHLBanks notwithstanding any exemption from the stay period and the FHLBanks are good for it.

B.  Section 108−staying of proceedings.

Exhibit 2 attached hereto includes a markup of Section 108 of IRMA to show the proposed exemption language.  The proposed language would apply solely to the FHLBanks.

C.  Section 604—voidable preferences.

Exhibit 2 attached hereto also includes a markup of Section 604 of IRMA to show the proposed changes to the voidable preference provisions of IRMA.  The proposed language would apply solely to the FHLBanks.

D.  Additional comparable or related provisions.

In reviewing IRMA, the FHLBanks have considered whether other comparable or related sections of IRMA need to be addressed because they raise concerns similar to the stay and preference provisions of IRMA Sections 108 and 604.  Based on that review, the following sections were identified for possible revision:

Section 605.  IRMA Section 605 is related to Section 604 (Voidable Preferences).  If collateral posted by a troubled insurance company member declines in value, the FHLBank may need to obtain additional collateral to remain fully secured as required by law.  However, similar to Section 604, the broad scope of Section 605 may allow a receiver to seize such additional collateral on the basis that it was transferred for "less than a reasonably equivalent value."  Consequently, for consistency with the proposed exemption from the voidable preference provision, Section 605 should similarly not apply to the enforcement of FHLBank security agreements, except in the case of any transfer made with actual intent to hinder, delay, or defraud.

Sections 114A and 504A(8).  These IRMA subsections allow a receiver or liquidator to reject any executory contract of the insurer.  Although we do not believe these subsections were intended to allow rejection of security agreements, outstanding extensions of credit, and corresponding perfected security interests, the broad language of these subsections or similar terms of individual state insolvency statutes could create a potential uncertainty for the FHLBanks.  Consequently, these subsections should not apply to FHLBank security agreements and related agreements.

## III.  Responses to Questions Submitted by NAIC Subgroup Member Florida Department of Financial Services

Attached as Exhibit 3 are the FHLBanks' responses to the specific questions submitted by the Florida Department of Financial Services.  The questions cover a range of topics, including seeking to understand whether the FHLBanks desire uniformity from the individual states and their respective departments of insurance.  As previously noted, the FHLBanks are seeking clarity not uniformity, and expect to work with their individual state departments of insurance regarding the applicable provisions of their respective states' insurance insolvency statutes that are to be considered for revision.

The other area of focus in the submitted questions is whether the receiver will have fewer assets available to it, and the impact of perceived FHLBank "claim jumping" on other creditors, including policyholders.  This question was considered by the NAIC in connection with the IRMA Section 711 QFC provision.  As with that legislative language (which, among other things, exempted QFC counterparties from stay and preference provisions), under state insurance insolvency laws, holders of secured claims can discharge their claims against collateral ahead of unsecured creditors, including policyholders.  Consequently, the FHLBanks, like QFC counterparties, are not seeking to jump from an unsecured to a secured status.  Instead, the FHLBanks are simply seeking to exercise their existing right to discharge their claims against

collateral free from the stay and voidable preference provisions of state insurance insolvency laws. If an FHLBank holds insufficient collateral to cover its claim, generally an FHLBank would become an unsecured creditor to the extent of the deficiency.

## IV.    Illustrative Benefits of the Proposed Legislation for Insurance Companies

As discussed on the last NAIC Subgroup call, and demonstrated in the FHLBank collateral haircut/discount example charts referenced above and included as Exhibit 1, the primary benefit of the proposed legislation for insurance companies is better collateral values (i.e., smaller collateral haircuts/discounts) when borrowing from an FHLBank. This change provides insurance company members with the ability to better deploy their assets (including, in certain cases, their whole loan assets). Optimizing the value of assets, either through pledging to secure low-cost funding from an FHLBank or pledging securities to support derivatives transactions is an issue of critical concern for insurance companies, particularly with the implementation of the Dodd-Frank derivatives clearing requirements and the increased need for securities collateral to pledge against such transactions.

As mentioned on recent NAIC Subgroup calls, FHLBank Topeka, following passage of the FHLBank legislation in two states in its district, has been able to modify its required collateral haircuts for insurance company members in those states. Attached as Exhibit 4 is a memorandum from FHLBank Topeka explaining collateral haircuts for insurance company members in those states as well as the states in their district where the legislation has not been enacted. Although this information is specific to FHLBank Topeka, it demonstrates the potential tangible value to insurance company members of other FHLBanks following the passage of the proposed legislation in their states.

Policyholders benefit from the insurance companies' access to low-cost funding from the FHLBanks on better terms. Without the proposed legislative revisions, insurance company members are limited in their ability to fully access FHLBank funding to most effectively manage their asset-liability risks.

By way of analogy, the effect of the QFC legislation found at Section 711 of IRMA was to improve the timing and certainty (but not the priority) of payments to QFC counterparties in the unlikely event of an insurance company failure thereby avoiding harm to such counterparties and the market more generally. This is also the case with the FHLBanks' proposed legislation as the FHLBanks, like QFC counterparties, are already secured creditors and thus, as explained above, are entitled under existing state insurance insolvency laws to discharge their claims against collateral ahead of unsecured creditors. Also, as with the QFC provisions, since the FHLBanks are cooperatives owned by their depository institution and insurance company members, the proposed legislation similarly reduces risk to the FHLBanks and their respective member-stockholders (including insurance company members) by providing the FHLBanks with clarity. Therefore, we believe that the value of the proposed legislation, specifically, the enhancement of the stability and safety and soundness of the insurance industry generally through access to low-cost funding from the FHLBanks on better terms, strongly supports improving the timing and certainty (but not the priority) of payments to the FHLBanks in the rare case of an insurance company's failure. In other words, the same balancing of interests that individual states considered in determining whether to support enactment of IRMA Section 711 for QFCs applies with regard to the proposed FHLBank legislation.

**V.  Benefits of FHLBank Membership and Borrowing by Insurance Companies—Rating Agency Perspective**

On June 12, 2013, Fitch issued a report titled "The Federal Home Loan Bank System: Its Role in the Life Insurance Industry" (Fitch Report).  See Exhibit 5.  Key items of note include recognition that:

>"The FHLB is able to source funds at very low rates due to its position as a government-sponsored entity (GSE). The FHLB is then able to pass these market savings onto its members . . . . Funds are available without the need to structure costly capital market documentation."

Additionally, the Fitch Report notes:

>"Great source of backup liquidity: Fitch Ratings believe that membership in the Federal Home Loan Bank (FHLB) system can enhance liquidity and financial flexibility for insurance companies, particularly those insurance companies with limited access to the capital markets.  Funding availability proved to be particularly important during the financial crisis, when access to traditional capital market sources decreased.  FHLB advances to insurance companies increased 91% between 2007 and 2008.
>While Fitch views access to FHLB funding as providing liquidity in a stress scenario that could mitigate potential negative rating actions, it has not upgraded insurers strictly due to FHLB membership.
>
>The FHLB provided needed liquidity to the banking and insurance industry during the financial crisis, allowing them to turn their somewhat illiquid mortgage portfolio into funds that could be used to finance operations without forced asset liquidation."

With respect to FHLBank stock, the Fitch Report states:

>"The contractual illiquidity of FHLB membership stock could be considered a credit negative. However, Fitch does not view FHLB stock illiquidity as a major concern for most insurance companies due to the small amount of FHLB stock they hold and the fact that many hold significant amounts of long-term investments in their portfolios. In addition, Fitch and members have found comfort that in practice, redemption of FHLB stock has not been restricted to the extent allowed in membership contracts. Also, many members find the current stock dividend paid by some FHLB districts to be attractive versus other alternative investments."

The Fitch Report recognizes that typically, FHLBank stock is one type of long-term investment held by life insurance companies.  Additionally, the Fitch Report suggests that in reviewing FHLBank capital stock that the key items for consideration are: 1) the overall amount of such capital stock held by an insurer; 2) the dividend; and 3) stock repurchase/redemption practices of each respective FHLBank to understand the scope of the investment.

Exhibit 1

**FHLBank Example−Required Collateralization Levels by Collateral Type (Reflecting Collateral Discounts)**

| *US Treasuries* | Depository Institution | Insurance Company | Lending Value Per $ Million Lost |
|---|---|---|---|
| 0-3 Year Remaining Maturity | 101% | 103% | (19,225) |
| 3-7 Year Remaining Maturity | 103% | 108% | (44,948) |
| ≥ 7 Year Remaining Maturity | 107% | 117% | (79,879) |
| 0-3 Year Remaining Maturity | 101% | 107% | (55,520) |
| 3-7 Year Remaining Maturity | 103% | 114% | (93,681) |
| ≥ 7 Year Remaining Maturity | 107% | 128% | (153,329) |

| Collateral Type | Depository | Insurance Company | Lendable Value Per $ Million Lost |
|---|---|---|---|
| *Market Valued Loans* | | | |
| 1-4 Family | 115% | 150% | (202,899) |
| 1-4 Family | 150% | 155% | (21,505) |
| Commercial Real Estate | 120% | 155% | (188,172) |
| Multi-Family | 135% | 170% | (152,505) |
| Multi-Family | 170% | 175% | (16,807) |

Exhibit 2

**IRMA Provisions**

***Proposed Revision to Section 108E Injunctions and Orders of the NAIC Insurer Receivership Model Act:***

E.  Notwithstanding Subsection C, the commencement of a delinquency proceeding under this Act does not operate as a stay or prohibition of:
    (10)       Any of the following actions:
           (a) An audit by a governmental unit to determine tax liability;
           (b) The issuance to the insurer by a governmental unit of a notice of tax deficiency;
           (c) A demand for tax returns;
           (d) The making of an assessment for any tax and issuance of a notice and demand for payment of the assessment; or
           (e) The exercise by a Federal Home Loan Bank of its rights regarding collateral pledged under a security agreement (or any pledge, security, collateral or guarantee agreement or any other similar arrangement or credit enhancement relating to such Federal Home Loan Bank security agreement).

***Proposed Revision to Section 604 C. Voidable Preferences and Liens of the NAIC Insurer Receivership Model Act:***

C.  The receiver may not avoid a transfer under this section:
    . . .
        (5)  Of money or other property arising under or in connection with a Federal Home Loan Bank security agreement (or any pledge, security, collateral or guarantee agreement or any other similar arrangement or credit enhancement relating to such Federal Home Loan Bank security agreement).

***Proposed Revisions:  Section 605. Fraudulent Transfers and Obligations***

A. The receiver may avoid any transfer of an interest of the insurer in property, any reinsurance transaction or any obligation incurred by an insurer that was made or incurred on or within two (2) years before the date of the initial filing of a petition commencing delinquency proceedings under this Act, if the insurer voluntarily or involuntarily:
(1) Made the transfer or incurred the obligation with actual intent to hinder, delay or defraud any person to which it was or became indebted on or after the date that the transfer was made or the obligation was incurred; or
(2) Received less than a reasonably equivalent value in exchange for the transfer or obligation; provided that this provision shall not apply to any transfer of money or other property arising under or in connection with a Federal Home Loan Bank security agreement (or any pledge, security, collateral or guarantee agreement or any other similar arrangement or credit enhancement relating to such Federal Home Loan Bank security agreement).
    . . . .

***Proposed Revisions: Section 114. Executory Contracts***

A.   The receiver may assume or reject any executory contract or unexpired lease of the insurer. Notwithstanding the foregoing, a Federal Home Loan Bank security agreement (or any pledge, security, collateral, or guarantee agreement or any other similar arrangement or credit enhancement relating to such Federal Home Loan Bank security agreement) shall not be considered an executory contract.

***Related Provision: Section 504. Powers of the Liquidator***

A.   The liquidator shall have the power:

(8)   To enter into such contracts as are necessary to carry out the order to liquidate, and, subject to the provisions of Section 114, to assume or reject any executory contract or unexpired lease to which the insurer is a party.

**Exhibit 3**

**Responses to Questions from the Florida**
**Department of Financial Services—Divisions of Rehabilitation and Liquidation**

1) A. If the legislation favoring FHLB is passed, will all FHLB implement it consistently?

   *Answer:* As set forth in our prior written submissions, we are seeking clarity not uniformity of implementation, although each FHLBank has similar substantive goals that it would like to achieve in the legislation in its district. The NAIC expressed a desire for the FHLBanks to consider a uniform approach, including reviewing applicable provisions of IRMA for amendment. The FHLBanks have been responsive to the NAIC. The FHLBanks expect to work individually with the respective state departments of insurance on the legislation.

   B. If not, why is the FHLB seeking identical implementation from the Receivers?

   *Answer:* Please see response to 1.A above.

   C. Does consistent implementation by the Receivers offer any benefits to the Receivers? If so, please provide empirical data.

   *Answer:* Please see response to 1.A above.

   D. Do all FHLB's interpret statutes/laws similarly?

   *Answer:* The FHLBanks recognize the specific terms of the insolvency statutes of individual states differ and they understand the need to be fully informed regarding the specific terms of each of these individual statutes.

2) Please provide empirical data identifying the amount of funds lost by FHLB due to the lack of legislation on this matter.

   *Answer:* As set forth in the attached memorandum and previous materials submitted to the NAIC Subgroup, the FHLBanks have never suffered a credit loss on an advance to an FHLBank member in their 80 plus year history. The FHLBanks, as cooperative institutions established to serve the important public policy mission of providing liquidity to their members by lending at rates slightly above U.S. Treasury rates, are operated and held, by regulation, to this conservative "no loss" standard. Consequently, when lending to their insurance company members, the FHLBanks must impose more conservative collateral requirements to address the incremental stay and voidable preference risks they face in lending to insurance companies that they do not face in lending to depository institutions. The regulatory, financial and business model consequences of a credit loss on an advance could be severe and affect the FHLBanks' ability to continue to serve their members through low-cost funding.

3) Please provide empirical data demonstrating how much money the FHLB anticipates Receivers will save. If possible, be state specific.

*Answer:* The FHLBanks believe that there are several benefits to receivers by excluding the FHLBanks from the stay provisions of the insolvency statutes. There will be less collateral tied up before or during rehabilitation if an FHLBank is able to lower its haircuts. This would make more funds available to the insurance company before a rehabilitation or receivership and to the rehabilitator after rehabilitation is initiated. Second, the rehabilitator may wish to work with the FHLBank to agree on rolling over maturing advances, thereby improving liquidity management and potentially timing repayments to coincide with planned asset liquidations or other objectives of the rehabilitator. Finally, receivers may reduce potential litigation costs charged against the receivership that may need to be incurred to resolve borrowing transactions of a failed insurance company with an FHLBank. The value of having statutory clarity and avoiding litigation expense was recognized previously by the receivers (and noted by IAIR representatives in an earlier NAIC Subgroup conference call) in regard to similar legislation, the IRMA Section 711 QFC legislation.

4) Please provide empirical data to support the statement that allowing the FHLB an exclusion from voidable preferences benefits Receivers.

*Answer:* Please see response to 3 above.

5) Please provide empirical data to support the statement that allowing the FHLB an exclusion from the automatic stay benefits Receivers.

*Answer:* Please see response to 3 above.

6) Please provide empirical data to support the statement that FHLB legislation will not result in less assets for other creditors of the receivership estate.

*Answer*: As illustrated in the FHLBanks' memorandum, due to stay and preference risks, the FHLBanks generally require greater collateralization levels for advances to insurance company members. If the FHLBanks are not subject to these additional risks, then, they can reduce the required collateralization levels. There would be less collateral tied up before and during rehabilitation of an FHLBank insurance company member. This makes more funds available to the insurer before rehabilitation and to the rehabilitator after rehabilitation is initiated. As set forth in the attached memorandum and previous materials submitted to the NAIC Subgroup, the FHLBanks are already secured creditors and thus are entitled under existing state insurance insolvency laws to discharge their claims against collateral ahead of unsecured creditors, including policyholders. Consequently, the FHLBanks are not seeking to jump from an unsecured to a secured status through the proposed legislation. Instead, the proposed legislation will simply improve the timing and certainty (but not the priority) of payments to the FHLBanks in the rare case of an insurance company's failure (with the attendant benefit of improved collateral haircuts for insurance company members as further explained in the attached memorandum). As a secured creditor, an FHLBank is also required, following the repayment of the debtor's outstanding obligations, to return any excess collateral value. Furthermore, in the event that an FHLBank holds insufficient collateral to cover its claim, the FHLBank generally becomes an unsecured creditor to the extent of the deficiency.

7) FHLB stated that the proposed legislation will contain language that disallows other creditors to ask for preferences. What assurances can the FHLB provide that this

legislation will not result in future legislative attempts by other creditors to receive distribution preferences?

*Answer:* The FHLBanks have expressly stated that their purpose in seeking the legislation is to achieve parity with unique exemptions that only they and the Federal Reserve Banks enjoy under federal law. The FHLBanks will ensure that their communications regarding the proposed legislation are clear on this point and do not refer to providing similar exemptions for other secured creditors. The FHLBanks note that, unlike other secured creditors, who regularly manage bankruptcy stay and preference risks in their lending, price for such events and potential losses and hold reserves against such potential losses, the FHLBanks' business model does not include being subject to such risks. For over 80 years, the FHLBanks have operated such that they have never suffered a credit loss on an advance to a member. The FHLBank business model and ability to provide low-cost funding to members at rates slightly above U.S. Treasury rates would be seriously impaired if the FHLBanks experienced a credit loss and, as a result, would have to address reserves and related issues. This would result in increased funding costs for FHLBank member depository institutions and insurance companies and thus have a negative financial impact on such members.

8) FHLB will not agree to waive prepayment fees on insurance companies placed in receivership because it would result in a violation of FHFA regulations. Fla. Stat. 631.271 reads that "no subclasses may be established within any class." Please explain how implementing the proposed FHLB legislation is not in violation of F.S. 631.271.

*Answer:* In addition to being a violation of FHFA regulations, because each FHLBank is a cooperative, waivers of such fees would also have a detrimental effect on the income of the respective FHLBank, which would indirectly affect the other insurance company members of such FHLBanks. Collectively, insurance company members owned over $3.5 billion in FHLBank stock at March 31, 2013. With respect to the specific provision cited, it is not clear that this conflicts with the proposed legislation, which simply improves the timing and certainty (but not the priority) of payments to the FHLBanks in the case of an insurance company's failure. If such a conflict is determined, a corresponding revision may need to be considered to such provision specifically regarding the FHLBanks.

9) Please explain how the request for uniformity between the Receivers concerning this proposed legislation does not erode the McCarran-Ferguson Act.

*Answer:* Please see response in 1.A above.

10) Please provide empirical data demonstrating that FHLB agreements provide access to liquidity on more favorable terms than from commercial lenders.

*Answer:*

a) Commercial banks generally charge a facility fee (e.g., 5-20 bps) for reliable access to a line of credit. The FHLBanks do not typically charge for access to credit.
b) Advance rates are consistent for members regardless of credit rating and vary by size and tenor, whereas commercial banks charge based on credit quality of the borrower, may charge default levels of interest, and may suspend lending (and accelerate debt) if a default occurs.

12

    *c)*  Members typically have immediate/same day access to borrowing.  They do not have to negotiate new lending agreements each time they want to borrow or engage in costly capital markets debt issuance.  This is especially beneficial to insurers who have unexpected policy payments that may otherwise require premature liquidation of investments at disadvantageous prices.

    *d)*  The FHLBanks generally will lend against illiquid assets and do so for long-term borrowings that may better match the ALM objectives of the member.  This is a primary advantage of FHLBank lending to depository institution members.

    *e)*  During the recent financial crisis, the FHLBanks funded insurance companies on the same day and at lower rates than commercial lenders due to liquidity from the capital markets and a stand-by line at the U.S. Treasury.

    *f)*  FHLBank collateral does not have the same risk as repurchase agreements and securities lending collateral, where a creditor may return "substantially the same" security on a specified date.  All FHLBank collateral is held and returned upon repayment of the obligation.

The attached recent Fitch Report (p.7) also includes data demonstrating that the FHLBanks lend to their members at very low rates, rates at a small spread to comparable U.S. Treasury rates.  Other creditors do not provide comparably priced funding.

11) Explain why a Receiver would want an insolvent company, often managed by directors and officers responsible for the insolvency to obtain more access to funds especially from FHLB?

*Answer:*  As demonstrated in our response to Question 10, the FHLBanks, because of their unique statutory purpose and status, are able to lend money on terms and at rates more attractive than those available from commercial banks.  In the two recent FHLBank insurance company rehabilitations, the receiver found continued access to FHLBank funding beneficial.  As set forth in the FHLBanks' prior written submissions, the FHLBanks have specific regulatory requirements that require the FHLBanks to follow the direction of the regulator of a weak member institution before lending to such institution.  Consequently, to the extent that a receiver would not want an entity subject to receivership to borrow from an FHLBank, the FHLBank would follow that direction, consistent with its regulations.  It is also observed that state statutes have provisions regarding prior approvals for entities subject to administrative supervision/receivership to borrow.  To the extent that a receiver does not want such an entity to borrow (from an FHLBank or any other creditor) the receiver would not approve such borrowing.

**Exhibit 4**

# MEMORANDUM  |  JUNE 13, 2013

**DATE:**　　June 13, 2013

**TO:**　　　Members of the NAIC FHLBank Legislation Subgroup

**FROM:**　　Sonia R. Betsworth, SVP, Chief Credit Officer

**RE:**　　　FHLBank Topeka's Current Practices for Addressing Collateral
　　　　　　Liquidation Risks Associated with Insurance Companies

## PURPOSE

Provide the Subgroup information regarding FHLBank Topeka's current collateral practices for addressing the longer liquidation risks associated with insurance companies that are domiciled in a state in which the insolvency laws potentially restrict our ability to liquidate collateral in due course.

## BACKGROUND

By federal law and by regulation, the FHLBanks are what's known as secured, or collateralized lenders. This means that insurance companies must pledge and deliver eligible collateral to the FHLBank to fully support their borrowings. Eligible collateral is discounted, which means the FHLBanks value it at less than 100% of face value. These discounts are necessary to accommodate the collateral's market value volatility. For example, if an insurance company borrows $100,000 and pledges an Agency Fixed Rate Bond (e.g., Fannie Mae Bond – 5 year maturity) as collateral, the pledged Agency bond will need to have a market value of $104,000, assuming we apply a discount of 4 percent.

We determine our collateral discounts, or "haircuts," by evaluating the market value volatility of the collateral over its expected liquidation period. Under normal circumstances, the market value volatility of collateral will increase with the length of the liquidation period, so that the longer the liquidation period, the larger the discount/haircut we must apply.

If an insurance company pledges highly liquid collateral to the FHLBank, our discount on that collateral would generally be very small. However, because some states' insurance company insolvency laws are unclear, the FHLBank assumes that an insurance company receiver would ask a court to order a "stay," which would delay the FHLBank from liquidating its collateral. A stay or voidable transfer laws could also

14

prohibit the insurance company from pledging additional collateral to the FHLBank to accommodate any decreases in the collateral's market value.

The legal uncertainties outlined above have resulted in FHLBank Topeka increasing collateral discounts/haircuts on collateral of insurance company members domiciled in states where the law is unclear, because of the possibility of longer liquidation periods.  In addition to higher discounts, FHLBank Topeka may also place additional restrictions on the amount we will lend to an insurance company and also limit the terms of the borrowings to as short as three months or less.

## CURRENT COLLATERAL DISCOUNTS/HAIRCUTS

As described above, FHLBank Topeka currently establishes additional collateral discounts/haircuts for insurance companies which are domiciled in states where the laws are unclear regarding our ability to liquidate collateral if we have reason to be concerned about those companies due to their financial condition or they are unrated.  These additional collateral discounts/haircuts are reviewed at least annually and can change significantly based on the volatility in the marketplace.  Identified below are the additional discounts/haircuts that are applied today to insurance companies:

| Asset Type | Additional Discount |
|---|---|
| *Securities* | |
| Agency Fixed-rate Bond < 3 Years to Maturity | 7% |
| Agency Fixed-Rate Bond 3-5 Years to Maturity | 1% |
| Agency Fixed-Rate Bond > 5 Years to Maturity | 4% |
| Agency Inverse Floater Bond | 7% |
| Agency MBS/Pass through | 18% |
| Agency HECM Reverse MBS | 7% |
| Agency Structured Bond | 14% |
| Agency Z Bond | 6% |
| Commercial MBS – 100% Defeased | 11% |
| Commercial MBS - < 100% Defeased | 7% |
| PLS NonPrime MBS | 11% |
| PLS Prime MBS | 21% |
| Student Loan ABS | 9% |
| U.S. Treasury Bond < 3 Years to Maturity | 1% |
| U.S. Treasury Bond 3-5 Years to Maturity | 1% |
| U.S. treasury Bond > 5 Years to Maturity | 4% |
| VA Vendee Trust | 3% |
| *Loans/Real Estate* | 9% |
| Conventional Amortizing 1-4 Family Mortgages | 3% |
| Conventional Amortizing 1-4 Family Mortgages – I/O | 10% |
| Multi-Family Real Estate | 10% |
| Commercial Real Estate | 10% |

With the recent adoption of legislation in Nebraska and Oklahoma that removed the uncertainty regarding our ability to liquidate collateral and, consequently, greatly reduced our liquidation risk, insurance companies domiciled in these states are no longer subjected to these additional discounts/haircuts.

If you have any questions, please do not hesitate to contact me.

**Exhibit 5**

# FitchRatings

# Insurance

Life Insurers/U.S.

# The Federal Home Loan Bank System

## Its Role in the Life Insurance Industry
**Special Report**

**Related Research**

2012 Statutory Trends of the U.S Life
Insurance Industry (May 2013)

Life Insurers' Financial Leverage and
Debt-Servicing Capacity (April 2013)

2013 Outlook: U.S. Life Insurance
(December 2012)

Life Insurers' Investment Portfolios —
Results of Fitch's Year-End 2011
Survey (October 2012)

**Analysts**

Bruce Cox
+1 312 606-2316
bruce.cox@fitchratings.com

R. Andrew Davidson
+1 312 368-3144
andrew.davidson@fitchratings.com

Douglas Meyer
+1 312 368-2061
douglas.meyer@fitchratings.com

Douglas Baker
+1 312 368-3207
douglas.baker@fitchratings.com

## Summary

**Good Source of Backup Liquidity:** Fitch Ratings believes that membership in the Federal Home Loan Bank (FHLB) system can enhance liquidity and financial flexibility for insurance companies, particularly those insurers with limited access to the capital markets. Funding availability proved to be particularly important during the financial crisis, when access to traditional capital market sources decreased. FHLB advances to insurance companies increased 91% between 2007 and 2008.

While Fitch views access to FHLB funding as providing liquidity in a stress scenario that could mitigate potential negative rating actions, it has not upgraded insurers strictly due to FHLB membership. Conversely, borrowing excessively relative to an insurer's capital base or using proceeds in a risky manner will likely have negative rating implications.

**FHLB Is a Low-Cost Source of Funds:** The FHLB is able to source funds at very low rates due to its position as a government-sponsored entity (GSE). The FHLB is then able to pass these market savings onto its members that seek to utilize certain assets in their investment portfolios as collateral for loans. Funds are available without the need to structure costly capital market documentation.

**Regulatory Uncertainty over Collateral Treatment:** The National Association of Insurance Commissioners (NAIC) has formed the Restricted Assets Subgroup to address certain regulatory uncertainty and inconsistency regarding the treatment of financial activities that have pledge-like restrictions, including FHLB advances. Proposed amendments to state receivership laws may provide clarity regarding the treatment of FHLB collateral in insolvency and provide some uniformity between state insurance regulations.

**FHLB Stock Illiquidity Concerns Muted:** The contractual illiquidity of FHLB membership stock could be considered a credit negative. However, it is not a major concern for most insurance companies due to the small amount of FHLB stock they hold, and the fact that many insurers hold significant amounts of long-term investments in their portfolios. In addition, members have found comfort that their redemption of FHLB stock has not been restricted to the extent allowed in membership contracts.

**Insurers Increasing Use of FHLB:** More insurers are becoming members of the FHLB or increasing their overall borrowing capacity. Over the past four years, the number of insurance companies joining the FHLB has grown by an average of 9%–10% each year. In addition several insurance groups have substantially increased their borrowing capacity in the FHLB since 2009, namely MetLife, New York Life, Riversource Life and the CNO Financial Group.

**Life Insurers Predominate Insurance Users of FHLB:** Among the 17 top insurance company FHLB borrowers at year-end 2012, only one was not a life insurance company. Life insurance companies dominate insurance company FHLB advance usage, mostly due to the presence of housing-related assets in their investment portfolios. Life insurers are usually more likely than other insurers to invest in this sector due to their need for long-duration investment assets to match against the long-duration and cash flow characteristics of their insurance liabilities. These investment assets are then ideally suited to act as collateral for an FHLB advance.

# FitchRatings

**Insurance**

## History

The FHLB was created by the U.S. Congress in 1932 to promote liquidity in the housing market. The FHLB promotes housing by bringing funds from nontraditional lenders into the housing finance market.

The FHLB stimulates the housing market by providing low-cost funds (advances or borrowings) to its member institutions, which then relend the funds within the housing capital market (see *Flow Chart of FHLB System* in Appendix B). The low-cost funds provided by the FHLB are sourced from centralized public debt offerings. FHLB districts jointly back their centralized debt offerings, which further enhance their ability to source low-cost funds. Together, these lead to high credit ratings. Fitch rates (the agency's only FHLB rating) the long-term Issuer Default Rating of FHLB Atlanta 'AAA' with a Negative Outlook. Under the FHLB Act, no FHLB is permitted to issue individual debt unless it receives regulatory approval. The Chicago FHLB is currently the only district with outstanding subordinated debt ($1 billion due in 2016).

The FHLB system is a collection of 12 district banks (see *Map of the FHLB District Territories* in Appendix B) and a central office (the Office of Finance) that is recognized as a GSE and is exempt from federal, state and local taxation. Each bank has its own specific members that are also its cooperative owners, as stock ownership is a condition of membership and of borrowing. Each bank is independently managed and governed by a separate board of directors. All of the banks are regulated by a single regulator, the Federal Housing Finance Authority, an independent federal agency in the executive branch of the U.S. government.

## 2012 FHLB Statistics by District

| District | Assets ($ Mil.) | Advances ($ Mil.) | Capital ($ Mil.) | Regulatory Capital Ratio (%) | Risk Based Capital (x) | Leverage Capital Ratio (%) | Wt. Avg. Dividend Rate (%) |
|---|---|---|---|---|---|---|---|
| Min. Required | N.A. | N.A. | N.A. | 4.0 | 1.00 | 5.0 | N.A. |
| Atlanta | 123,705 | 87,503 | 6,275 | 5.2 | 3.92 | 7.7 | 1.69 |
| Boston | 40,209 | 20,790 | 3,566 | 10.6 | 5.92 | 15.9 | 0.50 |
| Chicago | 69,584 | 14,530 | 3,448 | 4.8 | 2.17 | 7.2 | 0.17 |
| Cincinnati | 81,562 | 53,944 | 4,537 | 5.8 | 9.73 | 8.8 | 4.44 |
| Dallas | 35,755 | 18,395 | 1,771 | 5.0 | 4.44 | 7.5 | 0.38 |
| Des Moines | 47,367 | 26,614 | 2,834 | 5.7 | 7.24 | 8.5 | 2.82 |
| Indianapolis | 41,228 | 18,130 | 2,216 | 6.5 | 4.21 | 9.7 | 3.13 |
| New York | 102,989 | 75,888 | 5,491 | 5.6 | 11.69 | 8.3 | 4.50 |
| Pittsburgh | 64,616 | 40,498 | 3,428 | 5.9 | 3.70 | 8.8 | 0.18 |
| San Francisco | 86,421 | 43,750 | 5,613 | 12.4 | 2.64 | 18.7 | 0.97 |
| Seattle | 35,420 | 9,135 | 1,573 | 8.4 | 2.19 | 12.5 | 0.00 |
| Topeka | 33,819 | 16,573 | 1,721 | 5.2 | 4.46 | 7.2 | 2.26 |
| **Total FHLB**[a] | **762,454** | | **42,549** | **5.6** | **N.A.** | **N.A.** | **N.A.** |

[a]Includes combining adjustments. N.A. – Not available.
Source: Federal Home Loan Banks' combined financial report.

## Membership Eligibility

FHLB member institutions include banks, thrift institutions, commercial banks and credit unions and insurance companies. Currently there are about total 7,600 members in the FHLB system.

While certain eligibility requirements for FHLB membership can vary by district, all have the same standard guidelines set forth in the Code of Federal Regulations (CFR), Title 12, Subpart C (925.6). This part of the CFR states certain institutions are eligible to be a member if it meets the following criteria:

**Related Criteria**

Insurance Rating Methodology (January 2013)

Exhibit 5

# FitchRatings

1. It is duly organized under the laws of any state.
2. It is subject to inspection and regulation under the banking laws, or under similar laws, of any state.
3. It makes long-term home mortgage loans;
4. Its financial condition is such that advances may be safely made to it;
5. The character of its management is consistent with sound and economical home financing; and
6. Its home financing policy is consistent with sound and economical home financing.

If the applicant is an insured depository institution other than a community financial institution, then it must also have at least 10% of its total assets in residential mortgage loans. If the applicant is not an insured depository institution, it must have mortgage-related assets that reflect a commitment to housing finance, as determined by the discretion of the FHLB. Insurance companies generally fall under this last category and have satisfied the requirement through ownership of mortgage-backed securities (MBS), collateralized mortgage obligations (CMOs) and residential mortgages.

Members play a role in the formation of capital stock of individual FHLBs. Capital stock purchasing requirements vary by FHLB district, but generally members must purchase capital stock in their bank equal to the greater of 1% of the member's investments in "total mortgage assets," subject to a minimum and maximum, within 60 calendar days of membership approval. Members are required to purchase additional stock at the time of an advance. Stock purchases to support advances generally total about 4%–5% of that borrowing.

## Insurer Membership in FHLB System Is Growing

Insurance companies have been part of the FHLB system since 1934, just two years after its creation. For many years, insurance companies have been important investors in the housing sector, either directly or through the securitization market. While insurance company membership in the FHLB was growing prior to the financial crisis of 2008, it has picked up steam since then as more insurers recognized the financial stabilization and liquidity role the FHLB plays.

Likewise, certain FHLB districts have increased their marketing efforts to insurance companies in recognition of the role they play in the U.S. housing marketplace and the untapped loan capacity their housing investments represent. In 2012, insurance companies comprised 3.4% of the members, 8.7% of the regulatory capital and 12.5% of the funds advanced in the FHLB system, increases of 0.2, 0.7 and 0.9 percentage points, respectively, over the last year.

## Combined Membership Trends

| (As of Dec. 31) | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|
| Insurance Co. Members | 134 | 152 | 184 | 209 | 227 | 250 | 263 |
| Total Members | 8,125 | 8,075 | 8,152 | 8,057 | 7,849 | 7,774 | 7,635 |
| Insurance Co. Membership (%) | 1.6 | 1.9 | 2.3 | 2.6 | 2.9 | 3.2 | 3.4 |

Source: Federal Home Loan Banks' combined financial report.

Insurance company participation in the FHLB varies across FHLB districts. Insurance companies comprise a greater share of overall membership in some FHLB districts than in others. Advance usage by insurance companies also varies across districts (see page 6). The FHLB districts with the largest membership percentage are Indianapolis, Boston, Cincinnati and Des Moines. The difference across districts could possibly reflect the geographical

Exhibit 5

# FitchRatings

## Insurance

concentration of the insurance industry in certain states of domicile, the suitability of certain insurers to be FHLB members, the marketing efforts of the FHLB districts, or simply individual insurance company preference to be part of the FHLB system.

The districts that have grown insurance company members the most over the past four years ending with 2012 were Cincinnati, Des Moines, Indianapolis and Chicago. New insurance companies in these districts represent 74% of the 54 insurance members added FHLB system-wide during that period. With the exception of the Boston district, these four districts also have the largest absolute number and highest percentage of insurance companies in their individual membership.

### 2012 FHLB Membership by District

| District | Insurance Co. Members | Insurance Co. Members (%) |
|---|---|---|
| Atlanta | 14 | 1.4 |
| Boston | 27 | 6.0 |
| Chicago | 22 | 2.9 |
| Cincinnati | 35 | 4.7 |
| Dallas | 23 | 2.6 |
| Des Moines | 51 | 4.2 |
| Indianapolis | 48 | 11.7 |
| New York | 7 | 2.1 |
| Pittsburgh | 7 | 2.4 |
| San Francisco | 3 | 0.8 |
| Seattle | 2 | 0.6 |
| Topeka | 24 | 2.9 |
| **Total FHLB** | **263** | **3.4** |

Source: Federal Home Loan Banks' combined financial report.

Fitch believes the opportunity for further growth of insurance company membership in the FHLB is very high. Based on the insurers' state of domicile, without considering their suitability for FHLB membership or the availability of collateral, the average insurance company penetration rate in FHLB districts is only 7%. The Indianapolis district leads the way with a 19% penetration rate, but several districts only have a 1% penetration rate. FHLB underwriting of the individual insurance company prospects in their district may substantially change these numbers.

### Insurance Sector Estimated Breakdown of FHLB Membership



Source: SNL Financial database.

According to Fitch research, most FHLB insurance company members are life insurance companies. Further, Fitch estimates that at year-end 2012 about 14% of the companies in the life insurance industry were FHLB members compared with about 3% of property/casualty insurers.

Life insurers are also the top insurance company borrowers within the FHLB system. Among the top 17 insurance company borrowers with the FHLB at year-end 2012, only one was not a life insurance company. Life insurers dominate FHLB advance usage, mostly due to the presence of housing assets in their investment portfolios. Life insurers invest in this sector due to

### Insurance Company Advances/Borrowers



Source: Federal Home Loan Banks' combined financial report.

FitchRatings

their need for long-duration investment assets to match against the long-duration and cash flow characteristics of their insurance liabilities. These investment assets are then ideally suited to act as collateral for an FHLB advance.

## FHLB Enhanced Insurance Company Liquidity During Crisis

The FHLB provided needed liquidity to the banking and insurance industry during the financial crisis, allowing them to turn their somewhat illiquid mortgage portfolio into funds that could be used to finance operations without forced asset liquidation.

During the financial crisis, insurance companies increased use of FHLB advances as a quick source of funding to boost their liquidity. FHLB advances to insurance companies increased 91% between 2007 and 2008, a much larger percentage increase than the 35% rise for non-insurers over the 2006–2008 period.

At year-end 2012, the insurance industry reported approximately $38 billion of available FHLB borrowing capacity (of which 76% was associated with the life sector) compared with the $52 billion in insurance industry advances outstanding.

In the years since the financial crisis, insurance industry recognition of the FHLB funding availability seems to have led to increased membership and uses of advances. Although the number of borrowers has gone up, the absolute level of insurance company borrowings have fallen $3.3 billion off their year-end peak in 2008 as several large borrowers (Metropolitan Life Insurance Co., Transamerica Life Insurance Co., Aviva Life and Annuity Co., Security Life of Denver Insurance Co., among others) have decreased outstanding advances.

Several insurers still have significant amounts of FHLB advances in relation to their capital (see Appendix A). Fitch's insurance rating criteria states that amounts of operating debt such as FHLB funding agreement advances, letters of credit, securities lending and other instruments should account for no more than 15% of the general account liabilities of an insurance company without negative credit rating implications. There are only a few companies where FHLB advances represent an amount near the agency's prescribed limit, although as an element of operating debt, more companies approach the limit.

The contractual illiquidity of FHLB membership stock could be considered a credit negative. However, Fitch does not view FHLB stock illiquidity as a major concern for most insurance companies due to the small amount of FHLB stock they hold and the fact that many hold significant amounts of long-term investments in their portfolios. In addition, Fitch and members have found comfort that in practice, redemption of FHLB stock has not been restricted to the extent allowed in membership contracts. Also, many members find the current stock dividend paid by some FHLB districts to be attractive versus other alternative investments.

## FHLB Advances Are the Major Product Used by Insurers

In carrying out its mission to promote the housing market, the FHLB extends credit to certain institutions involved in the housing market. The FHLB's primary credit products are its low-cost, secured advances and lines of credit. Although the FHLB also offers ancillary products such as letters of credit, cash management services and derivative intermediation, they are sparingly used by the insurance industry.

# Fitch Ratings

# Insurance

Each FHLB determines the credit limit allowed its borrowers by evaluating a wide variety of factors, including, but not limited to, the borrower's overall creditworthiness and collateral management practices. A borrower's total credit limit with an FHLB includes the principal amount of outstanding advances, face amount of outstanding letters of credit, total exposure of the FHLB to the borrower under any derivative contract and credit enhancement obligation of the borrower on mortgage loans sold to the FHLB. The FHLBs impose borrowing limits on borrowers within a maximum range of 20%–55% of a borrower's total assets.

## Insurance Company Advances by District

| District | Insurance Co. Advances ($ Mil.) | Insurance Co. % of Total Advances |
|---|---|---|
| Atlanta | 902[a] | 1.0[a] |
| Boston | 1,500 | 8.4 |
| Chicago | 967 | 6.7 |
| Cincinnati | 3,017 | 5.6 |
| Dallas | 375 | 2.1 |
| Des Moines | 15,243 | 58.5 |
| Indianapolis | 8,448 | 48.6 |
| New York | 17,205 | 23.8 |
| Pittsburgh | 556[a] | 1.4[a] |
| San Francisco | 0 | 0.0 |
| Seattle | 0 | 0.0 |
| Topeka | 3,380 | 21.0 |
| **Total FHLB** | **51,593** | **12.5** |

[a]Estimated by Fitch.
Source: Federal Home Loan Banks' 10-K financial reports.

Advances are only available to institutions that are members at the time the advance is made and nonmembers that are approved mortgagees (generally called housing associates) under Title II of the National Housing Act.

Housing associates are generally state and local housing agencies (they hold less than 0.1% of advances at Dec. 31, 2012). Housing associates are not required or allowed to hold capital stock in the FHLB. There are also advances outstanding to some nonmember borrowers that have acquired members with outstanding advances. No new advances are made to these borrowers, and they are required to maintain capital stock in the FHLB while advances are outstanding and being paid off.

Advances may take the form of either direct borrowings, or in the case of insurance companies, funding agreements. Most of the advances at year-end 2012 were in the form of funding agreements. Insurance companies are active borrowers and comprise approximately 12.5% of the FHLBs combined advances, which is almost twice their share of membership.

As presented in the table on page 7, insurance companies are among the top five borrowers in about 75% of the districts at year-end 2012. These top five companies represent about 58% of all insurance company advances. Additional insurers that fall between the top five and top 10 borrowers in the New York district are Prudential Insurance Company of America ($2,325 million in advances or 3.2% of the district and 0.5% of total FHLB advances) and New York Life

### Insurance Company Growth in The FHLB System



Source: Federal Home Loan Banks' combined financial report.

Insurance Company ($1,350 million in advances or 1.9% of the district and 0.3% of total FHLB advances), which are significant borrowers. Metropolitan Life Insurance Company is the largest insurance company borrower in the FHLB system and is the fourth-largest borrower among any type of company.

# FitchRatings

## Insurance Companies in FHLB Districts' Top Five Borrowers

(As of Dec. 31, 2012)

| District | Company | Company Type | Advances ($ Mil.) | % District's Insurance Co. Advances | % District's Advances | % Total FHLB's Advances |
|---|---|---|---|---|---|---|
| New York | Metropolitan Life Ins Co. | Life | 13,512 | 78.5 | 18.7 | 3.3 |
| Boston | Massachusetts Mutual Life Ins Co. | Life | 600 | 40 | 3.0 | 0.1 |
| Pittsburgh | Genworth Life Ins Co. | Life | 493 | 88.7 | 1.2 | 0.1 |
| Cincinnati | Protective Life Ins Co. | Life | 1,071 | 35.5 | 1.9 | 0.3 |
| Indianapolis | Jackson National Life Ins Co. | Life | 1,810 | 21.4 | 10.4 | 0.4 |
| Indianapolis | Lincoln National Life Ins Co. | Life | 1,350 | 16.0 | 7.8 | 0.3 |
| Indianapolis | Blue Cross Blue Shield of Michigan | Health | 1,038 | 12.3 | 6.0 | 0.3 |
| Indianapolis | Guggenheim Life and Annuity Co. | Life | 1,038 | 12.3 | 6.0 | 0.3 |
| Chicago | Bankers Life and Casualty Co. | Life | 750 | 77.6 | 5.2 | 0.2 |
| Des Moines | Transamerica Life Ins Co. | Life | 2,875 | 18.9 | 11.0 | 0.7 |
| Des Moines | Aviva Life and Annuity Co. | Life | 1,961 | 12.9 | 7.5 | 0.5 |
| Des Moines | Principal Life Ins Co. | Life | 1,800 | 11.8 | 6.9 | 0.4 |
| Topeka | Security Life of Denver Ins Co. | Life | 1,100 | 32.5 | 6.8 | 0.3 |
| Topeka | Security Benefit Life Ins Co. | Life | 765 | 22.6 | 4.8 | 0.2 |
| Topeka | United of Omaha Life Ins Co. | Life | 640 | 18.9 | 4.0 | 0.2 |
| **Subtotal** | **N.A.** | **N.A.** | **30,803** | **N.A** | **N.A.** | **7.4** |

N.A. – Not applicable.
Source: Federal Home Loan Banks' 10-K financial reports.

While insurance companies are growing in share of membership and advances in the FHLB, growth on their relatively small base is not enough to counteract the declines of other members, which has led to an overall decline in FHLB membership and advances.

Many insurers, faced by the current prolonged low interest rate environment, are keenly interested in sourcing low-cost funds in which they can earn additional net investment income. FHLB advances offer such a source given their position at a small spread over Treasurys of similar maturity, and Treasury rates have dropped over time. FHLB advance rates to members are generally lower than those available from commercial sources.

**Weighted Average Interest Rates by Advance Redemption Terms**



Source: Combined FHLB Financial Report.

The terms of the advances offered by the FHLB are a wide range of fixed and variable-rate products with various maturities, interest rates, payment characteristics and optionality. Terms are free of rating triggers and interest rates do not vary by member. The one parameter that does vary by member and type of collateral is the discount rate used on collateral. Each FHLB is free to determine their collateral rules within regulations. Generally, FHLBs protect their security interests by filing UCC-1 financing statements, taking possession or control of such collateral, or taking other appropriate steps. Due to confidence and experience with their

Exhibit 5

# FitchRatings

individual underwriting, policies, procedures and collateral requirements, FHLBs do not expect credit losses on advances and, therefore, do not currently have any loss allowances on advances.

Loan collateral may be via a blanket lien on a pool of collateral (for borrowers deemed to be low risk) or specifically identified. Insurance companies borrow under the specifically identified status; collateral for an FHLB advance is confined to certain identified assets. Under the blanket lien status, an FHLB allows the borrower to retain possession of eligible collateral pledged to the FHLB, provided the borrower executes a written security agreement and agrees to hold the collateral for the benefit of the FHLB.

Further the loan collateral may be pledged or delivered to the lending FHLB district, but may also be held by a third party, such as a commercial bank, for safekeeping. With collateral pledged by insurance companies, most FHLBs take legal possession of eligible collateral pledged to the FHLB. Collateral reporting requirements may also be affected by the financial condition of the borrower, the degree of complexity involved in the pledging, verifying and reporting of collateral, and the type of collateral pledged.

Acceptable collateral includes, but is not limited to, home mortgage and other real estate assets such as MBS, CMOs and home equity; CMBS and commercial real estate; municipal bonds; and Treasury and government agency bonds. The advance rate against collateral varies with the lowest collateral discount rates given to some Treasury and government agency securities and the highest collateral discount rates to home equity lines. Delivery of the collateral also seems to decrease the discount rate against collateral.

The FHLB system has never taken a loss on an advance to an insurance company since its inception in 1932. This can be partially attributed to the general strength of the insurance companies and statutory accounting principles used by insurers. During this 81-year period, three rehabilitations of FHLB member insurers have taken place and the FHLBs have effectively collaborated with state insurance regulators to manage the situations without a loss.

## Regulatory Uncertainty over Collateral Treatment

Recently, two issues related to the regulation and accounting of insurance companies has become the subject of discussion between the FHLBs, insurance regulators and FHLB investors. The first issue concerns the validity of priority claim over collateral for FHLB advances in insolvency/rehabilitation. The second issue is related to the eligibility of captive insurers to be members of the FHLB.

For insurance companies, the subject of perfection of a lien on collateral has been open to some debate given their state regulation and the state's normal enforcement of the policyholder priority claim in insolvency/rehabilitation proceedings. For most FHLB member companies, the FHLB's insolvency/rehabilitation claim position is governed by federal laws that clearly spell out the FHLB's priority position. With respect to FHLB insurance company members, however, the congressional McCarran-Ferguson Act of 1945 provided that state law generally governs the regulation of insurance and shall not be invalidated by federal law unless the federal law expressly regulates the business of insurance.

While several states have definitively and legislatively validated the FHLB's priority insolvency/rehabilitation claim position, the majority have not provided such differentiation. However in the few actual insurance company insolvency/rehabilitation cases, state insurance regulators have worked with the FHLBs to assure their claims are recognized. All of these actual bankruptcies have been resolved without monetary loss by the FHLB.

In a more universal approach, the NAIC established a subgroup to propose amendments to existing insurance regulation, with the hope of providing clarity and consistency regarding the treatment of FHLB collateral in the event of insurance company insolvency. Another subgroup has been established to propose amendments to an exclusion from stay and voidable preference provisions for FHLB collateral.

The Finance Agency is also working on recommendations to specifically address this situation. On Oct. 5, 2012, the Finance Agency issued a notice with request for comment on a proposed advisory bulletin, which would set forth standards to guide Finance Agency staff in its supervision of secured lending to insurance company members by the FHLB. The advisory bulletin would set forth a series of considerations that the Finance Agency proposes to use in monitoring transactions between FHLBs and their insurance company members. Bulletin responses will be used by the Finance Agency supervisory staff to assess each FHLB's ability to evaluate the financial health of its insurance company members and the quality of their eligible collateral, as well as the extent to which the FHLB has a first-priority security interest in that collateral.

Fitch believes the risks of FHLB lending to insurance companies is no greater than what applies to other types of FHLB members due to the FHLBs underwriting and monitoring procedures, and the practice of establishing a first-priority lien on pledged collateral. While the FHLB procedures may differ for insurers, this is also true of the various other types of FHLB members. Fitch believes that the rigor of oversight by state departments of insurance and the framework of statutory accounting practices put in place by the NAIC should provide the FHLB system with some comfort as to the financial condition of insurers and the ability to exercise their claim on collateral pledged by an insurance company member.

The captive insurer issue relates to the possibility of captive insurers being created to gain access to FHLB advances without serving a valid insurance purpose. Fitch believes that normal state regulatory oversight of domestic captive insurers in conjunction with FHLB underwriting, monitoring and collateral procedures should be enough to validate captive insurer purpose and eligibility for FHLB membership or services.

# FitchRatings

## Insurance

### Appendix A: Information on FHLB Advances for Select Insurance Companies

| ($ Mil.) | Advances | 2012 General Account Liab. | Advances as % Gen. Acct Liab. | TAC | Advances % of TAC | Assets Pledged | Total Invested Assets | Asst. Pledged % of Inv. Assts. |
|---|---|---|---|---|---|---|---|---|
| Metropolitan Life Ins Co. | 13,512 [a] | 233,269 | 5.8 | 18,900 | 71.5 | 14,611 | 236,655 | 6.2 |
| Massachusetts Mutual Life Ins Co. | 600 [a] | 90,630 | 0.7 | 15,310 | 3.9 | 656 | 101,160 | 0.6 |
| Genworth Life Ins Co. | 493 [a] | 33,352 | 1.5 | 3,542 | 13.9 | 477 | 35,525 | 1.3 |
| Protective Life Ins Co. | 1,071 [a] | 20,365 | 5.3 | 3,221 | 33.3 | 1,488 | 22,406 | 6.6 |
| Jackson National Life Ins Co. | 1,810 [a] | 56,967 | 3.2 | 4,702 | 38.5 | 2,337 | 58,630 | 4.0 |
| Lincoln National Life Ins Co. | 1,350 | 78,666 | 1.7 | 7,317 | 18.5 | 2,377 | 81,604 | 2.9 |
| Blue Cross Blue Shield of Michigan | 1,038 | 4,409 | 23.5 | 3,061 | 33.9 | 1,292 | 6,527 | 19.8 |
| Guggenheim Life and Annuity Co | 1,038 [a] | 7,679 | 13.5 | 547 | 189.8 | 932 | 6,136 | 15.2 |
| Bankers Life and Casualty Co. | 750 [a] | 14,027 | 5.3 | 1,039 | 72.2 | 844 | 14,451 | 5.8 |
| Transamerica Life Ins Co. | 2,875 [a] | 51,418 | 5.6 | 6,391 | 45.0 | 3,185 | 54,453 | 5.8 |
| Aviva Life and Annuity Co. | 1,961 [a] | 47,781 | 4.1 | 3,146 | 62.3 | 2,144 | 48,915 | 4.4 |
| Principal Life Ins Co. | 1,800 [a] | 56,114 | 3.2 | 4,548 | 39.6 | 2,323 | 58,084 | 4.0 |
| Security Life of Denver Ins Co. | 1,100 [a] | 13,672 | 8.0 | 1,524 | 72.2 | 997 | 14,309 | 7.0 |
| Security Benefit Life Ins Co. | 765 [a] | 9,203 | 8.3 | 907 | 84.3 | 793 | 9,739 | 8.1 |
| United of Omaha Life Ins Co. | 640 | 13,129 | 4.9 | 1,189 | 53.8 | 770 | 13,625 | 5.7 |

[a] Funding agreements. TAC – Total adjusted capital. Note: Data as of Dec. 31, 2012.
Source: SNL Financial database.

**FitchRatings**

## Appendix B

### Map of the FHLB District Territories



**FHLB U.S. District Bank Territories**
New York District: Puerto Rico and
U.S. Virgin Islands.
Seattle District: American Samoa
and Guam.

Source: FHLB Office of Finance.

### Flow Chart of FHLB System



Source: Fitch Ratings.

# FitchRatings

# Insurance

ALL FITCH CREDIT RATINGS ARE SUBJECT TO CERTAIN LIMITATIONS AND DISCLAIMERS. PLEASE READ THESE LIMITATIONS AND DISCLAIMERS BY FOLLOWING THIS LINK: HTTP://FITCHRATINGS.COM/UNDERSTANDINGCREDITRATINGS. IN ADDITION, RATING DEFINITIONS AND THE TERMS OF USE OF SUCH RATINGS ARE AVAILABLE ON THE AGENCY'S PUBLIC WEB SITE AT WWW.FITCHRATINGS.COM. PUBLISHED RATINGS, CRITERIA, AND METHODOLOGIES ARE AVAILABLE FROM THIS SITE AT ALL TIMES. FITCH'S CODE OF CONDUCT, CONFIDENTIALITY, CONFLICTS OF INTEREST, AFFILIATE FIREWALL, COMPLIANCE, AND OTHER RELEVANT POLICIES AND PROCEDURES ARE ALSO AVAILABLE FROM THE CODE OF CONDUCT SECTION OF THIS SITE. FITCH MAY HAVE PROVIDED ANOTHER PERMISSIBLE SERVICE TO THE RATED ENTITY OR ITS RELATED THIRD PARTIES. DETAILS OF THIS SERVICE FOR RATINGS FOR WHICH THE LEAD ANALYST IS BASED IN AN EU-REGISTERED ENTITY CAN BE FOUND ON THE ENTITY SUMMARY PAGE FOR THIS ISSUER ON THE FITCH WEBSITE.

Copyright © 2013 by Fitch Ratings, Inc., Fitch Ratings Ltd. and its subsidiaries. One State Street Plaza, NY, NY 10004.Telephone: 1-800-753-4824, (212) 908-0500. Fax: (212) 480-4435. Reproduction or retransmission in whole or in part is prohibited except by permission. All rights reserved. In issuing and maintaining its ratings, Fitch relies on factual information it receives from issuers and underwriters and from other sources Fitch believes to be credible. Fitch conducts a reasonable investigation of the factual information relied upon by it in accordance with its ratings methodology, and obtains reasonable verification of that information from independent sources, to the extent such sources are available for a given security or in a given jurisdiction. The manner of Fitch's factual investigation and the scope of the third-party verification it obtains will vary depending on the nature of the rated security and its issuer, the requirements and practices in the jurisdiction in which the rated security is offered and sold and/or the issuer is located, the availability and nature of relevant public information, access to the management of the issuer and its advisers, the availability of pre-existing third-party verifications such as audit reports, agreed-upon procedures letters, appraisals, actuarial reports, engineering reports, legal opinions and other reports provided by third parties, the availability of independent and competent third-party verification sources with respect to the particular security or in the particular jurisdiction of the issuer, and a variety of other factors. Users of Fitch's ratings should understand that neither an enhanced factual investigation nor any third-party verification can ensure that all of the information Fitch relies on in connection with a rating will be accurate and complete. Ultimately, the issuer and its advisers are responsible for the accuracy of the information they provide to Fitch and to the market in offering documents and other reports. In issuing its ratings Fitch must rely on the work of experts, including independent auditors with respect to financial statements and attorneys with respect to legal and tax matters. Further, ratings are inherently forward-looking and embody assumptions and predictions about future events that by their nature cannot be verified as facts. As a result, despite any verification of current facts, ratings can be affected by future events or conditions that were not anticipated at the time a rating was issued or affirmed.

The information in this report is provided "as is" without any representation or warranty of any kind. A Fitch rating is an opinion as to the creditworthiness of a security. This opinion is based on established criteria and methodologies that Fitch is continuously evaluating and updating. Therefore, ratings are the collective work product of Fitch and no individual, or group of individuals, is solely responsible for a rating. The rating does not address the risk of loss due to risks other than credit risk, unless such risk is specifically mentioned. Fitch is not engaged in the offer or sale of any security. All Fitch reports have shared authorship. Individuals identified in a Fitch report were involved in, but are not solely responsible for, the opinions stated therein. The individuals are named for contact purposes only. A report providing a Fitch rating is neither a prospectus nor a substitute for the information assembled, verified and presented to investors by the issuer and its agents in connection with the sale of the securities. Ratings may be changed or withdrawn at anytime for any reason in the sole discretion of Fitch. Fitch does not provide investment advice of any sort. Ratings are not a recommendation to buy, sell, or hold any security. Ratings do not comment on the adequacy of market price, the suitability of any security for a particular investor, or the tax-exempt nature or taxability of payments made in respect to any security. Fitch receives fees from issuers, insurers, guarantors, other obligors, and underwriters for rating securities. Such fees generally vary from US$1,000 to US$750,000 (or the applicable currency equivalent) per issue. In certain cases, Fitch will rate all or a number of issues issued by a particular issuer, or insured or guaranteed by a particular insurer or guarantor, for a single annual fee. Such fees are expected to vary from US$10,000 to US$1,500,000 (or the applicable currency equivalent). The assignment, publication, or dissemination of a rating by Fitch shall not constitute a consent by Fitch to use its name as an expert in connection with any registration statement filed under the United States securities laws, the Financial Services and Markets Act of 2000 of the United Kingdom, or the securities laws of any particular jurisdiction. Due to the relative efficiency of electronic publishing and distribution, Fitch research may be available to electronic subscribers up to three days earlier than to print subscribers.